<pre>
 1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA        ) Criminal No. 18-CR-101-6
                                     )
 4                                   )
               vs.                   )
 5                                   )
                                     )
 6                                   ) Philadelphia, PA
                                     ) January 12, 2023
 7   MITCHELL WHITE                  ) 9:30 a.m.

 8                        JURY TRIAL - DAY 4
                     EXCERPT OF WITNESS AMANDA AMRON
 9             BEFORE THE HONORABLE GENE E.K. PRATTER
                     UNITED STATES DISTRICT JUDGE
10

11

12

13
                         MAUREEN MCHUGH, RPR
14                       OFFICIAL COURT REPORTER
             U.S. DISTRICT COURT, EASTERN DISTRICT OF PA
15                  601 Market Street, Room 2609
                       Philadelphia, PA 19106
16                        (267)299-7254

17

18

19

20

21

22

23

24

25
</pre>

A P P E A R A N C E S

For the Government:     MARY KAY COSTELLO, ESQUIRE
                        ASSISTANT UNITED STATES ATTORNEY
                        UNITED STATES ATTORNEY'S OFFICE
                        615 Chestnut Street, Suite 1250
                        Philadelphia, PA 19106
                        marykay.costello@usdoj.gov

                        CHRISTOPHER PARISI, ESQUIRE
                        ASSISTANT UNITED STATES ATTORNEY
                        UNITED STATES ATTORNEY'S OFFICE
                        615 Chestnut Street, Suite 1250
                        Philadelphia, PA 19106
                        christopher.parisi@usdoj.gov

For Defendant:          ANN C. FLANNERY, ESQUIRE
                        ANN C. FLANNERY LAW OFFICE
                        1835 Market Street
                        Suite 2900
                        Philadelphia, PA 19103
                        acf@annflannerylaw.com

I N D E X

For the Government:

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| AMANDA AMRON | 3 | 20 | -- | |

1          THE COURT:  Great.  Thank you very much for

2   accommodating the schedule for today.  We are ready to resume.

3          Government may call the next witness.

4          MR. PARISI:  Your Honor, the next witness is Amanda

5   Amron.

6          THE DEPUTY CLERK:  Please remain standing.  Raise

7   your right hand.

8          (Whereupon, AMANDA AMRON is duly sworn.)

9          THE DEPUTY CLERK:  Please have a seat.

10          Please state your full name and spell your last name

11   for the record.

12          THE WITNESS:  Amanda Elizabeth Amron, A-M-R-O-N.

13          THE COURT:  Good afternoon, Ms. Amron.  How are you

14   doing?

15          THE WITNESS:  Doing all right.

16          THE COURT:  Good.  Are you comfortable?

17          THE WITNESS:  I am.

18          THE COURT:  Excellent.  Keep your voice up.

19          You may proceed.

20          MR. PARISI:  Thank you, Your Honor.

21                  DIRECT EXAMINATION

22   BY MR. PARISI:

23     Q.   Good afternoon, Ms. Amron.

24     A.   Good afternoon.

25     Q.   You have to speak up and into the microphone so we

1  can hear what you say.

2      A.    All right.

3      Q.    Could you tell the jury where you went to school?

4      A.    Drexel University.

5      Q.    What did you study?

6      A.    PA -- it was a master's in health sciences with a PA

7  certificate.

8      Q.    When you say "PA," does that mean physician's

9  assistant?

10     A.    Physician assistant.

11     Q.    You have to wait for me to finish my question.

12          When did you graduate?

13     A.    What year?

14     Q.    Yes.

15     A.    2015.

16     Q.    Did you have a classmate named Cassius Brown?

17     A.    I did.

18     Q.    And did that person recommend you to a particular

19 urgent care after you graduated?

20     A.    He did.

21     Q.    And what was the name of that place?

22     A.    Advanced Urgent Care.

23     Q.    Did you go start working there?

24     A.    I did.

25     Q.    And when did you start working there?

1     A.    2015.

2     Q.    Do you remember what month?

3     A.    July.

4     Q.    When did you graduate, what month?

5     A.    March.

6     Q.    And then you worked there after you graduated?

7     A.    Correct.

8     Q.    Were there different locations for Advanced Urgent

9 Care?

10    A.    There were.

11    Q.    And did you work in different locations?

12    A.    I did.

13    Q.    Which ones did you work in?

14    A.    Primarily the City Ave, Roosevelt Boulevard, and a

15 couple of times in the Willow Grove.

16    Q.    When you graduated and first started working at

17 Advanced Urgent Care, did you have a DEA registration

18 number?

19    A.    I did not.

20    Q.    Was that something you were waiting on or trying to

21 get?

22    A.    Correct.

23    Q.    Did you get one eventually?

24    A.    I did.

25    Q.    And when did you get that, if you recall?

1      A.    August 11, 2015.

2      Q.    So there were a few months there, a month or two,

3  where you were working but didn't have that number?

4      A.    That is correct.

5      Q.    So let's talk about Advanced Urgent Care.

6            What did you think the job was going to be like when

7  you started?

8      A.    So I had just graduated school.  I was explained that

9  it was an urgent care to see acute care patients that are not

10  the level of an emergency room but still require help, can't

11  get into their primary physician for one reason or another.

12  So I was thinking kind of like the span of things anywhere

13  from like child with an ear infection to maybe someone with a

14  bellyache or something along those lines.

15      Q.    Once you got to Advanced Urgent Care, did the reality

16  match those expectations?

17      A.    No.

18      Q.    What was the reality?

19      A.    It was primarily a pain management clinic of sorts

20  with a small number of walk-in urgent cares.

21      Q.    Do you know who owned or ran Advanced Urgent Care?

22      A.    Dr. Nikparvar.

23      Q.    And was he your supervisor when you started?

24      A.    He was.

25      Q.    Did you ever speak with him?

1    A.    Yes.

2    Q.    How often?

3    A.    Almost daily on the phone.

4    Q.    How often did you actually work with him in the same

5  location, if you remember?

6    A.    I don't remember actually working with him.  I've

7  seen him in person once.

8    Q.    So your daily contact was electronic it sounds

9  like?

10    A.    Electronically.

11    Q.    Do you recall what your salary was?  Was it an hourly

12  rate?

13    A.    It was an hourly rate of $50 an hour with the

14  possibility of bonuses for other types of metrics.

15    Q.    Was one of those if you saw a certain number of

16  patients in a day?

17    A.    Correct.

18    Q.    When you started at Advanced Urgent Care, did you

19  receive any training?

20    A.    Yes.

21    Q.    And before we get to that, do you know the defendant

22  Mitchell White?

23    A.    I do.

24    Q.    And did you work with him at Advanced Urgent Care?

25    A.    I did.

1    Q.   Was he someone who provided training to you?

2    A.   He was.

3    Q.   Tell us what kind of training Mitchell White provided

4    you.

5    A.   So the training that I received was a couple weeks

6    long.  It entailed kind of going through what it took to see a

7    patient in a day, primarily the pain patients because that was

8    the bigger scope of patients, kind of introducing me to the

9    charting, where things were.  You know, what you were supposed

10   to do for each patient.  And shadowing for a little bit and

11   then seeing patients on my own.

12   Q.   Did you and the defendant ever discuss urine drug

13   screens?

14   A.   Yes.

15   Q.   And did he explain to you as part of this training

16   process about levels on urine drug screens?

17   A.   Yeah.

18   Q.   When I'm talking about levels, is that something

19   where the person takes oxycodone, it shows up in a subsequent

20   drug screen?

21   A.   Right.  So it was explained to me that these were

22   pain management patients, that you were to evaluate the urine

23   drug screen these patients were to have, unlike a normal drug

24   screen where you're trying to see if someone doesn't have it.

25        When you are a pain management patient, you are

1    supposed to have a certain level of the medication, the

2    controlled substance you are taking, in your urine.  And that

3    was explained to me that you would check each week to ensure

4    that these patients had the adequate level of this controlled

5    substance in their urine and nothing else.

6        Q.   When you say "it was explained to me," was that

7    explained to you by the defendant?

8        A.   Yes.  He was primarily training me.

9        Q.   Besides the defendant, if you had questions at

10   Advanced Urgent Care about a patient or about practice or

11   anything like that, who were other people that you could go

12   to?

13       A.   The person who was on site primarily was Joanne.  She

14   was the manager of the site.  Maybe more than one site, but

15   definitely City Ave.  So I asked her a lot of questions.  She,

16   I believe, had a nursing background and was able to answer a

17   lot of those questions.

18            And then primarily, once it got into more patient

19   related, like specific questions for each patient, I would

20   call my supervising physician, Dr. Nik.

21       Q.   Okay.  Would you ever ask questions of the

22   defendant?

23       A.   Yes.  As part of the training, prior to kind of --

24   kind of switched over to Dr. Nik once my training was

25   completed in a couple weeks.

1       Q.   Okay.  Was there any particular location that you

2   tended to work more than others?

3       A.   Yeah, City Ave.

4       Q.   City Avenue.  And was the defendant there?

5       A.   Yes.

6       Q.   And how often was he there when you were working?

7       A.   Most of the time when I was training, and then it

8   would be primarily an individual provider center, but

9   intermittently through -- most of the two to three weeks that

10  I was training and then intermittently throughout the rest of

11  my time there.

12      Q.   Let's talk about Advanced Urgent Care sort of

13  generally, and focusing on City Avenue.

14           When you went there, would you ever open the practice

15  in the morning, be there first thing?

16      A.   Yes.

17      Q.   Did you ever see patients waiting?

18      A.   Yes, there was always a line out the door waiting for

19  the place to open.

20      Q.   And what type of patients were those?  Were those

21  urgent care or other types?

22      A.   Other types of patients.

23      Q.   What was the other type?

24      A.   Pain management is the other type of patient.

25      Q.   So that's who was waiting?

1      A.    Correct.

2      Q.    How about the waiting room, did you ever observe the

3   waiting room inside the City Avenue Advanced Urgent Care

4   location?

5      A.    Yes.

6      Q.    How would you describe that?

7      A.    Full, usually at all times.

8      Q.    How about the demeanor of the people in the waiting

9   room?

10     A.    Inpatient.  You know, they wanted to be seen, get

11  their medication.  Primarily the waiting room would be full of

12  pain management patients.  At times it could get aggressive if

13  the waits were long.

14     Q.    Did you ever hear anyone shouting?

15     A.    Frequently.

16     Q.    And how about fights or physical altercations?

17     A.    I don't recall specific fights.  I do know that the

18  aggression -- I don't think we ever really let it get to that

19  point, but aggression verbally and body language-wise got to

20  the points where there were times that we called the police on

21  patients.

22     Q.    And were those patients that you just described

23  always pain patients?

24     A.    Yes, because those were the ones that waited more

25  often than not.

1    Q.    Let's talk about the pain patients a little bit more.

2          During the time at Advanced Urgent Care, did you have

3    an opportunity to review patient files?

4    A.    I did.

5    Q.    And review the paperwork with them?

6    A.    Yes.

7    Q.    And did that include urine drug screens?

8    A.    Weekly, yes.

9    Q.    Did you see anything in those files that concerned

10   you?

11   A.    So can you clarify?

12   Q.    Sure.  In the course of reviewing the patient files

13   and specifically the urine drug screens, did you ever see

14   urine drug screens that showed the presence of street drugs?

15   A.    Okay.  So, yeah.  Each week the patient would come in

16   and do -- whatever their time frame was, they would come in

17   and have a urine drug screen.  That one would then get sent

18   out, but you would be reviewing the one from the week prior,

19   their visit prior.  And frequently you would see street drugs

20   in their urine in addition, or not like as the only thing in

21   their urine.

22          So maybe they weren't taking the medication that you

23   were prescribing, and all that was in their urine was street

24   drugs, or maybe there was a level sufficient or insufficient

25   of the controlled substance that they were taking in addition

1    to street drugs.  It was not an uncommon thing to see.

2       Q.   Do you recall if there was ever some form of contract

3    between Advanced Urgent Care and pain patients?

4       A.   There was, with each initial visit.

5       Q.   We don't have to go through the exact language, but

6    what was sort of the general tone of the contract?  What was

7    it setting out and what was it saying to the patient?

8       A.   So basically -- and most pain management clinics

9    would have this, not just Advanced.  It's a contract that a

10   patient comes in and signs stating that they understand that

11   they're going to be getting their pain medication from this

12   clinic, that they are only going to be taking the pain

13   medicine in which we prescribe, they will not be doing street

14   drugs or getting controlled substances from another physician.

15   And that if they were to do so, they would be discharged from

16   the practice.

17      Q.   In your experience, was that contract at Advanced

18   Urgent Care actually enforced?

19      A.   No.

20      Q.   Did you ever discuss these issues, the street drugs

21   or the contract or any other concerns you had with the

22   defendant?

23      A.   Yes.

24      Q.   Before you got your DEA registration number, did you

25   see patients?

1      A.    I did.

2      Q.    And did some of those patients receive controlled

3  substances?

4      A.    They did.

5      Q.    How was it that you were able to see them and issue

6  controlled substances to them?

7      A.    I was trained to go through the process of how I

8  would go about doing it on my own.  Go in, talk to the

9  patient, see if their pain was controlled, come back, evaluate

10  their urine drug screen and fill a prescription.

11         So once I got my DEA, that would then be me signing

12  off on it.  Or prior to that, whoever I was working with that

13  day, usually Mitchell White, would be the provider to sign

14  that script.

15      Q.    Did the defendant ever give you presigned

16  prescription pads?

17      A.    He did.

18      Q.    And can you tell us how that happened?

19      A.    So there were times in which in the middle of the day

20  he would take a leave from the workplace for whatever reason,

21  and in order to continue the patients, the patient flow, for

22  them to continue to be seen, there was a blank script pad with

23  signatures left.  Because I couldn't sign them on my own, I

24  didn't have a DEA yet.

25      Q.    And where was that pad left?

1    A.    On my desk.  There were two desks in the back of the

2  building, I would function out of one of them and Mitchell the

3  other.

4    Q.    Whose signature was on the pad that was left on your

5  desk?

6    A.    His.

7    Q.    And when you say "his," do you mean the

8  defendant's?

9    A.    Mitchell's.

10       MR. PARISI:  May I just have one moment, Your Honor?

11  BY MR. PARISI:

12    Q.    Ms. Amron, if you know, do you know how the pain

13  patients were paying for their visits?

14    A.    There was a fee schedule taped up in the front desk

15  for the front office or the desk ladies to follow.  Don't know

16  if that's the only way in which they were paying, if some of

17  them went through insurance or not, but I do know primarily

18  they all went through this fee schedule.

19    Q.    And when you say "fee schedule," does that mean

20  cash?

21    A.    Cash.

22    Q.    Let's talk about the fee schedule you saw.

23       Did that reflect different prices for different

24  numbers of pills?

25    A.    Correct.  I don't recall the numbers of pills per and

1   what the cash numbers were, but it increased as the script
2   increased.
3       Q.   Did that concern you?
4       A.   Yeah.
5       Q.   Did you say anything about that?
6       A.   I don't recall.
7       Q.   Do you know who would collect cash from Advanced
8   Urgent Care at the end of the day?
9       A.   Nikparvar-Fard's wife.
10      Q.   And let me turn your attention now to December of
11   2015.
12           Did you discover a problem with prescriptions you had
13   issued?
14      A.   Yes.
15      Q.   Tell us about the problem you discovered.
16      A.   I had a patient that -- I mean, you see all these
17   patients relatively regularly, right?  They are coming in on a
18   relatively regular time frame to receive these chronic
19   scripts.
20           But there was one patient, an older lady, who I, I
21   guess, connected well with, and she came in to give me a
22   Christmas present.  And while she was --
23      Q.   Let me stop you there.  If you remember, what was the
24   Christmas present?
25      A.   Britney Spears perfume.

1     Q.   So tell us what happened when this patient brought in

2 Britney Spears perfume?

3     A.   She also mentioned as like an off-handed thing, like,

4 Amanda, also when I went to pick up my script was given this

5 lidocaine cream. We didn't discuss it. How do I use it?

6        And I didn't recall writing it for her, so I go and I

7 pull her chart and there's no indication of that script ever

8 being written. So I called Dr. Nik and expressed concern that

9 a patient was given a prescription that wasn't written for and

10 how did she get it and I was concerned -- although this

11 specific patient didn't have a known allergy to lidocaine,

12 there was no way for anyone to have known that who dispensed

13 it to her, and I was really concerned.

14        And I was informed at the time to don't worry about

15 it. You know, "we have a deal with the Poplar Pharmacy that

16 any time somebody comes and brings in a controlled substance,

17 they're also given this, and that's how that happened." He

18 was explaining to me, "that's how that happened, that's how

19 your name got on this script."

20     Q.   So when you say "I was informed," you're talking

21 about Dr. Nik?

22     A.   Uh-huh.

23     Q.   Is that a yes?

24     A.   Yes.

25     Q.   And so he's the one that told you don't worry about

1    it?

2        A.    Yeah, he was the one who told me not to be concerned

3    and that was an agreement that he had in place with one of the

4    pharmacists, the pharmacist specifically that filled this

5    script.

6        Q.    Notwithstanding Dr. Nik's comment not to worry about

7    it, were you worried about it?

8        A.    I was very worried about it.

9        Q.    Why?

10       A.    I was a PA straight out of school and somebody was

11   writing scripts with my name on it.  And although lidocaine

12   topical cream in the scheme of things is not all too dangerous

13   and probably the worse that could have happened was she had

14   some sort of skin reaction, I was concerned that were there

15   other scripts out there with my name on it that might have a

16   more ominous outcome if a patient took it.

17       Q.    Switching gears just a little bit here.  In your

18   experience, did every pain patient that came in at Advanced

19   Urgent Care get a prescription if they wanted one?

20       A.    Yes.

21       Q.    Did you ultimately leave Advanced Urgent Care?

22       A.    I did.

23       Q.    And what was the moment or the catalyst for that

24   decision?

25       A.    I went home the day that I got -- that that woman

1    came in -- and told my mother, who I spoke to and still do

2    speak to on a regular basis, daily basis, and expressed my

3    concern to her because I was still very disturbed over the

4    fact that this happened.  And she told me don't go back there,

5    took it upon herself to call the DEA because her daughter, who

6    had worked so hard to become a PA, she was concerned that my

7    license would be taken or something along those lines,

8    something bad would happen to me because my name was now being

9    signed to prescriptions that I didn't write and there was no

10   record of.

11          We then were informed that there was an investigation

12   occurring and asked to come to a meeting.

13      Q.   Let me stop you there.  So did you ultimately meet

14   with DEA agents?

15      A.   Yeah, we were asked to do this meeting and we went

16   and we met with the DEA agents.

17      Q.   And did you tell them about the things you saw?

18      A.   Told them about everything.  And given, they knew

19   most of it.

20      Q.   Did you get another job working in an urgent care?

21      A.   I did.

22      Q.   Did that happen right away?

23      A.   It did.  It was already in the process.  I had

24   already been looking for other positions.  I was concerned

25   enough prior to this happening that I wanted to leave, but I

1 didn't want to leave before I had another position.

2 So that was in the process and that was already like

3 almost signed and done with.

4 Q.  Thinking about -- are you still working in an urgent

5 care facility?

6 A.  Still working in the same urgent care.

7 Q.  Okay.  So thinking about that place comparing it to

8 Advanced Urgent Care, were they anything like one another?

9 A.  It was like day and night.  I remember complaining to

10 my mother about the on-boarding process of the urgent care

11 where I'm at now because there was barely no on-boarding

12 process at Advanced.  It was just, Oh, you want this?  Okay,

13 start working.

14 And the urgent care that I had signed a contract with

15 told me it would be ninety days before I was allowed to start

16 working because of all the credentialing and licensing that

17 they had to go through to get me to be a proper PA at their

18 facility.

19 MR. PARISI:  Your Honor, those are all the questions

20 I have.  Thank you.

21 THE COURT:  Any cross-examination.

22 MS. FLANNERY:  Yes, Your Honor.  Thank you.

23 THE COURT:  Sure.

24 CROSS-EXAMINATION

25 BY MS. FLANNERY:

1      Q.   Good afternoon, Ms. Amron.  My name is Ann Flannery
2    and I represent Mr. White.
3      A.   Good afternoon.
4      Q.   So let me just get the time frame straight.
5           When did you start?
6      A.   Around July 2015.
7      Q.   And when did you leave?
8      A.   Around December 2015.
9      Q.   And your first couple of weeks is when you had the
10   most contact with Mr. White; is that correct?
11     A.   Correct.
12     Q.   So he was showing you around the place and showing
13   you where things were, correct?
14     A.   Uh-huh.
15     Q.   And he gave you some basic orientation to the urine
16   drug screens?
17     A.   And how to go about seeing those patients.
18     Q.   What you did when they came in, correct, and how you
19   had to check their prior urine levels?
20     A.   Uh-huh.  Yes.  Sorry.
21     Q.   By the way, you knew Mr. White was a physician
22   assistant?
23     A.   I did.
24     Q.   And you knew he went to Drexel?  Did you know he went
25   to Drexel?

1      A.   I don't recall that now, but I probably did back
2   then.

3      Q.   But you had just come out of Drexel's PA school,
4   correct?

5      A.   Correct.

6      Q.   Did you get any specialized training there about --
7   any in-depth pain management training?

8      A.   We did not.

9      Q.   So did you know how long Mitchell White had been
10  there?

11     A.   I think it was like a year or two.

12     Q.   Once you got oriented to the facilities and what to
13  do when a patient came in, then -- am I correct in
14  understanding your testimony, then you turned to your
15  supervising physician, who was Dr. Nik?

16     A.   Primarily, yes.

17     Q.   And so when you answered questions like did everyone
18  get a prescription who came in, you're speaking of your
19  experience with Dr. Nik; is that correct?

20     A.   No, I was speaking of my experience interacting with
21  the patients and, you know, having observed other providers
22  seeing patients as well.

23          Like I said, I had very little person-to-person
24  interaction with Dr. Nik, but based on his instruction and my
25  interactions with patients and other providers, that's what

1  I'm -- you know, that's what I saw.

2       Q.   All right.  But you certainly didn't -- you weren't

3  with Mitchell White when he saw all the patients that he saw

4  in that period of time, did you?

5       A.   Correct.

6       Q.   So you can't say what he did or didn't do with

7  respect to patients, can you?

8       A.   No.

9       Q.   And the incident with the lidocaine, which was

10  concerning, that involved a Dr. Nik patient, correct?

11      A.   My patient.

12      Q.   Your patient.

13      A.   Yes.

14      Q.   I'm sorry.  But your interaction on it was with Dr.

15  Nik?

16      A.   Correct.

17      Q.   So Mitchell White didn't have anything to do with

18  that incident?

19      A.   No.  Correct.

20      Q.   And you have a physician, a mother who's a

21  physician?

22      A.   Correct.

23      Q.   And who is Robert Amron?

24      A.   He's my father.

25      Q.   And what does he do?

1        A.    He was a lawyer and a CPA.

2        Q.    The pain management patients, did they have

3   appointments?

4        A.    I don't recall appointments.

5        Q.    So you say there was a line.  Was it first come,

6   first served?

7        A.    I believe so.  I think they registered at the front

8   and were seen in a first-come, first-serve basis, which is why

9   there was always such extended wait times.

10       Q.    Now, you said you saw some patients with street drugs

11  in addition to prescribed drugs or was the only thing in the

12  urine.

13             Did you refuse to see those patients?

14       A.    No.  So the process there was call your supervising

15  physician and consult with your supervising physician about

16  what steps to take.  And so I would call Dr. Nik usually once

17  I was on my own, doing my own prescriptions.

18             And you know, during training I would refer to

19  Mitchell or Jason, or whoever was there that day, and consult

20  them as to what they would do.  And when I was on my own,

21  consult Dr. Nik as to what he wanted me to do.

22       Q.    So after your two-week period, it was Dr. Nik that

23  was giving you the instructions?

24       A.    Correct.

25       Q.    And you said while you were waiting for your DEA,

1   whoever you were working with that day would sign

2   prescriptions for you?

3       A.   Correct.

4       Q.   Who else would be working there during the day during

5   that period you got prescriptions signed from?

6       A.   Primarily it was Mitchell White.  I don't recall

7   other instances.  I do know that I was given a summary of

8   testimony that I had given to the DEA, and there were other

9   providers listed on that list that I had attested to at the

10  time did it.  Which I'm sure it was the truth, I just don't

11  recall currently, seven and a half years later, other

12  providers.

13      Q.   But did anybody suggest to you that this was

14  illegal?

15      A.   Can you clarify that?  What was illegal?

16      Q.   At the time, if you recall, did anyone suggest to you

17  that this was illegal to do?

18      A.   That them signing the scripts was illegal?

19      Q.   Right.

20      A.   No.

21      Q.   And you stayed through your period when you didn't

22  have the registration, right?

23      A.   Correct.

24      Q.   What concerned you was someone -- with respect to the

25  lidocaine, what concerned you and was the tipping point was

1   that someone apparently was writing prescriptions over your

2   signature that you didn't give permission to?

3       A.   Well, yeah.  Like you said, tipping point, right?

4           So there were red flags that went off before then

5   with, you know, giving people prescriptions despite having

6   street drugs in their urine or giving large prescriptions in

7   large milligrams and quantities that maybe it didn't seem like

8   it was medically necessary to do, despite being instructed to

9   do so.

10          But when that happened, when somebody came in with a

11  script with my name on it that I hadn't written, that was the

12  tipping point.

13      Q.   Did you ever use the prescriptions that Mr. White

14  gave you for an inappropriate purpose?

15      A.   Which prescription?  What prescription?

16      Q.   When you were waiting for your DEA and you signed on

17  someone else's.  Did you ever use Mr. White's prescriptions or

18  anyone else's for an improper purpose?

19      A.   At the time it wasn't expressed to have been

20  improper, it is what was instructed, but I did not use -- if

21  they were there, they signed off on the scripts that I had

22  written in the sig portion of the script, but never did I use

23  a presigned script.

24      Q.   Okay.  So those prescriptions -- you weren't given

25  prescriptions and said, here, automatically give this person

1  this amount no matter what?

2      A.    Like a pre-written prescription to go give it to

3  them?

4      Q.    Yeah.

5      A.    No.

6      Q.    And when you say large quantities that disturbed you,

7  are we talking about what -- what range?  About 140?  120?

8      A.    I actually don't recall the exact number.  I just --

9  I mean, many of the patients were on 30 milligrams oxycodones,

10  and in and of itself -- you could be dispensing five of those

11  and that's concerning, in my opinion.

12          But they were definitely large quantities.  Like,

13  we're talking double, maybe even triple, at the time,

14  digits.

15      Q.    Of quantity?

16      A.    Of quantity.  The amount of tablets that the

17  pharmacist was supposed to dispense to the patient.

18      Q.    Where is the urgent care that you went to when you

19  left?

20      A.    I went to MedExpress Urgent Care, and that urgent

21  care -- at the time I was at a New Jersey location.  And they

22  have nations across the country, though.

23      Q.    Where in New Jersey?

24      A.    My primary location was Mount Ephraim.

25      Q.    Mount Ephraim, New Jersey?

1    A.    Correct.

2          MS. FLANNERY:  May I have a moment, please?

3          THE COURT:  Yes.

4  BY MS. FLANNERY:

5    Q.    Does the name Cindy Finkelman ring a bell?

6    A.    That was a provider that was staffed at Advanced

7  Urgent Care.  I don't recall much of my interaction with

8  her.

9    Q.    Do you recall telling the DEA earlier that she signed

10 prescriptions in the same manner as Mr. White and Cassius

11 Brown?

12   A.    I've reviewed the summary of the -- what is it?  DEA

13 6 or something like that?  Is that what it is?

14   Q.    You're learning a lot.

15   A.    Short period of time.

16         So the DEA 6, which I believe is a summary of the

17 oral account I gave when meeting with the DEA agents, states

18 that Cassius Brown and Cindy Finkelman were also providers

19 that did that action.

20         I don't recall my interaction with them doing that,

21 but if I said it back then, it was true.

22   Q.    Your memory of what happened was, is it fair to say,

23 a little clearer back then than it is now?

24   A.    Yeah.

25   Q.    Do you remember when it was that you spoke with the

1    DEA?

2            And I don't mean to give you a test.  Would it help

3    you to look at the date on the DEA 6?

4        A.    Sure.  I think it was within the time frame, like

5    shortly before I left.

6            MS. FLANNERY:  May I approach, Your Honor?

7            THE COURT:  Yes.

8            MR. PARISI:  If may just see what she's showing her.

9            MS. FLANNERY:  Oh, I'm sorry.

10   BY MS. FLANNERY:

11       Q.    I'll direct your attention to the first line.

12       A.    Okay, yes.  So I think that was -- 12/16 was the --

13   the report was created the day after we met with them.

14       Q.    Thank you.

15           MR. PARISI:  No follow-up, Your Honor.  Thank you.

16           THE COURT:  Ms. Flannery, you're completed your

17   examination?  You're done?

18           MS. FLANNERY:  I am, Your Honor.  I'm sorry.

19           THE COURT:  There's no redirect.

20           MR. PARISI:  No follow-up.

21           THE COURT:  Ms. Amron, you're excused.  Thanks very

22   much.  Have a good rest of your day.

23           THE WITNESS:  You too.

24           (Witness excused.)

25           THE COURT:  Government may call the next witness.

1          (End of excerpt.)

2

3                          CERTIFICATE

4

5     I certify that the foregoing is a correct transcript from the

6     record of proceedings in the above-entitled matter.

7

8

9     *Maureen McHugh*

      Maureen McHugh, RPR      Date:  March 13, 2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Concordance

< Dates >
**August 11, 2015** 6:1
**December 2015** 21:8
**January 12, 2023** 1:12
**July 2015** 21:6
**March 13, 2023** 30:13
**$50** 7:13
**(267)299-7254** 1:31

< 1 >
**12/16** 29:12
**120** 27:7
**1250** 2:7, 2:14
**140** 27:7
**18-CR-101** 1:5
**1835** 2:11
**19103** 2:23
**19106** 1:30, 2:8, 2:15

< 2 >
**20** 2:38
**2015** 4:15, 5:1, 16:11
**2609** 1:29
**2900** 2:22

< 3 >
**3** 1:16, 2:38
**30** 27:9

< 6 >
**6** 28:13, 28:16, 29:3
**601** 1:29
**615** 2:7, 2:14

< 9 >
**9:30** 1:13

< A >
**A-M-R-O-N** 3:12
**a.m.** 1:13
**able** 9:16, 14:5
**above-entitled** 30:6
**accommodating** 3:2
**account** 28:17

**acf@annflannerylaw.com** 2:24
**across** 27:22
**action** 28:19
**actually** 7:4, 7:6, 13:18, 27:8
**acute** 6:9
**addition** 12:20, 12:25, 24:11
**adequate** 9:4
**Advanced** 4:22, 5:8, 5:17, 6:5, 6:15, 6:21,
    7:18, 7:24, 9:10, 10:12, 11:3, 12:2,
    13:3, 13:9, 13:17, 16:7, 18:18, 18:21,
    20:8, 20:12, 28:6
**afternoon** 3:13, 3:23, 3:24, 21:1, 21:3
**agents** 19:14, 19:16, 28:17
**aggression** 11:18, 11:19
**aggressive** 11:12
**agreement** 18:3
**allergy** 17:11
**allowed** 20:15
**Almost** 7:3, 20:3
**already** 19:23, 19:24, 20:2
**altercations** 11:16
**although** 17:10, 18:11
**Amanda** 1:17, 2:38, 3:4, 3:8, 3:12, 17:4
**AMERICA** 1:5
**amount** 27:1, 27:16
**Amron** 1:17, 2:38, 3:5, 3:8, 3:12, 3:13,
    3:23, 15:12, 21:1, 23:23, 29:21
**Ann** 2:19, 2:20, 21:1
**answer** 9:16
**answered** 22:17
**anybody** 25:13
**apparently** 26:1
**appointments** 24:3, 24:4
**approach** 29:6
**Around** 21:6, 21:8, 21:12
**ASSISTANT** 2:5, 2:12, 4:9, 4:10, 21:22
**attention** 16:10, 29:11
**attested** 25:9
**ATTORNEY** 2:5, 2:12
**ATTORNEY'S** 2:6, 2:13
**automatically** 26:25
**Ave** 5:14, 10:3
**Ave.** 9:15
**Avenue** 10:4, 10:13, 11:3
**away** 19:22

< B >
**back** 14:9, 15:1, 19:4, 22:1, 28:21, 28:23
**background** 9:16

**bad** 19:8
**barely** 20:11
**based** 22:24
**basic** 21:15
**basically** 13:8
**basis** 19:2, 24:8
**become** 19:6
**believe** 9:16, 24:7, 28:16
**bell** 28:5
**bellyache** 6:14
**Besides** 9:9
**bigger** 8:8
**bit** 8:10, 12:1, 18:17
**blank** 14:22
**body** 11:19
**bonuses** 7:14
**Boulevard** 5:14
**brings** 17:16
**Britney** 16:25, 17:2
**brought** 17:1
**Brown** 4:16, 28:11, 28:18
**building** 15:2

< C >
**C.** 2:19, 2:20
**call** 3:3, 9:20, 19:5, 24:14, 24:16, 29:25
**called** 11:20, 17:8
**Care** 4:19, 4:22, 5:9, 5:17, 6:5, 6:9, 6:15,
    6:21, 7:18, 7:24, 9:10, 10:12, 10:21,
    11:3, 12:2, 13:3, 13:18, 16:8, 18:19,
    18:21, 19:20, 20:5, 20:6, 20:8, 20:10,
    20:14, 27:18, 27:20, 27:21, 28:7
**cares** 6:20
**Cash** 15:20, 15:21, 16:1, 16:7
**Cassius** 4:16, 28:10, 28:18
**catalyst** 18:23
**center** 10:8
**certain** 7:15, 9:1
**certainly** 23:2
**CERTIFICATE** 4:7, 30:3
**certify** 30:5
**chart** 17:7
**charting** 8:9
**check** 9:3, 21:19
**Chestnut** 2:7, 2:14
**child** 6:13
**Christmas** 16:22, 16:24
**CHRISTOPHER** 2:11
**christopher.parisi@usdoj.gov** 2:16

# Concordance

chronic 16:18
Cindy 28:5, 28:18
City 5:14, 9:15, 10:3, 10:4, 10:13, 11:3
clarify 12:11, 25:15
classmate 4:16
clearer 28:23
CLERK 3:6, 3:9
clinic 6:19, 13:12
clinics 13:8
collect 16:7
comes 13:10, 17:16
comfortable 3:16
coming 16:17
comment 18:6
comparing 20:7
complaining 20:9
completed 9:25, 29:16
concern 16:3, 17:8, 19:3
concerned 12:9, 17:10, 17:13, 18:2,
    18:14, 19:6, 19:24, 25:24, 25:25
concerning 23:10, 27:11
concerns 13:21
connected 16:21
consult 24:15, 24:19, 24:21
contact 7:8, 21:10
continue 14:21, 14:22
contract 13:2, 13:6, 13:9, 13:17, 13:21,
    20:14
controlled 9:2, 9:4, 12:25, 13:14, 14:2,
    14:6, 14:9, 17:16
Correct 5:7, 5:22, 6:4, 7:17, 11:1, 15:25,
    21:10, 21:11, 21:13, 21:18, 22:4, 22:5,
    22:13, 22:19, 23:5, 23:10, 23:16,
    23:19, 23:22, 24:24, 25:3, 25:23, 28:1,
    30:5
COSTELLO 2:4
country 27:22
couple 5:15, 8:5, 9:25, 21:9
course 12:12
COURT 1:1, 1:27, 1:28, 3:1, 3:13, 3:16,
    3:18, 20:21, 20:23, 28:3, 29:7, 29:16,
    29:19, 29:21, 29:25
CPA 24:1
cream 17:5, 18:12
created 29:13
credentialing 20:16
Criminal 1:5
CROSS 2:36
CROSS-EXAMINATION 20:21, 20:24
currently 25:11

## < D >

daily 7:3, 7:8, 19:2
dangerous 18:12
Date 29:3, 30:13
daughter 19:5
DAY 1:16, 7:16, 8:7, 14:13, 14:19, 16:8,
    18:25, 20:9, 24:19, 25:1, 25:4, 29:13,
    29:22
days 20:15
DEA 5:17, 13:24, 14:11, 14:24, 19:5,
    19:14, 19:16, 24:25, 25:8, 26:16, 28:9,
    28:12, 28:16, 28:17, 29:1, 29:3
deal 17:15
December 16:10
decision 18:24
Defendant 2:19, 7:21, 8:12, 9:7, 9:9,
    9:22, 10:4, 13:22, 14:15, 15:8
definitely 9:15, 27:12
demeanor 11:8
DEPUTY 3:6, 3:9
describe 11:6
described 11:22
desk 15:1, 15:5, 15:14, 15:15
desks 15:1
despite 26:5, 26:8
different 5:8, 5:11, 15:23
digits 27:14
DIRECT 2:36, 3:21, 29:11
discharged 13:15
discover 16:12
discovered 16:15
discuss 8:12, 13:20, 17:5
dispense 27:17
dispensed 17:12
dispensing 27:10
DISTRICT 1:1, 1:2, 1:19, 1:28
disturbed 19:3, 27:6
Doing 3:14, 3:15, 13:13, 14:8, 24:17,
    28:20
done 20:3, 29:17
door 10:18
double 27:13
Drexel 4:4, 21:24, 21:25, 22:3
drug 8:12, 8:16, 8:20, 8:23, 12:7, 12:13,
    12:14, 12:17, 14:10, 21:16
drugs 12:14, 12:19, 12:24, 13:1, 13:14,
    13:20, 24:10, 24:11, 26:6
duly 3:8

During 12:2, 24:18, 25:4

## < E >

ear 6:13
earlier 28:9
EASTERN 1:2, 1:28
electronic 7:8
Electronically 7:10
Elizabeth 3:12
emergency 6:10
End 16:8, 30:1
enforced 13:18
enough 19:25
ensure 9:3
entailed 8:6
Ephraim 27:24, 27:25
ESQUIRE 2:4, 2:11, 2:19
evaluate 8:22, 14:9
eventually 5:23
everyone 22:17
everything 19:18
exact 13:5, 27:8
EXAMINATION 3:21, 29:17
Excellent 3:18
EXCERPT 1:17
excerpt. 30:1
excused 29:21
excused. 29:24
expectations 6:16
experience 13:17, 18:18, 22:19, 22:20
explain 8:15
explained 6:8, 8:21, 9:3, 9:6, 9:7
explaining 17:18
expressed 17:8, 19:2, 26:19
extended 24:9

## < F >

facilities 22:12
facility 20:5, 20:18
fact 19:4
fair 28:22
father 23:24
fee 15:14, 15:18, 15:19, 15:22
few 6:2
fights 11:16, 11:17
files 12:3, 12:9, 12:12
fill 14:10
filled 18:4

# Concordance

**finish** 4:11
**Finkelman** 28:5, 28:18
**first** 5:16, 10:15, 21:9, 24:5, 24:6, 29:11
**first-come** 24:8
**first-serve** 24:8
**five** 27:10
**flags** 26:4
**Flannery** 2:19, 2:20, 21:1, 28:2, 29:6, 29:9, 29:16
**flow** 14:21
**focusing** 10:13
**follow** 15:15
**follow-up** 29:15, 29:20
**foregoing** 30:5
**form** 13:2
**frame** 12:16, 16:18, 21:4, 29:4
**Frequently** 11:15, 12:19
**front** 15:14, 15:15, 24:7
**Full** 3:10, 11:7, 11:11
**function** 15:2

**< G >**
**gave** 21:15, 26:14, 28:17
**gears** 18:17
**GENE** 1:18
**general** 13:6
**generally** 10:13
**getting** 13:11, 13:14
**give** 14:15, 16:21, 26:2, 26:25, 27:2, 29:2
**given** 17:4, 17:9, 17:17, 19:18, 25:7, 25:8, 26:24
**giving** 24:23, 26:5, 26:6
**Government** 2:4, 2:35, 3:3, 29:25
**graduate** 4:12, 5:4
**graduated** 4:19, 5:6, 5:16, 6:8
**Great** 3:1
**Grove** 5:15
**guess** 16:21

**< H >**
**half** 25:11
**hand** 3:7
**happen** 19:8, 19:22
**happened** 14:18, 17:1, 17:18, 18:13, 19:4, 26:10, 28:22
**happened.** 17:17
**happening** 19:25
**hard** 19:6

**health** 4:6
**hear** 4:1, 11:14
**help** 6:10, 29:2
**herself** 19:5
**home** 18:25
**Honor** 3:4, 3:20, 15:10, 20:19, 20:22, 29:6, 29:15, 29:18
**HONORABLE** 1:18
**hour** 7:13
**hourly** 7:11, 7:13

**< I >**
**illegal** 25:14, 25:15, 25:17, 25:18
**improper** 26:18, 26:20
**in-depth** 22:7
**inappropriate** 26:14
**incident** 23:9, 23:18
**include** 12:7
**increased** 16:1, 16:2
**indication** 17:7
**individual** 10:8
**infection** 6:13
**informed** 17:14, 17:20, 19:11
**initial** 13:4
**Inpatient** 11:10
**inside** 11:3
**instances** 25:7
**instructed** 26:8, 26:20
**instruction** 22:24
**instructions** 24:23
**insufficient** 12:24
**insurance** 15:17
**interacting** 22:20
**interaction** 22:24, 23:14, 28:7, 28:20
**interactions** 22:25
**intermittently** 10:9, 10:10
**introducing** 8:8
**investigation** 19:11
**involved** 23:10
**issue** 14:5
**issued** 16:13
**issues** 13:20
**itself** 27:10

**< J >**
**Jason** 24:19
**Jersey** 27:21, 27:23, 27:25
**Joanne** 9:13

**job** 6:6, 19:20
**JUDGE** 1:19
**July** 5:3
**JURY** 1:16, 4:3

**< K >**
**KAY** 2:4
**Keep** 3:18
**kind** 6:12, 8:3, 8:6, 8:8, 9:23, 9:24
**known** 17:11, 17:12

**< L >**
**ladies** 15:15
**lady** 16:20
**language** 13:5
**language-wise** 11:19
**large** 26:6, 26:7, 27:6, 27:12
**last** 3:10
**later** 25:11
**LAW** 2:20
**lawyer** 24:1
**learning** 28:14
**leave** 14:20, 18:21, 19:25, 20:1, 21:7
**left** 14:23, 14:25, 15:4, 27:19, 29:5
**level** 6:10, 9:1, 9:4, 12:24
**levels** 8:16, 8:18, 21:19
**license** 19:7
**licensing** 20:16
**lidocaine** 17:5, 17:11, 18:11, 23:9, 25:25
**line** 10:18, 24:5, 29:11
**lines** 6:14, 19:7
**list** 25:9
**listed** 25:9
**little** 8:10, 12:1, 18:17, 22:23, 28:23
**location** 7:5, 10:1, 11:4, 27:21, 27:24
**locations** 5:8, 5:11
**long** 8:6, 11:13, 22:9
**look** 29:3
**looking** 19:24
**lot** 9:15, 9:17, 28:14

**< M >**
**management** 6:19, 8:22, 8:25, 10:24, 11:12, 13:8, 22:7, 24:2
**manager** 9:14
**manner** 28:10
**March** 5:5

# Concordance

**Market** 1:29, 2:21
**MARY** 2:4
marykay.costello@usdoj.gov 2:9
**master** 4:6
**match** 6:16
**matter** 27:1, 30:6
**Maureen** 1:26, 30:13
**Mchugh** 1:26, 30:13
**mean** 4:8, 15:7, 15:19, 16:16, 27:9, 29:2
**Medexpress** 27:20
**medically** 26:8
**medication** 9:1, 11:11, 12:22, 13:11
**medicine** 13:13
**meet** 19:13
**meeting** 19:12, 19:15, 28:17
**memory** 28:22
**mentioned** 17:3
**met** 19:16, 29:13
**metrics** 7:14
**microphone** 3:25
**middle** 14:19
**milligrams** 26:7, 27:9
**Mitchell** 1:13, 7:22, 8:3, 14:13, 15:2, 15:9, 22:9, 23:3, 23:17, 24:19, 25:6
**moment** 15:10, 18:23, 28:2
**month** 5:2, 5:4, 6:2
**months** 6:2
**morning** 10:15
**mother** 19:1, 20:10, 23:20
**Mount** 27:24, 27:25
**MR. PARISI** 3:4, 3:22, 15:10, 29:8, 29:15, 29:20
**Ms** 3:13, 3:23, 15:12, 21:1, 28:2, 29:6, 29:9, 29:16, 29:21
**MS. FLANNERY** 20:22, 20:25, 28:4, 29:10, 29:18


**< N >**
**name** 3:10, 4:21, 17:19, 18:11, 18:15, 19:8, 21:1, 26:11, 28:5
**named** 4:16
**nations** 27:22
**necessary** 26:8
**New** 27:21, 27:23, 27:25
**next** 3:3, 3:4, 29:25
**night** 20:9
**Nik** 9:20, 9:24, 17:8, 17:21, 18:6, 22:15, 22:19, 22:24, 23:10, 23:15, 24:16, 24:21, 24:22

**Nikparvar** 6:22
**Nikparvar-fard** 16:9
**ninety** 20:15
**No.** 1:5, 23:19, 24:14
**normal** 8:23
**nothing** 9:5
**Notwithstanding** 18:6
**number** 5:18, 6:3, 6:20, 7:15, 13:24, 27:8
**numbers** 15:24, 15:25, 16:1
**nursing** 9:16


**< O >**
**observe** 11:2
**observed** 22:21
**occurring** 19:12
**off-handed** 17:3
**OFFICE** 2:6, 2:13, 2:20, 15:15
**OFFICIAL** 1:27
**often** 7:2, 7:4, 10:6, 11:25
**Okay** 9:21, 10:1, 12:15, 20:7, 20:12, 26:24, 29:12
**older** 16:20
**ominous** 18:16
**on-boarding** 20:10, 20:11
**Once** 6:15, 7:7, 9:18, 9:24, 14:11, 22:12, 24:16
**one** 5:23, 6:11, 7:15, 9:14, 12:17, 12:18, 15:2, 15:10, 16:20, 17:25, 18:2, 18:3, 18:19, 20:8
**ones** 5:13, 11:24
**open** 10:14, 10:19
**opinion** 27:11
**opportunity** 12:3
**oral** 28:17
**order** 14:21
**orientation** 21:15
**oriented** 22:12
**others** 10:2
**outcome** 18:16
**own** 8:11, 14:8, 14:23, 24:17, 24:20
**owned** 6:21
**oxycodone** 8:19
**oxycodones** 27:9


**< P >**
**PA** 1:11, 1:28, 1:30, 2:8, 2:15, 2:23, 4:6, 4:8, 18:10, 19:6, 20:17, 22:3
**pad** 14:22, 14:25, 15:4

**pads** 14:16
**Pain** 6:19, 8:7, 8:22, 8:25, 10:24, 11:12, 11:23, 12:1, 13:3, 13:8, 13:11, 13:12, 14:9, 15:12, 18:18, 22:7, 24:2
**paperwork** 12:5
**PARISI** 2:11, 3:20, 15:11, 20:19
**part** 8:15, 9:23
**particular** 4:18, 10:1
**patient** 8:7, 8:10, 8:25, 9:10, 9:18, 9:19, 10:24, 12:3, 12:12, 12:15, 13:7, 13:10, 14:9, 14:21, 16:16, 16:20, 17:1, 17:9, 17:11, 18:16, 18:18, 22:13, 23:10, 23:11, 23:12, 27:17
**patients** 6:9, 7:16, 8:7, 8:8, 8:11, 8:22, 8:23, 9:4, 10:17, 10:20, 10:22, 11:12, 11:21, 11:22, 11:23, 12:1, 13:3, 13:25, 14:2, 14:21, 15:13, 16:17, 21:17, 22:21, 22:22, 22:25, 23:3, 23:7, 24:2, 24:10, 24:13, 27:9
**paying** 15:13, 15:16
**PENNSYLVANIA** 1:2
**people** 9:11, 11:8, 26:5
**per** 15:25
**perfume** 16:25, 17:2
**period** 23:4, 24:22, 25:5, 25:21, 28:15
**permission** 26:2
**person** 4:18, 7:7, 8:19, 9:13, 26:25
**person-to-person** 22:23
**pharmacist** 18:4, 27:17
**pharmacists** 18:4
**Pharmacy** 17:15
**Philadelphia** 1:11, 1:30, 2:8, 2:15, 2:23
**phone** 7:3
**physical** 11:16
**Physician** 4:8, 4:10, 6:11, 9:20, 13:14, 21:21, 22:15, 23:20, 23:21, 24:15
**pick** 17:4
**pills** 15:24, 15:25
**place** 4:21, 10:19, 18:3, 20:7, 21:12
**Please** 3:6, 3:9, 3:10, 28:2
**point** 11:19, 25:25, 26:3, 26:12
**points** 11:20
**police** 11:20
**Poplar** 17:15
**portion** 26:22
**position** 20:1
**positions** 19:24
**possibility** 7:14
**practice** 9:10, 10:14, 13:16
**PRATTER** 1:18

# Concordance

**pre-written** 27:2
**prescribe** 13:13
**prescribed** 24:11
**prescribing** 12:23
**prescription** 14:10, 14:16, 17:9, 18:19, 22:18, 26:15, 27:2
**prescriptions** 16:12, 19:9, 24:17, 25:2, 25:5, 26:1, 26:5, 26:6, 26:13, 26:17, 26:24, 26:25, 28:10
**presence** 12:14
**present** 16:22, 16:24
**presigned** 14:15, 26:23
**prices** 15:23
**Primarily** 5:14, 6:19, 8:7, 9:8, 9:13, 9:18, 10:8, 11:11, 15:17, 22:16, 25:6
**primary** 6:11, 27:24
**prior** 9:23, 12:18, 12:19, 14:12, 19:25, 21:19
**probably** 18:13, 22:1
**problem** 16:12, 16:15
**proceed** 3:19
**proceedings** 30:6
**process** 8:16, 14:7, 19:23, 20:2, 20:10, 20:12, 24:14
**proper** 20:17
**provided** 8:1, 8:3
**provider** 10:8, 14:13, 28:6
**providers** 22:21, 22:25, 25:9, 25:12, 28:18
**pull** 17:7
**purpose** 26:14, 26:18


**< Q >**
**quantities** 26:7, 27:6, 27:12
**quantity** 27:15, 27:16
**question** 4:11
**questions** 9:9, 9:15, 9:17, 9:19, 9:21, 20:19, 22:17


**< R >**
**Raise** 3:6
**ran** 6:21
**range** 27:7
**rate** 7:12, 7:13
**reaction** 18:14
**ready** 3:2
**reality** 6:15, 6:18
**really** 11:18, 17:13

**reason** 6:11, 14:20
**recall** 5:25, 7:11, 11:17, 13:2, 15:25, 16:6, 17:6, 22:1, 24:4, 25:5, 25:11, 25:16, 27:8, 28:7, 28:9, 28:20
**receive** 7:19, 14:2, 16:18
**received** 8:5
**recommend** 4:18
**record** 3:11, 19:10, 30:6
**RECROSS** 2:36
**red** 26:4
**REDIRECT** 2:36, 29:19
**refer** 24:18
**reflect** 15:23
**refuse** 24:13
**registered** 24:7
**registration** 5:17, 13:24, 25:22
**regular** 16:18, 19:2
**regularly** 16:17
**related** 9:19
**relatively** 16:17, 16:18
**remain** 3:6
**remember** 5:2, 7:5, 7:6, 16:23, 20:9, 28:25
**report** 29:13
**REPORTER** 1:27
**represent** 21:2
**require** 6:10
**respect** 23:7, 25:24
**rest** 10:10, 29:22
**resume** 3:2
**review** 12:3, 12:5
**reviewed** 28:12
**reviewing** 12:12, 12:18
**ring** 28:5
**Robert** 23:23
**Room** 1:29, 6:10, 11:2, 11:3, 11:9, 11:11
**Roosevelt** 5:14
**RPR** 1:26, 30:13


**< S >**
**salary** 7:11
**saw** 7:15, 15:22, 19:17, 23:1, 23:3, 24:10
**saying** 13:7
**schedule** 3:2, 15:14, 15:18, 15:19, 15:22
**scheme** 18:12
**school** 4:3, 6:8, 18:10, 22:3
**sciences** 4:6
**scope** 8:8
**screen** 8:20, 8:23, 8:24, 12:17, 14:10

**screens** 8:13, 8:16, 12:7, 12:13, 12:14, 21:16
**script** 14:14, 14:22, 16:1, 17:4, 17:7, 18:5, 26:11, 26:22, 26:23
**script.** 17:19
**scripts** 16:19, 18:11, 18:15, 25:18, 26:21
**seat** 3:9
**seeing** 8:11, 21:17, 22:22
**seem** 26:7
**seen** 7:7, 11:10, 14:22, 24:8
**sent** 12:17
**served** 24:6
**setting** 13:7
**seven** 25:11
**shadowing** 8:10
**Short** 28:15
**shortly** 29:5
**shouting** 11:14
**showed** 12:14
**showing** 21:12, 29:8
**shows** 8:19
**sig** 26:22
**sign** 14:13, 14:23, 25:1
**signature** 15:4, 26:2
**signatures** 14:23
**signed** 19:9, 20:3, 20:14, 25:5, 26:16, 26:21, 28:9
**signing** 14:11, 25:18
**signs** 13:10
**site** 9:13, 9:14
**skin** 18:14
**small** 6:20
**somebody** 17:16, 18:10, 26:10
**someone** 6:13, 8:1, 8:24, 25:24, 26:1, 26:17
**Sorry** 21:20, 23:14, 29:9, 29:18
**sort** 10:12, 13:6, 18:14
**sorts** 6:19
**sounds** 7:8
**span** 6:12
**speaking** 22:18, 22:20
**Spears** 16:25, 17:2
**specialized** 22:6
**specific** 9:19, 11:17, 17:11
**specifically** 12:13, 18:4
**spell** 3:10
**spoke** 19:1, 28:25
**staffed** 28:6
**standing** 3:6
**start** 4:23, 4:25, 20:13, 20:15, 21:5

## Concordance

**started** 5:16, 6:7, 6:23, 7:18

**state** 3:10

**STATES** 1:1, 1:5, 1:19, 2:5, 2:6, 2:12, 2:13, 28:17

**stating** 13:10

**stayed** 25:21

**steps** 24:16

**stop** 16:23, 19:13

**straight** 18:10, 21:4

**Street** 1:29, 2:7, 2:14, 2:21, 12:14, 12:19, 12:23, 13:1, 13:13, 13:20, 24:10, 26:6

**study** 4:5

**subsequent** 8:19

**substance** 9:2, 9:5, 12:25, 17:16

**substances** 13:14, 14:3, 14:6

**sufficient** 12:24

**suggest** 25:13, 25:16

**Suite** 2:7, 2:14, 2:22

**summary** 25:7, 28:12, 28:16

**supervising** 9:20, 22:15, 24:14, 24:15

**supervisor** 6:23

**supposed** 8:9, 9:1, 27:17

**switched** 9:24

**Switching** 18:17

**sworn.** 3:8

**< T >**

**tablets** 27:16

**taped** 15:14

**tended** 10:2

**test** 29:2

**testimony** 22:14, 25:8

**Thanks** 29:21

**Thinking** 6:12, 20:4, 20:7

**though** 27:22

**three** 10:9

**throughout** 10:10

**tipping** 25:25, 26:3, 26:12

**today** 3:2

**tone** 13:6

**took** 8:6, 18:16, 19:5

**topical** 18:12

**trained** 14:7

**training** 7:19, 8:1, 8:3, 8:5, 8:15, 9:8, 9:23, 9:24, 10:7, 10:10, 22:6, 22:7, 24:18

**transcript** 30:5

**TRIAL** 1:16

**triple** 27:13

**true** 28:21

**truth** 25:10

**trying** 5:20, 8:24

**turn** 16:10

**turned** 22:14

**two** 6:2, 10:9, 15:1, 22:11

**two-week** 24:22

**type** 10:20, 10:23, 10:24

**types** 7:14, 10:21, 10:22

**< U >**

**ultimately** 18:21, 19:13

**uncommon** 13:1

**understand** 13:10

**understanding** 22:14

**UNITED** 1:1, 1:5, 1:19, 2:5, 2:6, 2:12, 2:13

**University** 4:4

**unlike** 8:23

**Urgent** 4:19, 4:22, 5:8, 5:17, 6:5, 6:9, 6:15, 6:20, 6:21, 7:18, 7:24, 9:10, 10:12, 10:21, 11:3, 12:2, 13:3, 13:18, 16:8, 18:19, 18:21, 19:20, 20:4, 20:6, 20:8, 20:10, 20:14, 27:18, 27:20, 28:7

**urine** 8:12, 8:16, 8:22, 9:2, 9:5, 12:7, 12:13, 12:14, 12:17, 12:20, 12:21, 12:23, 14:10, 21:15, 21:19, 24:12, 26:6

**< V >**

**verbally** 11:19

**visit** 12:19, 13:4

**visits** 15:13

**voice** 3:18

**vs** 1:8

**< W >**

**wait** 4:11, 24:9

**waited** 11:24

**waiting** 5:20, 10:17, 10:18, 10:25, 11:2, 11:3, 11:8, 11:11, 24:25, 26:16

**waits** 11:13

**walk-in** 6:20

**wanted** 11:10, 18:19, 19:25, 24:21

**week** 9:3, 12:15, 12:18

**Weekly** 12:8

**weeks** 8:5, 9:25, 10:9, 21:9

**whatever** 12:16, 14:20

**Whereupon** 3:8

**White** 1:13, 7:22, 8:3, 14:13, 21:2, 21:10, 21:21, 22:9, 23:3, 23:17, 25:6, 26:13, 26:17, 28:10

**whoever** 14:12, 24:19, 25:1

**wife** 16:9

**will** 13:13

**Willow** 5:15

**within** 29:4

**Witness** 1:17, 3:3, 3:4, 3:12, 3:15, 3:17, 29:23, 29:24, 29:25

**woman** 18:25

**work** 5:11, 5:13, 7:4, 7:24, 10:2

**worked** 5:6, 19:6

**working** 4:23, 4:25, 5:16, 6:3, 7:6, 10:6, 14:12, 19:20, 20:4, 20:6, 20:13, 20:16, 25:1, 25:4

**workplace** 14:20

**worried** 18:7, 18:8

**worry** 17:14, 17:25, 18:6

**worse** 18:13

**write** 19:9

**writing** 17:6, 18:11, 26:1

**written** 17:8, 17:9, 26:11, 26:22

**< Y >**

**year** 4:13, 22:11

**years** 25:11