```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3
     UNITED STATES OF AMERICA        :   CRIMINAL ACTION
 4                                   :
                 vs.                 :
 5                                   :
     MEHDI NIKPARVAR-FARD            :   NO. 18-101-1
 6                                   :

 7                        PHILADELPHIA, PENNSYLVANIA

 8                            JULY 5, 2022

 9   BEFORE:        THE HONORABLE GENE E.K. PRATTER, J.

10                            BAIL HEARING

11   APPEARANCES:
                     OFFICE OF THE UNITED STATES ATTORNEY
12                   BY:  MARY KAY COSTELLO, ESQUIRE
                     CHRISTOPHER ERIC PARISI, ESQUIRE
13                   Assistants United States Attorney
                     Eastern District of Pennsylvania
14                   Suite 1250 - 615 Chestnut Street
                     Philadelphia, PA  19106
15                   Counsel for the Government

16                   FRANK DESIMONE, ESQUIRE
                     123 South Broad Street
17                   Suite 2500
                     Philadelphia, PA  19109
18                         - and -
                     BLANK ROME LLP
19                   BY:  ANN E. QUERNS, ESQUIRE
                     130 N. 18th Street
20                   Philadelphia, PA  19103
                     Counsel for the Defendant
21
                     KATHLEEN FELDMAN, CSR, CRR, RPR, CM
22                   Official Court Reporter
                     U.S. Courthouse
23                   601 Market Street
                     Philadelphia, PA 19106
24                   (215) 779-5578

25        (Transcript produced by machine shorthand via C.A.T.)
```

```
 1                    (Deputy Clerk opened court)

 2            THE COURT:  Hello, everybody.  Please take your

 3  seat.

 4            MR. DESIMONE:  Good morning, Your Honor.

 5            THE COURT:  Good morning.  Good morning, everybody.

 6  So this is yet another bail hearing in connection with the

 7  defendant's application for pretrial release in the case of

 8  United States of America versus Mehdi Nikparvar-Fard, Criminal

 9  Action 18-101.

10            Taking attendance, we'll start with Ms. Costello.

11            MS. COSTELLO:  Good morning, Your Honor.  Mary

12  Costello for the United States.

13            MR. PARISI:  Good morning, Your Honor.  Christopher

14  Parisi on behalf of the Government as well.

15            MR. DESIMONE:  Good morning, Your Honor.  Frank

16  DeSimone for Dr. Nikparvar-Fard.

17            MS. QUERNS:  And Ann Querns also for Dr.

18  Nikparvar-Fard.

19            THE PRETRIAL SERVICES OFFICER:  Good morning, Your

20  Honor.  Jimmy Gedeus, Pretrial Services.

21            THE COURT:  Thank you very much.

22            All right, Ms. Querns, Mr. DeSimone.

23            MR. DESIMONE:  Your Honor, if I might, I'd ask Your

24  Honor how you want us to proceed.  We have witnesses and we

25  have other things we want to put on the record.
```

1          THE COURT:  Whatever works for you, Mr. DeSimone.

2    I'll be able to follow along.

3          MR. DESIMONE:  All right.  I think what I'd like to

4    do in the beginning, Your Honor, is lay the foundation for

5    this.  As Your Honor knows, on May the 4th, we were given a

6    bunch of new discovery.  I don't want to go into the details

7    of it, but -- and because of that, Your Honor, the case was --

8    we had to postpone the trial in this matter until January.

9    You know, it just reminded me of what Churchill said.  It

10   wasn't the end of the beginning.  This is just the end of the

11   beginning.  Because what has happened since then, Your Honor,

12   is we have been going through this with Ms. Querns and she's

13   going to address some of this.  To take this back, Judge, Ms.

14   Querns told us this morning, we looked at a letter we received

15   from the Government in February of 2019 saying to us that they

16   were going to give us the discovery -- the discovery had begun

17   and they were going to give us discovery that was going to be

18   completed by March 2019.  That's three -- three and a half

19   years, whatever that is, time.  And as you know, Your Honor,

20   that hasn't happened.  What did happen in the interim, Your

21   Honor, and again Ms. Querns will testify or get up and tell

22   you, we received some transmissions from informants and some

23   tapes and, again, I was reading them and I called Ms. Querns

24   and I said to her, This doesn't seem right.  There's no flow

25   here.  So Ms. Querns corresponded with the Government in

1   December of 2019, way before the pandemic, I mean, four months

2   before we had a pandemic problem, and requested, said

3   specifically, and she will show you the e-mail specifically,

4   asked for any informants, any additional informants, do you

5   have anything else here, what else -- do you have any other

6   recordings, anything?  The Government responded no.  No.  No.

7            Well, flash forward and then flash back, we have now

8   found out that that is not correct, but we did not find that

9   out until just this past May when we were three weeks from

10  trial.  This continued, Your Honor, and it was almost like

11  being a dentist, you know, and this still continues, by the

12  way.  Nothing -- I'm not casting aspersions on anybody, I'm

13  just giving you the facts.  We were given some discovery.

14  70,000 pages.

15           THE COURT:  How does this relate to being a dentist?

16           MR. DESIMONE:  Pardon, you know, when you have to

17  pull teeth to get the discovery, you see.  I'm sorry.

18           THE COURT:  All right, well, your metaphor --

19           MR. DESIMONE:  That's my metaphor.

20           THE COURT:  All right.

21           MR. DESIMONE:  Now you've got the metaphor and I

22  feel like the dentist.

23           THE COURT:  All right, again.

24           MR. DESIMONE:  Okay, you got it.  I won't beat the

25  dead horse, Judge, for another metaphor.

1    So, anyway, what has happened here, one of the

2    recordings from this gentleman Higgins, he -- let me give you

3    some perspective here.  Dr. Nikparvar-Fard got arrested on the

4    other case and he was in custody.  Nevertheless, Mr. Higgins

5    went into his practice and for four months made recordings

6    which we weren't given.  Now, on those recordings and you're

7    going to see here what really was the problem when I tell you

8    this is the end of the beginning -- Churchillian -- we tell

9    the Government there is exculpatory evidence, and, Judge, as I

10   tell you, if I've ever seen exculpatory evidence, there's a

11   lot here.  The Government says, Oh, no, some of these things

12   are not exculpatory.  And I asked the Government then, did you

13   pay the informant, does he have a deal, Mr. Higgins?  What's

14   the situation?  Well, I haven't had an answer to that and I

15   think the reason the Government is saying to me -- I'm not

16   going to put words in their mouth -- Oh, we may not call this

17   person.  It's immaterial whether they call him or not.  They

18   sent somebody in to get incriminating evidence that they

19   either paid or made a deal with to get incriminating

20   information on Dr. Nikparvar-Fard and, in fact, got

21   exculpatory information of Dr. -- and there's legions of

22   instances.  I don't want to give my case away, but it will

23   become apparent.

24       So if the Government's position today is, well,

25   we're not going to turn that stuff over, we still don't have

1    it yet because we're not calling witnesses or it's not

2    exculpatory, we're going to have another hearing in front of

3    Your Honor on that.

4            There's another witness, Dr. DiGiralomo, a

5    government witness.  It turns out now that he's in 7 or 8

6    other matters.  We don't -- and the Government's telling us,

7    well, we're not sure whether we're going to call

8    Dr. DiGiralomo.  He was initially on the list of the people

9    they were going to call.  We're not sure we're going to call

10   him.  So what do we need to do then?  Do we have to wait until

11   December to find out, to see if we're entitled to the other

12   discovery, which I think we're entitled to anyway.  That's

13   another hearing.  That's another hearing that we're going to

14   have to be in front of Your Honor.  This is as a result of May

15   4th, Judge, and there's more.  This is just the tip of the

16   iceberg.

17           The other thing that's happened is that when we look

18   at this material, Judge, and we start to analyze it, we have

19   to get it to our client and there's a myriad of problems with

20   the prison and him getting the --

21           THE COURT:  Have there been any changes either

22   within the BOP or generally or the FDC here across the street

23   that have changed the way in which any given detainee has

24   access to prepare for trial?

25           MR. DESIMONE:  He's telling me right now he hasn't

1    received access to some of the charts, files.  He says they're

2    patient files -- any of them.  The same --

3              (Discussion with the defendant off the record.)

4              THE COURT:  I think my question was has there been

5    any changes in the facilities or the policies of the BOP --

6              MR. DESIMONE:  I don't know, Judge.

7              THE COURT:  -- or the FDC with respect to getting a

8    detainee access to whatever that person might need in order to

9    prepare?

10             Ms. Querns.

11             MS. QUERNS:  Not to our knowledge.  The discovery

12   that is sent by the Government to Dr. Nikparvar-Fard he seems

13   to receive earlier and easier.  To the extent we -- to the

14   extent it is not sent by the Government because it is not

15   specifically Jencks Act material, we have a very difficult

16   time having it actually reach him.

17             THE COURT:  Okay.  Thanks.

18             MR. DESIMONE:  So that's the answer to that, Judge,

19   I guess.

20             THE COURT:  And Ms. Costello or Mr. Parisi, if you

21   know something other than that or any additional information,

22   you can either tell me now or you can tell me when it's your

23   turn to talk.

24             Okay, sorry, Mr. DeSimone.

25             MR. DESIMONE:  That's okay.

```
 1              THE COURT:  That was a question that was on my mind.
 2              MR. DESIMONE:  All right, it was a good question
 3    actually.  I just know the difficulty continues on for me when
 4    I talk to him and see him and I don't know if it's Jencks or
 5    not or if it was always this bad or bad.  Anyway,
 6    interestingly enough, Judge, if you recall back in January, we
 7    were scheduled to go to trial.  We had the Omicron situation.
 8    The Government answered ready.  They stated they were ready
 9    for trial.  They were ready for trial but hadn't given us
10    these documents.  So it's incredulous, Judge, how they can
11    answer and say -- they were going to say, Oh, we were ready
12    and you can't count this time against us, we did our due
13    diligence because we were ready.  Well, they didn't do their
14    due diligence because they weren't ready and whether that was
15    negligence or whatever it was, that was wrong because,
16    obviously, as of May 4th, they weren't ready.  So this inures
17    to the detriment of the defendant, Judge.  In the meantime, we
18    received phone calls, they transcribed phone calls from the
19    prison, which we didn't know.  You know, we assumed they
20    might, but I didn't know they transcribed phone calls.
21              MS. COSTELLO:  Objection, Your Honor.  We did not
22    transcribe any phone calls.
23              MR. DESIMONE:  Well, they recorded phone calls.  I'm
24    sorry, I used the wrong word, Judge.  They didn't transcribe
25    them, they recorded them.  If they didn't transcribe them,
```

1    that's not my fault.

2              MS. COSTELLO:  Your Honor, we did not record them

3    ourselves, obviously.

4              THE COURT:  I think they are naturally recorded.

5              MR. DESIMONE:  Well, they are naturally recorded but

6    we received --

7              THE COURT:  So that's no surprise there.

8              MR. DESIMONE:  Yes, but, Judge, what we received

9    affects bail directly and I'll tell you why.

10              THE COURT:  Okay.

11              MR. DESIMONE:  Some of the things, the calls we're

12    going to play this morning, and it's Dr. Nikparvar-Fard

13    speaking to his daughter on the phone, and one of my arguments

14    is going to be, you know, she's got issues and he would never

15    do anything to hurt his family or his daughter or leave and I

16    think we would have played these at other bail hearings,

17    Judge, had we been given --

18              THE COURT:  Well, maybe I can, in focusing my

19    thoughts about this, I can help focus.

20              MR. DESIMONE:  Thank you, Judge.

21              THE COURT:  Clearly there's a pretty straightforward

22    list of considerations from the Court of Appeals.  I don't

23    know how you pronounce it, but the Accetturo case.

24              MR. DESIMONE:  The Ruan case just came out.

25              THE COURT:  That's a different issue.

1                MR. DESIMONE:  I'm sorry.

2                THE COURT:  That's the legal issue.  I'm talking

3      about the factors whether when pretrial detention might run

4      afoul of due process, which is what I imagine is your --

5                MR. DESIMONE:  Correct.

6                THE COURT:  -- basic argument and that is how

7      serious are the charges, they obviously are very serious, how

8      strong is the Government's case on the merits.  That's where

9      the Ruan case, you may want to use that there.

10               MR. DESIMONE:  Exactly.

11               THE COURT:  Is the case complex?  I mean, yes, it's

12     been designated complex, but is it four and a half years

13     complex?  One might -- that may be a rhetorical question.

14     What's the risk of flight and the danger to the community.

15     We've had that issue.  I've had that issue for a very long

16     time with the flight.  And you were just beginning to make

17     reference to that, I think, Mr. DeSimone.

18               MR. DESIMONE:  Yes, I was, Your Honor.

19               THE COURT:  How long has this defendant been

20     detained?  We know it's been, everybody can count, it's 42

21     months and has there been some sort of blame game going in

22     terms of who's responsible for the delay?

23               MR. DESIMONE:  Right.

24               THE COURT:  Up until now, it's been essentially --

25     nobody has really argued that the passage of time is the

1    responsibility of one side or the other.  It's just been.  I

2    understand from what you've been saying that the argument now

3    is that the Government is responsible for the latest

4    collection of delay.

5              MR. DESIMONE:  Yes.

6              THE COURT:  So that's pretty much the way the case

7    law would --

8              MR. DESIMONE:  Correct, Your Honor, and I don't

9    disagree and the passage of time is --

10             THE COURT:  I don't care which of these issues you

11   want to focus on, but you may proceed.

12             MR. DESIMONE:  Before Ms. Querns speaks, there's a

13   very -- it's not so-so that we think from May 4th, it's the

14   Government's fault.  I say, no, Judge, I say when they

15   answered ready in January and we're ready to go and they said

16   to you as of Omicron, we're ready, that was a responsibility

17   from way back, Judge, not only from May the 4th, because if

18   they answered ready on May the 4th and they didn't produce

19   these documents until May the 4th, they weren't ready.  They

20   just weren't.  And you say the blame game you call it, the

21   blame game.  Well, that's right.  We have to -- I mean it's

22   apparent.  So Ms. Querns is going to say something.

23             MS. QUERNS:  Your Honor, as you know, we are here

24   today because we believe that Dr. Nikparvar-Fard's detention

25   at this point surpasses what is permissible under the due

1   process clause under the Constitution and I'll address each of

2   the Accetturo factors.

3            First, as to time, it's our position that the length

4   of time alone justified his release under due process.  While,

5   Your Honor, again the Government may disagree with that, we

6   will address -- we think all of the other factors that Your

7   Honor previously found may have tipped towards the

8   Government's favor now tip toward the defendant's favor.  For

9   instance, the cause of the delay.  Like you said before, it

10  was a pretty neutral factor.  At this point, it's not neutral

11  anymore.  The Government had all of this evidence beforehand.

12  Whether or not it was in the possession of former AUSA

13  Bologna's possession or the current AUSAs, the Government had

14  possession of all of this evidence for years before they

15  produced it and for them to produce it now and cause this

16  delay and require that he continue to be detained pretrial

17  tips that in his favor at this point because it's not his

18  fault.  The other cases that the Government cites are not --

19  are not on point for our defendant.  He has not filed motions

20  asking the entire U.S. Attorneys to recuse themselves or

21  switched counsel seven times.  The defendant has done nothing

22  to cause this delay.  While other defendants asked for a short

23  continuance related to the Ruan case, the Ruan case has been

24  decided.  We could all be before you gearing up for trial

25  again, yet we're not because of the Government's late

1    production of evidence.  The strength of the Government's case

2    has changed.  Both the exculpatory evidence on the most recent

3    production directly impacts the strength of the

4    Government's case regardless of what they say.  Their own

5    witnesses who they are going to put on the stand presumably to

6    testify against our client, their own witnesses are recorded,

7    without them knowing, saying exculpatory things, things that

8    Dr. Nikparvar-Fard never did anything, never did anything

9    illegal, that all of the prescriptions were -- were within

10   bounds.  And, additionally, the Ruan case.  Again, it changes

11   the calculus as to the Government's -- the strength of the

12   Government's case.  They now need to prove that Advanced

13   Urgent Cares existed for the purpose of prescribing drugs

14   illegally and that's a high bar.  Additionally, some of the

15   pleas that they got, the witnesses in their statements say

16   they think they were doing the right thing and for -- now that

17   Ruan has indicated that to the extent a doctor thinks they're

18   doing the right thing, it is within bounds, I question how

19   helpful those witnesses will be at this point.  So the

20   strength of the Government's case has definitely changed.

21          The severity of the charges, yes, the charges before

22   Dr. Nikparvar-Fard are serious, but he has served significant

23   time at this point, more time than we have found other

24   physicians who were found guilty of similar charges are

25   sentenced to.  So the charges are severe, but even if he is

1    found guilty, he has likely served his time at this point.

2           THE COURT:  Well, he faces up to 30 years in prison.

3           MS. QUERNS:  Yes, I will not dispute what the

4    Guideline ranges are.

5           THE COURT:  Okay.

6           MS. QUERNS:  And then as to him being a flight risk,

7    we have a fulsome bail package.  And the jail calls that Mr.

8    DeSimone has referenced, they show how he wants to be with his

9    kids, he is a devoted family man, and that 20-minute phone

10   call that the marshals recorded of him being arrested on the

11   civil contempt charges does not show the entire person that he

12   is and the jail calls contrast that and show he's not going to

13   go anywhere.  He is in a position now where he has done

14   significant time, had significant assets up and his case has

15   gotten better.  So it is our position that at this point

16   continued detention of him would be punishment, that it is not

17   -- it is excessive in relation to the nonpunitive purpose

18   which is to assure his appearance here at trial.  He is a

19   nonviolent offender, it is a nonviolent crime, and the

20   Government has not cited a single case that involves a

21   similarly nonviolent offender, nonviolent crime, this level of

22   detention and it being no fault of his own.  Thank you.

23          THE COURT:  So, as I understand it, you've got

24   evidence to present.

25          MR. DESIMONE:  Yes.  Yes, Your Honor.

1          THE COURT:  But first let me offer the Government

2     the opportunity for what I guess is turning into like an

3     opening statement.

4          MS. COSTELLO:  Well, thank you, Your Honor.  I think

5     that the defense is mistaken about a lot of things and I want

6     to focus on the things that matter and not all the nonsense

7     and I think that what matters is that nothing really has

8     changed, here, Your Honor.  The Government's case is extremely

9     strong, Your Honor.  That hasn't changed.  I'm very confident

10    in this case and the evidence.  Ruan changes nothing for us.

11    I said that before and I'll say it again even after it came

12    out.  We're still going to prove the exact same things that we

13    were going to prove before, that this was knowing and

14    intentional.  So that doesn't change.  And we have, as I said,

15    six cooperating defendants who are going to corroborate our

16    expert report and we have the documentary evidence that's

17    going to corroborate all of them.  So the strength of this

18    case has not changed despite Ruan.  Ruan is a red herring,

19    Your Honor.  Certainly it's going to require a tweak in jury

20    instructions similar to what we did, but it's not going to do

21    so very much.  It doesn't change what we intended to prove.

22    He's still a flight risk, Your Honor.  He's still going to

23    ignore the Court's orders.  He's still a threat to the

24    Government witnesses.  And if I remind the Court of a letter

25    that AUSA Jason Bologna sent to the Court about the defendant

1   reaching out to our expert witness, sending a letter like a

2   discovery request, surreptitiously using a fake envelope with

3   the lawyer's name on it, I think you remember what I'm

4   speaking about.

5          THE COURT:  I do.

6          MS. COSTELLO:  That's what he does behind bars.

7   What do you think he's going to do when he's out?  Okay, he

8   loves his daughter.  Okay, we'll stipulate to that, Your

9   Honor.  I think he loved her when he was doing these crimes

10  too and I think he loved her at the other bail hearings and I

11  don't think that's a big factor because nothing has changed as

12  far as his personality, who he is and what he's done and what

13  he's in danger of doing.  And if he's got all these assets,

14  like I think Ms. Querns says he has significant assets, well,

15  why aren't they pledged?  It seems to me based on these bail

16  conditions, he doesn't have much to lose, Your Honor, because

17  it's not his stuff and I think it's something that should be

18  taken into consideration.  This is a man who threatened United

19  States Marshals, threatened to kill them, threatened to kill

20  another witness, failed to appear, has civil contempt orders

21  against him, had a concealed weapon on him when he was picked

22  up on that.  I mean these facts haven't changed and a lot of

23  this is just a distraction to keep the Court from focusing

24  back on those things, the things that really matter from

25  making a decision.  And one other mistake at least that Ms.

1   Querns makes was to say this information was in possession of

2   AUSA Bologna or perhaps us before.  It was not, and she knows

3   that and we've talked about it, and so I think they should get

4   their facts straight before they start making accusations,

5   Your Honor.  I don't appreciate that.

6           THE COURT:  Where was it?

7           MS. COSTELLO:  It was in the possession of the FBI.

8   No, you said AUSA Jason Bologna and then you said us.  Neither

9   one of us had it at the time.  As soon as it came into my

10  possession, we turned it over without even reviewing it

11  ourselves, Your Honor, because we recognized the importance of

12  getting it out and that it needed to go out and that was done.

13  So their complaint is that we produced discovery as we were

14  required to do.  I mean what else are we supposed to do, Your

15  Honor?  I mean we did what we were supposed to do.  And as far

16  as this stuff being exculpatory, that is bananas.  Excuse my

17  slang, Your Honor, but I think Mr. DeSimone said --

18          THE COURT:  Well, why do bananas get a bad name?

19          MS. COSTELLO:  I don't know.

20          THE COURT:  You know, what's the problem with

21  bananas?

22          MR. DESIMONE:  It's a good fruit too.

23          THE COURT:  Sorry.

24          MS. COSTELLO:  Mr. DeSimone said there's legion of

25  instances of exculpatory evidence and there's not a single

1   piece of exculpatory evidence in their brief.  Why didn't they

2   bring it out?  All of the stuff they put in here is

3   irrelevant, silly nonsense again.  I think it's just a

4   distraction to keep the Court focusing on what matters, which

5   is, is passage of time enough to say that we're willing to

6   take a risk and put this defendant back on the street?  And I

7   think the risk is too high, Your Honor, and that's my opening

8   statement.

9              THE COURT:  Okay.  Well, as I said, I wanted to

10  be --

11             MR. DESIMONE:  Fair.

12             THE COURT:  -- symmetrical.

13             MR. DESIMONE:  I just want to say one thing.

14             THE COURT:  More of an opening.

15             MR. DESIMONE:  I want to thank you, Ms. Costello,

16  for making my point where she said that I'm bananas and the

17  stuff is bananas which shows we're going to have a hearing and

18  we're going to see how bananas we are, whether this is

19  exculpatory, and you're going to have to make more rulings

20  thanks to the Government.  Judge, I don't care who had it, I

21  didn't say Ms. Costello had it or Mr. Bologna.  I didn't cast

22  aspersions on anybody.  The Government had it.  The FBI had

23  it.  And it's -- we didn't have it.  They had it.  They have a

24  duty, and the cases are here, it doesn't matter who has it.

25  The Government had it.  And it took them three and a half

1    years or two and a half years to give it to us.

2              Do you have anything you want to say?  You said --

3              MS. QUERNS:  The new production also indicates that

4    AUSA Bologna was being briefed on this informant the entire

5    time.  So if it was in the possession of the FBI and not

6    physically at the U.S. Attorney's Office, I don't know.  I'm

7    not trying to disparage anyone.  We just didn't have it, we

8    didn't know it existed.

9              MR. DESIMONE:  So you have it.

10             MS. QUERNS:  And the evidence suggests that they

11   did.

12             MR. DESIMONE:  Judge, may I call my witnesses?

13             THE COURT:  Sure.

14             MR. DESIMONE:  Should I stand over here or I'll come

15   up?

16             THE COURT:  Where do you plan the witness to be?

17             MR. DESIMONE:  Sit up there on the witness stand.

18             THE COURT:  Then why don't you use the lectern.

19             MR. DESIMONE:  I just, with juries, I always think

20   there's a jury box and I lose my perspective.

21             THE COURT:  This is a pretty empty box.

22             MR. DESIMONE:  I --

23             THE COURT:  Unless you want us to bring in a

24   hologram jury.

25             MR. DESIMONE:  That would be good, Judge, yes.

```
1              THE DEPUTY CLERK:  Please remain standing and raise
2    your right hand.
3              NIUSHA HOUSHMAND SWORN
4              THE DEPUTY CLERK:  Could you please have a seat and
5    state and spell your full name for the record.
6              THE WITNESS:  My first name is N-I-U-S-H-A and my
7    last name is H-O-U-S-H-M-A-N-D.
8              THE COURT:  Good morning, Ms. Houshmand.  How are
9    you doing today?
10             THE WITNESS:  Good.  How are you?
11             THE COURT:  I'm okay so far.
12             THE WITNESS:  Good.
13             THE COURT:  Go ahead.
14                      DIRECT EXAMINATION
15   BY MR. DESIMONE:
16   Q.   Niusha --
17             MR. DESIMONE:  May I call her Niusha, Judge?
18             THE COURT:  Whatever.
19   BY MR. DESIMONE:
20   Q.   Niusha, I want you to speak up loud and clearly.  How
21   many children do you have?
22   A.   I have two children.
23   Q.   You heard the Government say that nothing has changed
24   since 2017 or '18.  Would you tell us about your daughter, how
25   she was in 2017 first.  How was she?
```

1  A.   Okay.  In 2017, she was very happy girl and all of her
2  grades is perfect.  We never had a problem.  The
3  psychology/psychiatric doctor, she had a stay in the hospital.
4  And now it's -- okay.
5  Q.   All right.  So now in 2017, you said things were okay.
6  A.   Yes.
7  Q.   Did you ever hear, were you ever present or did you ever
8  hear conversations between your husband and her on the
9  telephone?
10  A.   Yes.
11  Q.   Okay.  How did your husband feel about -- did he ever
12  express to you how he feels about his daughter?
13  A.   You know, he really cared for my daughter and even my son
14  and all the time that they talk on the phone, they are just --
15  it's about their love, about their caring.  He really cares
16  about his children.
17  Q.   We need to know if something has changed within the last
18  year or two with your daughter.  Would you tell Your Honor if
19  something has changed?
20  A.   My daughter, because all of these things has happened and
21  the Court unfortunately keep postponing and the date changed,
22  and last year, she start to be very, very depressed and in the
23  last September, she was really bad.  She stayed in the
24  hospital for two weeks, almost two weeks.  She's under
25  medication and a doctor keeps increasing the dose and also

1    it's really affecting her studies.  She couldn't take it two

2    times, the SAT, because she is in 11th grade and this is the

3    year that she needs.

4            THE COURT:  She's in 11th grade?

5            THE WITNESS:  Yes.  She needs to do the SAT and the

6    essay for the college, but I cannot, you know, ask her to

7    study for this herself because she's not in a position, you

8    know, that she can study and focus on her studies and she's

9    seeing the psychiatrist doctor and the psychology doctor and

10   now she's unfortunately under suicide watch because of all of

11   these things that happened and she's very sensitive too.

12   She's really daddy's girl.  And even when I heard that the

13   Court has rescheduled for the January, I don't know how to

14   tell her.  I'm scared that something will happen because any

15   time that I tell her about the Court, she's panicking and

16   something new happened to her.  So I'm trying to talk with the

17   doctor and the psychiatrist to see in which way we can talk

18   with her to make sure she calm and, you know, she can handle

19   this, that the Court has still rescheduled for the January

20   meeting.

21   Q.   Does she have a specific problem that they diagnosed when

22   she was in the hospital?

23   A.   Yes.  She was diagnosed, because all of the depression,

24   she was diagnosed with eating disorder.  She stopped eating.

25   What's it called, anorexia, if I'm not mistaken.  And the

1    doctor talks with her every day and they said all of this

2    happened is because she is really, really depressed for her

3    dad and she says I don't understand why the Court was supposed

4    to be in 2019 and why this is all happening.  I really want it

5    to be done.  And she's just 16 years old.  You know, it's

6    really hard for her.  That's why I was panicking to tell her

7    about the January, she doesn't know that.

8    Q.   That wasn't her condition in 2017?

9    A.   Absolutely not.

10   Q.   Does your husband know about that?

11   A.   Just a little.  She doesn't -- he doesn't know all of the

12   details and I'm trying to not to tell him.

13   Q.   Okay.  Fine.

14        MR. DESIMONE:  I have no further questions.

15   BY MR. DESIMONE:

16   Q.   And, by the way, your son, did he have a problem too?

17   A.   He does have a problem, too, because he's actually like

18   the only man in our family and he thinks that all of the

19   responsibility of the things that happen to the sister, you

20   know, he's trying to just helping her, but it was an effect on

21   him, too, and he was really very depressed while all this

22   happening to my daughter and it ended up that I talked with

23   the advisor and the advisor says that I highly recommend that

24   your son drop his courses because he's in a very high

25   depression.  So it ended up at the end of the term he dropped

1    his course.

2    Q.   What school was he in?

3    A.   Lehigh University.

4    Q.   Lehigh University.  And he had to drop out for a

5    semester?

6    A.   Yes.

7    Q.   Okay.  The judge is concerned about a flight risk.  Would

8    your husband leave?

9    A.   Absolutely not because he really, really cares for his

10   family.  Really cares.  Especially my children and he's not

11   going to do anything that, you know, hurt his family.  I know

12   that.  He's not going to do it.

13           MR. DESIMONE:  Thank you.  Your witness.

14           THE COURT:  Ms. Costello.

15           MS. COSTELLO:  Yes, Your Honor.

16                    CROSS-EXAMINATION

17   BY MS. COSTELLO:

18   Q.   Good afternoon.

19   A.   Good afternoon.

20   Q.   I just want to make sure you understand the situation

21   here today and going forward.  You do understand, don't you,

22   that your husband faces the possibility of decades in prison?

23   A.   I'm not sure because the Court -- we don't know yet.  The

24   Court is going to be in January.  We haven't resolved it.

25   Q.   You don't know what the possibility is if he's convicted?

1   A.   I know the possibility, but I really hope that everything

2   goes well.  I'm not sure if he's guilty or not.

3   Q.   Oh, I understand that.  I'm not saying he's guilty.

4   We're going to have a trial, okay?

5   A.   Yes.

6   Q.   My question is do you recognize if he's convicted, he

7   faces a possibility of decades in prison.  Do you understand

8   that?

9   A.   Yeah.

10   Q.   Okay.

11          MS. COSTELLO:  Thank you, Your Honor.  Nothing

12   further.

13          THE COURT:  Is there any redirect?

14          MR. DESIMONE:  No, Your Honor.

15          THE COURT:  Well, I have just one question.  Who

16   owns the property there in Penn Valley?

17          THE WITNESS:  The trust owns the property.

18          THE COURT:  Who are the beneficiaries of the trust?

19          THE WITNESS:  My children.  My son and my daughter.

20          THE COURT:  Do you know if it's what we call a

21   revocable trust or an irrevocable trust?

22          THE WITNESS:  Yeah, I do.

23          THE COURT:  Do you know which it is, what kind of

24   trust?

25          THE WITNESS:  I think it's -- we had --

1          THE COURT:  Can you get the property back from your

2     kids, from the trust?

3          THE WITNESS:  Yeah, we had an attorney last year

4     from the Blank Rome.  They say that they can put the house on

5     my son's name since he's 18 now.  We can transfer the title to

6     my son's name.

7          THE COURT:  Okay.  Right now the house is still in

8     the name of the trust, is that right?

9          THE WITNESS:  Yes.  Yes.

10         THE COURT:  Do you know or do you have any belief

11    that the house could go back into your name or your

12    husband's name now?

13         THE WITNESS:  I don't know about that if it can go

14    on my name or my husband's name, but they told me that it can

15    go to my son's name.

16         THE COURT:  I understand that part.  Where is your

17    daughter now?  Where is she today?

18         THE WITNESS:  She's at home and given I told my son

19    to come and stay with her because she really wanted to come

20    today.  This morning she was crying.

21         THE COURT:  Is anybody there watching her?

22         THE WITNESS:  Yes, my son.  My son taking off.  He's

23    working, but I ask him to take off because I want to leave the

24    house and he stay with my daughter until I go home.

25         THE COURT:  What is your -- your son's not in

1   school, right?

2            THE WITNESS:  No, no, he's working here in the

3   summer.

4            THE COURT:  What is he doing?

5            THE WITNESS:  He's a swimming coach at the camp, the

6   kids camp, summer camp.  He's just teaching the kids swimming.

7            THE COURT:  When did he drop out of Lehigh?

8            THE WITNESS:  For the semester -- not -- two

9   semesters.

10            MR. DESIMONE:  Ago.

11            THE COURT:  Did he go to school last year at all?

12            THE WITNESS:  Oh, yes.

13            THE COURT:  So when did he drop out?

14            THE WITNESS:  Not the last semester, the semester

15   before that.

16            THE COURT:  The fall semester?

17            THE WITNESS:  Yes, the fall semester.

18            THE COURT:  He went back to school this spring?

19            THE WITNESS:  Yes.

20            THE COURT:  What year is he, a freshman, a

21   sophomore, what?

22            THE WITNESS:  He's a second year of the college.

23            THE COURT:  Okay.  Does your daughter have a summer

24   job?

25            THE WITNESS:  No, because I'm trying to --

1          THE COURT:  No, no, no, I just want to know if she

2    has a job.

3          THE WITNESS:  No.  No.  I cannot leave her because

4    she's under suicide watch.  I have to be with her all the

5    time.

6          MR. DESIMONE:  Judge, in light of your questions,

7    may we see you at sidebar with the U.S. Attorney with -- we

8    want to do this at sidebar.

9          THE COURT:  I don't quite understand.

10         MR. DESIMONE:  Well, it has to do with her daughter.

11         THE COURT:  Well, I don't know that you need

12   anything more.

13         MR. DESIMONE:  Well, there's one thing you asked why

14   she's not here this morning.

15         THE COURT:  I've got an answer.

16         MR. DESIMONE:  Well, all right.

17         THE COURT:  I mean, I'm not --

18         MR. DESIMONE:  Can I see --

19         THE COURT:  All I really wanted to know is where she

20   was.

21         MR. DESIMONE:  Can I see Your Honor?

22         THE COURT:  That's all I really cared about.

23         MR. DESIMONE:  Can I see you with the U.S. Attorney

24   at sidebar, Your Honor?

25         THE COURT:  Yes.

```
 1            And Ms. Feldman, yes?
 2            MR. DESIMONE:  Oh, yes.
 3                    (Sidebar:)
 4            MR. DESIMONE:  She didn't want the husband to hear
 5   this, but what happened this morning is the daughter cut
 6   herself.
 7            THE COURT:  Okay, all I wanted to know --
 8            MR. DESIMONE:  I understand.  I understand, Judge.
 9            THE COURT:  I don't need to know any more.
10            MR. DESIMONE:  Well, she was cutting herself this
11   morning because she had to come down here to court.
12            THE COURT:  She didn't have to come.  I just
13   wanted -- I got the answer to the question.
14            MR. DESIMONE:  No, I just wanted to make clear.
15            THE COURT:  Okay, there's a certain flexibility in
16   evidentiary standards here.  I got the answer that I was --
17   the question I was interested in.
18            MR. DESIMONE:  Okay.
19                    (End of sidebar)
20            THE COURT:  As a result of the Court's questions of
21   the witness, do either counsel have any further questions for
22   her?
23            MR. DESIMONE:  No, Your Honor.
24            MS. COSTELLO:  No, Your Honor.
25            THE COURT:  Okay, you can step down.  Thanks.
```

1          THE WITNESS:  Thank you.

2          MR. DESIMONE:  I call Dr. Nikparvar-Fard.

3          THE COURT:  Fine.

4          MEHDI NIKPARVAR-FARD SWORN

5          THE DEPUTY CLERK:  Please state your full name and

6    spell your last name for the record.

7          THE WITNESS:  Mehdi Nikparvar-Fard.  Also Mehdi

8    Armani.

9          THE COURT:  Sir, although there's no requirement,

10   most witnesses when they are testifying, and unless you feel

11   strongly against this, most witnesses remove the mask so that

12   the court reporter can understand what's being said, but if

13   you feel at all vulnerable as a result of that, that's fine,

14   we'll do the best we can.

15         THE WITNESS:  Okay.

16         THE COURT:  But do keep your voice up, okay?

17         Mr. DeSimone, you can proceed.

18                      DIRECT EXAMINATION

19   BY MR. DESIMONE:

20   Q.   Doctor, the lady who just testified is your wife, is that

21   right?

22   A.   Yes.

23   Q.   And she was talking about your daughter, correct?  Your

24   daughter, is that right?

25   A.   Yes.

1  Q.   Tell me -- tell Her Honor how you feel about your

2  daughter and her condition and everything else.  Take us

3  through your relationship with your daughter because we're

4  going to play some tapes, but go ahead, Doctor.

5  A.   I'm kind of disturbed at this moment.  I don't know.  I

6  had no conversation with the Judge and I'm very disturbed.

7  Q.   Why?

8  A.   Because my wife doesn't keep me updated.  Very disturbed.

9  Very disturbed with the fact that you discussed with the

10  judge.  But I have very strong inclination with my son and

11  with my wife.

12  Q.   Would you do anything to hurt --

13  A.   Absolutely not.  Everything -- my life is over.  I'm 52.

14  My productive life is over.  I may have another 10, 20, 30

15  years more.  Those are next generation.  They are the ones

16  that I put all of my life, for them, so I wanted them to be

17  having a joyful life.  I wanted them to be happy.

18  Q.   So if you were put on -- if Your Honor granted the bail

19  petition, would you honor that?  Would you stay and honor the

20  petition and not try to do anything to leave?

21  A.   Absolutely.  Absolutely.  There's nothing for me to

22  leave.  I mean leave when?  Leave what?  I mean where do I go?

23  Go to Ramos to do what?  My life is over.  I mean it's just

24  nonsense.

25  Q.   And your family, how important is your family to you?

1   A.   All of my life is my family.

2   Q.   Doctor, I'm going to play some -- we have some recordings

3   we were given.  I want you to listen to them.  These are in

4   October and they were from --

5          MR. DESIMONE:  If I might lay a foundation, Your

6   Honor.

7   BY MR. DESIMONE:

8   Q.   -- from prison of you, with you and your daughter talking

9   about school.  So we're going to play some of the tapes.

10         MR. DESIMONE:  It's October and December, Ann.

11         MS. QUERNS:  I have four tapes randomly from the --

12         MR. DESIMONE:  Play a couple.

13         They're not that long, Your Honor.

14         (Tape recording played)

15         MR. PARISI:  Your Honor, just for clarification of

16   the record, can counsel or somebody just tell us the date of

17   the call?

18         THE COURT:  That would be helpful.

19         MR. DESIMONE:  Yeah, it's like ten seconds.

20         MS. QUERNS:  This one is December 7.

21         MR. DESIMONE:  December 7 what?

22         MS. QUERNS:  December 7, 2017, 11:58 p.m.  It's what

23   the file name is.  I don't know if that represents the --

24         THE COURT:  11:58 p.m.?

25         MS. QUERNS:  That is what the file name is.  I'm not

1    sure whether, what time it corresponds to or not.

2            THE COURT:  Okay.

3    BY MR. DESIMONE:

4    Q.   What time would you usually talk to your daughter,

5    Doctor?

6    A.   I always make two phone calls.  One in the morning so I

7    can talk with my wife if there is anything regarding the legal

8    stuff.  I don't want them to hear anything about the legal.  I

9    wanted them to have peaceful life.  I don't want them to be

10   disturbed.  And then when they come back from the school,

11   afternoon phone call is only for kids and all of the phone

12   calls that I made to my kids is in the afternoon.

13   Q.   Okay.  So this is sometime in the afternoon?

14   A.   Yeah, 3:30.

15   Q.   All right, not 11:58?

16   A.   5 p.m., something like that.

17           MR. DESIMONE:  And so for the record, Your Honor --

18   BY MR. DESIMONE:

19   Q.   The people on the phone call, if you can identify them?

20   A.   Yes, my daughter and my son.

21   Q.   Okay.  Fine.

22   A.   And my wife.  And when I talk to her, first I ask if the

23   kids are home, can I talk to them.  That's the translation of

24   my Persian language.

25                       (Tape recording played)

1          THE COURT:  Could I just have an estimate as to how

2     long -- this is a December 2017 --

3          MR. DESIMONE:  Yes, Your Honor.

4          THE COURT:  -- phone call?

5          MR. DESIMONE:  How long is the call?

6          MS. QUERNS:  There's approximately four more

7     minutes.

8          THE COURT:  All right, how long are each of these

9     calls?

10         MR. DESIMONE:  Yeah, I thought they were 5 or

11    10 minutes.

12         MS. QUERNS:  We don't need to play all of them.

13         MR. DESIMONE:  We're not going to play them all.

14         THE COURT:  Well, this one is -- you know, I don't

15    mean to control how you do this, but we're sitting here in

16    July of 2022.  I'm not quite sure what I'm supposed to be

17    listening for in a December 2017 phone call.

18         MR. DESIMONE:  You're listening to --

19         THE COURT:  I know what I'm listening to, Mr.

20    DeSimone.

21         MR. DESIMONE:  No, I know.

22         THE COURT:  I'm not sure why I am listening to it.

23         MR. DESIMONE:  That's why I'm explaining this.  Why

24    you're listening to this is you're hearing this man speak to

25    his daughter --

 1                THE COURT:  His son, actually, he's speaking to.

 2                MR. DESIMONE:  Is that your son or daughter?

 3                THE WITNESS:  My son.

 4                MR. DESIMONE:  Is that your son?

 5                I thought that was his daughter.  I can't even hear

 6      the tape.

 7                THE COURT:  Right now they're talking about physics.

 8                MR. DESIMONE:  I understand, Judge.  I understand.

 9      But the concern he has --

10                THE COURT:  I get it.  I understand it, but I'm

11      still talking about why in July of 2022 am I going to be

12      focused on a 2017 phone call.

13                MR. DESIMONE:  The Government is telling you that

14      he's a flight risk.  He is telling you that he wouldn't do

15      anything to hurt his children.

16                THE COURT:  I understand that.

17                MR. DESIMONE:  And these phone calls are showing

18      Your Honor how much he cares for his children and his

19      daughter, who his wife just testified, has gotten sick since

20      then.  So it's more, all the more reason he's not going to do

21      anything to flee while they're here.

22                THE COURT:  I'm just -- I just wanted to know how

23      long.

24                MR. DESIMONE:  That's why.

25                THE COURT:  How long is this portion and why 2017?

1    That was my question.  What are the other excerpts that we're

2    going to be --

3              MR. DESIMONE:  Sure.  Do you have any of his

4    daughter?

5              MS. QUERNS:  Yeah, she's on the end of the tape, and

6    after this tape, we can provide the rest to the extent --

7              MR. DESIMONE:  To the Court.

8              THE COURT:  No, I just want to know the date and the

9    length of time.

10             MS. QUERNS:  They're -- there is one from October,

11   there's one from November.

12             THE COURT:  Of what year?

13             MS. QUERNS:  All 2017.  They were just produced.

14             THE COURT:  All from 2017?

15             MS. QUERNS:  Yes.

16             THE COURT:  All right, I don't need to listen to

17   2017.

18             MR. DESIMONE:  We don't have any other ones, Judge.

19             THE COURT:  Okay.  I accept the representation of

20   counsel and the witnesses that the defendant cares for his

21   kids.

22             MR. DESIMONE:  Right.  Okay.

23             THE COURT:  And I think that the Government's counsel

24   stipulated to that --

25             MR. DESIMONE:  Fine.

```
 1              THE COURT:  -- as well.
 2   BY MR. DESIMONE:
 3   Q.   So, therefore, would you do anything to hurt your
 4   children?
 5   A.   Absolutely not.
 6   Q.   Would you leave, would you violate the bail conditions
 7   and leave?
 8   A.   Absolutely not.
 9   Q.   And you know that would hurt your children, do you not?
10   A.   Absolutely.  They not only -- hurt them mostly, but
11   they're going to lose their home.  I'm not going to let them
12   to lose their home.  I'm not going to let them to lose their
13   assets.  These are -- these are what they need for future.
14   Q.   And you heard the present condition of your daughter,
15   right --
16   A.   Yes.
17   Q.   -- how fragile it is?
18   A.   Yes.  That's correct, yes.
19   Q.   Would you do anything?
20   A.   Absolutely not.  Absolutely not.
21              MR. DESIMONE:  That's all.  That's all I have.
22              THE COURT:  Okay, focus only on the issues that
23   bring us here today.
24              Does the Government have any questions of the
25   witness?
```

```
 1              MS. COSTELLO:  May I have a moment, Your Honor?

 2              THE COURT:  Sure.

 3              MS. COSTELLO:  Okay.  Yes, Your Honor.

 4              THE COURT:  Go ahead.

 5                          CROSS-EXAMINATION

 6   BY MS. COSTELLO:

 7   Q.    Dr. Nik, good afternoon.

 8   A.    Good afternoon.

 9   Q.    You testified repeatedly that you would do nothing to

10   hurt your children, isn't that what you said?

11   A.    Yes, I did.

12   Q.    That's not true, is it?

13   A.    It is true.

14              MR. DESIMONE:  Objection, Judge.  You just said just

15   focus on the things in the case.

16              MS. COSTELLO:  If I may, Your Honor.

17              THE COURT:  Well, why don't you just let me overrule

18   the objection and I know counsel listened to what I had to

19   say.  The premise of the question was the witness' own

20   statement here just a minute ago.

21              MR. DESIMONE:  Fine.

22              THE COURT:  So, you know, I'm sure we'll keep track

23   of how far or narrow the questions are.

24              Go ahead.

25              MS. COSTELLO:  Thank you, Your Honor.
```

1  BY MS. COSTELLO:

2  Q.   Isn't it true, sir, that you got yourself convicted for

3  threatening a United States Marshal?

4  A.   Yes, it is true.

5  Q.   And you went to jail for that, didn't you?

6  A.   Yes.

7  Q.   That probably hurt your daughter, didn't it?

8         MR. DESIMONE:   Object.

9         THE COURT:   Overruled.

10        THE WITNESS:   I'm sure it did.

11  BY MS. COSTELLO:

12  Q.   And you got yourself into that pickle because you were

13  found in civil contempt, isn't that right?

14  A.   That's true.

15  Q.   Because you failed to participate in civil proceedings

16  against you, isn't that right?

17  A.   Well, that was a start of what happened to me and it was

18  -- I was very, very emotional at that time when they arrested

19  me and dragged me in front of my patients and that emotional

20  disturbance got the best of me.

21  Q.   Um-hum, and it caused your daughter some pain too, didn't

22  it?

23  A.   Definitely.  I'm sure it did.

24  Q.   And you had a concealed weapon on you when you made that

25  threat, isn't that right?

1  A.   Yes, I did.

2  Q.   And at any time did you also threaten a former employee

3  who was a witness in a state court proceeding, sir?

4        MR. DESIMONE:  Objection, Your Honor.  What are we

5  talking about?  Another case?

6        MS. COSTELLO:  Um-hum.  We're talking about the

7  defendant's risk of flight, Your Honor.

8        MR. DESIMONE:  No, Your Honor.

9        MS. COSTELLO:  Well, yes, Your Honor, it is.

10        MR. DESIMONE:  Well, no, in another -- how do I

11  respond?

12        THE COURT:  The testimony is he would do nothing to

13  violate the conditions.

14        MR. DESIMONE:  Correct, Judge, how many times do I

15  beat my wife.  She said you threatened a witness in another

16  state court proceeding.

17        THE COURT:  I think everybody can accede to the fact

18  none of this is new to the Court.

19        MR. DESIMONE:  Okay.

20        THE COURT:  I've heard all of this.  Everybody has

21  argued it one side or the other lo these many years and I

22  don't imagine any of the history has changed.

23        MS. COSTELLO:  Thank you.  All right.

24        THE COURT:  Counsel is just trying to remind the

25  Court of all these things that I have very much on a list in

1   front of me.  I want to thank you very much.

2            MR. DESIMONE:  Judge, may I ask, what employee and

3   what judge?

4            THE COURT:  Sure.  What are you talking about, Ms.

5   Costello?

6            MS. COSTELLO:  It was, I believe, a former employee

7   who was suing I think it was -- maybe it was unemployment

8   compensation.

9            MR. DESIMONE:  Whatever it is, Judge, I think it

10  might have been, I have no idea what she's talking about.

11           THE COURT:  Okay, folks.

12           MS. COSTELLO:  It's in the briefing.  Have you read,

13  it, Frank?

14           MR. DESIMONE:  Who cares about reading the briefing.

15           THE COURT:  Well, I care about reading the briefing.

16           MR. DESIMONE:  Well, but there's not --

17           THE COURT:  Okay, everybody, go back to your

18  corners, kids.

19           My focus could not be more clear today.  Could not

20  be more clear.  You know, I went through the factors that are

21  set forth by the Third Circuit right upstairs that I have to

22  focus on and these have been the factors since 1986.  There

23  they are. (Indicating)  Thanks.

24           MS. COSTELLO:  Thank you, Your Honor, and I will

25  move on, if I may?

1              THE COURT:  Sure.

2    BY MS. COSTELLO:

3    Q.   Let me ask you about the proposed conditions of release,

4    okay?  It says you'll post a $50,000 cash bond, is that right?

5    A.   Yes.

6    Q.   Now, isn't that significantly lower than what you agreed

7    to post before?

8    A.   Yes, it is.

9    Q.   Okay.  And then you're going to post this property in

10   South Carolina which is -- but that property's in trust,

11   right?

12   A.   I don't know if it's in the trust or if it's in -- I

13   don't -- I think it is in the trust, yes.

14   Q.   Okay, so it's not in your name, right?

15   A.   No, it's not in my name.

16   Q.   And then there's some equity in a house that's owned by,

17   and forgive me, I cannot pronounce these names, but a person,

18   last name Fazelinia and Razzaghi?

19   A.   Yes.

20   Q.   Okay, that's not in your name, right?

21   A.   No, they are not in my name.

22   Q.   And then you're posting some property within the names of

23   the Razzaghis -- again, the Razzaghis -- Khadijeh, I'm sorry

24   if I'm messing up these names, Mehdi Razzaghi, right?

25   A.   Yes.

1  Q.   Not in your name, right?

2  A.   No, they're not in my name.

3  Q.   Okay.  Would you agree with me, sir, that based on these

4  conditions, you don't have very much to lose if you run, is

5  that right?

6  A.   I have everything to lose.  My family, my kids.  Those

7  are everything I have.  I have nothing else.

8  Q.   Well, they're not pledged here, right --

9  A.   No.

10  Q.   -- based on these conditions?

11  A.   I think they are.  When my kids pledge their only asset

12  they have, when my friends who don't owe me anything, who I do

13  not employ them, they know me from my personality, they have

14  been dealing with me, staying with me, knowing me for many,

15  many years and they come forward and they put their entire

16  savings they worked their whole life to have this savings, and

17  without even thinking of one second, they put that as a

18  condition of bail --

19  Q.   Right.

20  A.   -- those are --

21  Q.   Sir, I understand what these people have to lose, but you

22  don't have much to lose here.

23  A.   I have everything to lose.

24  Q.   Really?  It's very different from what you testified to

25  on direct examination.  You said your life is over, didn't

1  you?

2  A.   Yes, it is.  I don't care about --

3  Q.   So you actually have nothing to lose, do you?

4  A.   My -- I do have -- if you allow me to answer the

5  question, I will answer it.

6  Q.   Well, sir, my question is focused --

7            MR. DESIMONE:  Objection.  Let him answer this.

8            THE COURT:  Okay, Ms. Costello, let him finish.

9            MS. COSTELLO:  Sure.

10            THE WITNESS:  There are -- everything I have is with

11  my kids, my wife.  That's all I have.  I have nothing else.  I

12  really don't care about myself.  The only thing I care about

13  is their well-being, they be safe, and they have a future.  If

14  they're happy, if they can just forget about me and move on,

15  that would be the best option for me, but they can't.  They

16  are emotionally connected to me and I cannot let that destroy

17  their lives.  So everything I do, I have to make sure they

18  have a good life and enjoy their life.  When I call my wife

19  and she cry over the phone, I get upset not because I'm in the

20  jail, just because I told her, listen, imagine I had a car

21  accident and I die, you have to have your own life.  You need

22  to -- you need to have -- you need to think about your kids.

23  You need to be able to enjoy your life.  You can't just be

24  upset about me all the time.  So everything I have is them.

25  For me to lose them, for me to let them get hurt physically or

1    emotionally or financially, they are going to lose their

2    houses, my friends are going to lose their houses, it's

3    unimaginable for me to let all that happen.  It's just -- it

4    just -- we are talking in a different world.  I don't know how

5    -- I don't know how to explain it.  My world of thinking is

6    completely different thinking from all as to whether it's in

7    your name or not.

8    Q.   That's very, very convenient for you, isn't it, that it's

9    not in your name?

10   A.   Convenient?  I don't understand what you mean.

11   Q.   I think you do.

12             MS. COSTELLO:  May I, Your Honor?

13             Nothing further, Your Honor.  Thank you.

14             THE COURT:  Any redirect?

15             MR. DESIMONE:  Just one other, Your Honor.

16                       REDIRECT EXAMINATION

17   BY MR. DESIMONE:

18   Q.   Dr. Nik, would you explain to the Court why the cash bail

19   is lower.

20   A.   We have really -- this -- this trial, of course, is going

21   to be financially extremely expensive for me.  I don't have a

22   public defender, I have to pay my lawyer on hourly basis, and

23   on top of that, the detention itself has caused significant

24   amount of financial expenses on my family.  For example, I

25   have to have my lawyer to represent me when I give you some

1   charts.  So in addition to these two lawyers, you and her, I

2   had to hire or pay to another lawyer to come to jail so I can

3   give you the chart.  I cannot do anything with the

4   communications so I have to hire another individual or pay --

5   not hire, pay another individual to write and type and

6   document the stuff that I want to be able to pass it to you or

7   to Ann.  So I write it, this goes to somebody who has to type

8   it, and then that will be the communication to you.  In

9   addition to that, because of the only revenue that my family

10  had is from vacation rental in South Carolina and because of

11  the Corona last year, the vacation rental just completely

12  flattened out.  We're hoping that this year might be better,

13  but we almost lose one and a half years of income and that is

14  significant amount of financial burden on me and that is the

15  reason why my wife wanted to try to ask for the bank to get a

16  mortgage and put more money and I said, no, I'm not going to

17  go home with that.  I'm going to stay here.  I'm not going to

18  let you or let my kids to go through a loan, to get a loan

19  from the bank to pay for my release.  I mean just I'm going to

20  stay if that's the case.

21           MR. DESIMONE:  Thank you.

22           MS. COSTELLO:  Nothing here.  Nothing from the

23  Government, Your Honor.

24           MR. DESIMONE:  Judge, we rest.  We have nothing

25  else.

```
 1              THE COURT:  Okay.  You can step down, sir.

 2              Are there any financial statements at all?  I'm

 3    puzzled a little bit because it sounds to me as though there's

 4    some reservation of resources in order to pay for legal

 5    expenses as opposed to there's no disclosure as to what

 6    financial resources this defendant has at his disposal.

 7              MS. QUERNS:  Well --

 8              THE COURT:  It's just a natural question and why

 9    we're concerned.

10              MS. QUERNS:  We can provide financial statements or

11    whatnot, but the cash bail amount --

12              THE COURT:  Well, it has changed over --

13              MS. QUERNS:  It has remained -- this is the same as

14    it was in the last application, but there were times when it

15    was higher earlier on in the process before the case has

16    continued to go on.  So if Your Honor would like financial

17    statements or attorneys' bills --

18              THE COURT:  I'm not in the business of saying what

19    evidence you should choose to provide.  I just -- it's really

20    up to you all, frankly.

21              MR. DESIMONE:  Well, we have --

22              THE COURT:  As it has been all along.

23              MR. DESIMONE:  The only thing is, Your Honor, we

24    would really if the Court would give us -- I mean we have

25    presented -- we've listened to Your Honor and Your Honor had
```

 1   alluded to the fact that at one point in time that you'd like

 2   to hear the defendant and we weren't prepared to put him on,

 3   we did put him on today, and if --

 4           THE COURT:  Well, no, I didn't say I wanted to hear

 5   him.

 6           MR. DESIMONE:  No, no, no, I know you didn't say

 7   that.

 8           THE COURT:  What I said was that it would seem to me

 9   that at least among the various issues that the defendant's

10   had to deal with was the question of the earnestness with

11   which one might evaluate whether or not --

12           MR. DESIMONE:  I understand.

13           THE COURT:  -- he was a flight risk, et cetera, et

14   cetera.

15           MR. DESIMONE:  I understand.

16           THE COURT:  I didn't say what I wanted or didn't

17   want.

18           MR. DESIMONE:  No, but it is good to have some

19   guidance from the Court.  So, I mean, instead when we sent you

20   10, 15 tapes to listen to and you don't want to hear that --

21           THE COURT:  No, I just said what I wanted to know

22   was what the dates were that you had and --

23           MR. DESIMONE:  Well, they're the only ones we have.

24   We don't have from 2018 and 2019.  We don't have those, Judge,

25   but if you need financial -- whatever the Court thinks they

1   have a question about in any of these areas, if the Court has

2   a question for us, and -- we can't read, Your Honor,

3   respectfully, we can't read your mind -- we will supply that.

4   That's all.  That's all we're saying.  I think that's all Ms.

5   Querns is saying.  If there's an area where you have a

6   question, like you had some questions and we -- what are the

7   dates of those telephone calls?  We were able to supply those.

8   If you have questions that will help you make a decision --

9           THE COURT:  I think the lingo is I have been as

10  transparent as I possibly could be each time we've been

11  together on this issue.

12          MR. DESIMONE:  All right.

13          THE COURT:  And I haven't changed.  The reason why

14  I'm having a hearing today is that there are some things that

15  have changed.

16          MR. DESIMONE:  There's been many things that have

17  changed.

18          THE COURT:  That is why I, frankly, if you look at

19  the scenario here, why the Court reached out and said is there

20  any reason to get together again on pretrial --

21          MR. DESIMONE:  No, I understand, Your Honor, and we

22  did.  In fact, you told us --

23          THE COURT:  And here we are.

24          MR. DESIMONE:  You told us to get with the

25  Government.  We listened to the Court, we called the

1    Government.  They didn't want to necessarily -- they didn't

2    have any interest in really talking about it, but we did.  We

3    reached out because you asked us to.

4              So what I'm saying is Ms. Querns is -- she's

5    excellent.  I am really honored to be working with her

6    actually and whatever you need, whatever the Court --

7              THE COURT:  Okay.

8              MR. DESIMONE:  You have it.  You know what I mean.

9              THE COURT:  And I appreciate that.

10             Does the Government have any evidence to present?

11             MS. COSTELLO:  No, Your Honor.

12             THE COURT:  Okay.  To the extent I haven't already

13   heard it, do you have any closing arguments?

14             MR. DESIMONE:  No, Judge, you heard our position.

15   You heard us in the opening then.

16             THE COURT:  I did indeed.  Hey, I want to give you

17   every opportunity.

18             MR. DESIMONE:  No, we're set.

19             MS. COSTELLO:  No, really, Your Honor, just if the

20   Court focuses on the Accetturo factors, then the

21   Government's position is that the defendant should continue to

22   be detained and I have nothing further to say unless you have

23   questions for us.

24             THE COURT:  All right.  Well, the reason I asked if

25   there was anything in addition to the written submissions, not

1    because I want to hear any more of mud slinging or any more

2    "ly" words.  You've all probably heard me say more times than

3    you care that if it were up to me, I would take a red pen to

4    every adverb that isn't anything that's submitted to me these

5    days and we would save a lot of trees because -- and sadly

6    you're not unique in this, counsel, but I can't emphasize

7    enough how distracting reading submissions are when so much of

8    the time is spent squabbling or name calling or trying to

9    appear not to be name calling, but it being name calling with

10   opposing counsel.  I appreciate it very much that all of my

11   prior concerns that have been articulated as reasons for

12   denying the defendant's motion for pretrial release were and,

13   frankly, remain significant trouble spots, but there are four

14   matters that I've been wrestling with that have developed

15   since the last time I addressed this issue.

16          One has been just the inevitable passage of even

17   more time.  Now everybody agrees and we can all count that it

18   will be at least four years before we get together for trial.

19   I don't know what the future holds, but right now it looks

20   like it will be at least four years before we have a trial.

21   By any measure, that's a very long time not often seen in any

22   of the case law, speaking of which you've also probably heard

23   me say that I am quite unpersuaded that the law is

24   commoditized.  So that every case -- meaning that every case

25   is a tailor-made case and every case is unique.  Sure we pull

1   out some guidance from other cases, but it's a little bit and

2   particularly in this situation makes it hard to find a case

3   on, quote, all fours with this one.  So while I appreciate the

4   fact that you can use the computer to search pretrial release

5   and a certain amount of time and it spits out cases, I don't

6   find the cases that have been cited to the Court all that

7   helpful in the final analysis because this is a unique case.

8   Okay, number one is the passage of time.

9         Number two, as I point -- as my questions should

10   show, the facilities at the Detention Center apparently are

11   not improved to mitigate the challenges for any defendant,

12   this one included, to prepare for trial in any meaningful way.

13   When I say this, I am not blaming the Bureau of Prisons or the

14   FDC.  I am simply making a realistic observation that there

15   are challenges that have not been mitigated or ameliorated for

16   preparing for trial which actually in this particular case

17   leads to the next development because it underscores the issue

18   of preparation with counsel and that is the issuance of the

19   Supreme Court's opinion in the Ruan case.  I do not

20   necessarily disagree that it is a "game changer" for this

21   case, but it does entice a defendant to try and take a sharper

22   look at some of the evidence and that arguably means that

23   there needs to be a greater interaction with counsel.  I'm not

24   suggesting that there's any change in the Government's theory

25   of the case or evidence, I am merely pointing out that it does

1   cause the Court to look again at the issue of the ease with
2   which a defendant can work with counsel to prepare
3   particularly a document intensive or records intensive kind of
4   a case.  So that's the third development that has changed.
5           The fourth one is the Government's, not counsel, not
6   any particular counsel, but the overall Government's rather
7   troublesome and unattractive May of 2022 production of yet
8   more potential evidence that made the delay of the May 31st,
9   2022 trial inevitable and unavoidable.  I'm not focusing on
10  any given lawyer and I urge counsel to decline doing the same,
11  nor am I focusing on any particular trial team or records
12  custodian for this development.  I must say, you know, though
13  in this that I don't find it particularly helpful to try and
14  parse the Government's responsibility by a trial team or by
15  some sort of segregation.  I don't think anybody seriously
16  thinks that the Government's role can be segmented in that
17  way.  I just think it's something you have to live with.  I
18  mean in a very small pale-in-comparison similarity, I do
19  recall when I used to be a practicing lawyer and was working
20  in a very large firm and I would be the only lawyer handling
21  the case and I'd develop some conflict and I would throw
22  myself at the mercy of the Court and say, But, Judge, I have a
23  conflict, I'm supposed to be in a deposition, I mean it could
24  have been even a vacation and the answer to me always was
25  along the lines of, Well, you know, cry me a river, Mrs.

1    Pratter.  You happen to come from a big firm.  Somebody else

2    can pick up the cudgels.  As I said, it's a pale pathetic

3    comparison, but the Government is, in fact, the Government and

4    I'm sure that is no surprise.

5          I consider there still to be some gaps, but,

6    nonetheless, I'll tell you what I am prepared to do and that

7    is a very, very reluctant preparation to issue an order to

8    allow pretrial release on certain very specific conditions,

9    one of which, by the way, will not be to require the children

10   to post their passports.  It's almost a Biblical thing, I

11   mean, to the extent that the children have to answer for the

12   vagaries of their parents.  Not with me.  So but the same is

13   not true of a spouse who arguably has some voluntary choice in

14   her husband.  The children do not have a choice in their

15   parents so I'm not asking the kids to post their passports,

16   but the defendant's wife will have to.

17         Let me outline what I expect that the order will say

18   and we will all gather together again when Ms. Costello or one

19   of her colleagues may find it opportune to say she told me so,

20   but we'll see.

21         The conditions are going to be that there be a

22   $100,000 cash bond posted; that the defendant or the owners

23   with full title, anybody who has title to the 400 Fairview

24   Road, Penn Valley property and the Murrells Inlet, South

25   Carolina property will post the title or whatever the full

1   equity interest is, however, I understand there's a trust that
2   may or may not apparently at least currently own or hold title
3   to these properties, but whoever owns these properties, those
4   interests will be tendered and posted.  When I say posted, by
5   the way, it's going to be once the Court has received a
6   satisfactory documentary evidence of compliance of these
7   conditions and then the defendant will be released from the
8   FDC.  Continuing the list then, that is, the posting of the
9   full equity interest in the 6744 Emlen Street, Unit 7 property
10  and the Hawthorne Avenue, Havertown property, both of which
11  are real properties apparently owned by Hossein and Hanieh
12  Razzaghi who shall, by the way, also be required to present a
13  written agreement under oath to the posting of these
14  properties as provided in this order.  The same with respect
15  to the title to the Militia Drive, Wayne property and the 6736
16  Emlen Street, Unit 3 property, again with the same statement
17  under oath of agreement to the posting of the title of those
18  properties.  I'm also going to order that upon the payment of
19  the bond and the compliance with all of these provisions that
20  the defendant will be released to his wife to reside at the
21  400 Fairview Road, Penn Valley, and in saying that, I want to
22  accentuate the fact that she is the boss.  She is in charge.
23  He is not.  And she is an arm of the Court in keeping track of
24  the defendant.  The defendant must not leave the Penn Valley
25  property without prior authorization from Pretrial Services or

1    this Court.  He must surrender all passports and visas to

2    Pretrial Services and must not apply for any passport for

3    travel documents nor seek any sanctuary or protection of or

4    from or in any governmental political entity or subdivision.

5    The defendant's wife must surrender her passport and all these

6    will be given to Pretrial Services and must not apply for any

7    passport or other travel documents.  The defendant will be

8    subject to location monitoring by global positioning system

9    devices and must not leave the property, the Penn Valley

10    property, as I said, without Pretrial Services or the Court's

11    prior authorization.  The cost for the GPS monitoring device

12    will be borne by the defendant.

13        The defendant must avoid all direct or indirect

14    contact, this means including through counsel, with anyone

15    other than his family, medical doctors and counselors and

16    attorneys including he is to have no contact with the

17    codefendants, with witnesses for any of the parties in this

18    case, any victims of the alleged crimes and any and all people

19    involved in the conduct which is the subject of this case.

20    This will include any more gambits trying to reach out either

21    surreptitiously or directly with any witness of the Government

22    including the expert witnesses.

23        The defendant must report to Pretrial Services on a

24    regular basis with a schedule to be set by Pretrial Services.

25    Of course, the defendant must refrain from possessing or

1   handling any firearm or other dangerous weapons and there are

2   no firearms or dangerous weapons that will be permitted to be

3   anywhere on the premises of the 400 Fairview Road, Penn Valley

4   property.  I think I understood that there had been previously

5   guns there, but they've been tendered, but let's just make

6   sure nobody has brought back any guns or there isn't any one

7   there.

8           The defendant must seek mental health treatment

9   including counseling for anger management at his own cost.

10          Violation of any of these conditions once the

11   defendant is released if I've received evidence of compliance

12   of these -- but violation of any of these conditions once the

13   defendant is released from the Detention Center will result in

14   revocation of pretrial release and a return of the defendant

15   to pretrial detention.

16          Questions, comments?

17          MR. DESIMONE:  No, Your Honor.

18          MS. QUERNS:  No, Your Honor.

19          THE COURT:  Ms. Costello.

20          MS. COSTELLO:  No.

21          THE COURT:  How about from Pretrial Services?

22          THE PRETRIAL SERVICES OFFICER:  No questions.

23          THE COURT:  It's a fairly lengthy order so I need to

24   get it typed up.

25          MS. COSTELLO:  If I may, Your Honor, there still is

1    an outstanding legal issue with respect to the 400 Fairview

2    Road, that that is subject to forfeiture.  Typically, my

3    understanding of the case law is that that cannot usually be

4    pledged as bail.  I think that was the subject of previous

5    briefing.

6          THE COURT:  I'm not sure I followed that prior

7    issue.

8          MS. COSTELLO:  I'm not a forfeiture expert, so I

9    agree with you.

10          THE COURT:  Where is Mr. Minni when you need him?

11          MS. COSTELLO:  I don't know.  I did not see him

12    today.  I don't know.  So that's the only thing.  Whatever.

13    We're not going to make an issue about it.

14          THE COURT:  Well, the pledging or the posting is

15    whoever has title to these properties shall provide whatever

16    it is they can for purposes of giving up their, you know, the

17    owner, the titled owner's equitable and legal title pending

18    the defendant's appearance for trial.  So if it turns out they

19    have no power to lose the property if the defendant were to

20    abscond, you know, so be it.  That's why there's a fairly long

21    laundry list here.

22          MS. COSTELLO:  Thank you, Your Honor.

23          MR. DESIMONE:  Your Honor, one thing the defendant

24    did ask me and I know what the answer is going to be, can he

25    speak to our expert and, of course, the answer is he can speak

1   to his own expert.

2            THE COURT:  Yes.

3            MR. DESIMONE:  But I wanted to make sure, he wanted

4   to make sure, so that's it.

5            THE COURT:  Well, presumably, that's with counsel

6   present.

7            MR. DESIMONE:  Yes.

8            THE COURT:  Because, otherwise, your expert's going

9   to have to be given all the admonitions of not being an

10  indirect conduit for anything that would be inappropriate.

11           MR. DESIMONE:  He's up in Massachusetts Medical in

12  Harvard.  He's not even going to --

13           THE COURT:  Well, wherever, I don't care where he

14  is.

15           MR. DESIMONE:  He's not -- the expert's not calling

16  anybody.  He means to speak to him on the telephone and go

17  over the facts of the case.

18           THE COURT:  Then I recommend very strongly, Mr.

19  DeSimone, that you or one of your colleagues go through this

20  list so that the expert doesn't become -- so there's no

21  risk --

22           MR. DESIMONE:  Judge --

23           THE COURT:  -- that the expert become a vehicle for

24  anything that might be misunderstood.

25           MR. DESIMONE:  Judge, we have enough trouble getting

1   the expert on the phone ourselves.

2          THE COURT:  I understand.

3          MR. DESIMONE:  Whether or not he's going to talk to

4   somebody else, I will -- we'll tell him, okay.

5          THE COURT:  I'm not going to make him sign anything.

6   I'm leaving a little bit --

7          MR. DESIMONE:  I'm not worried about the expert,

8   Judge.

9          THE COURT:  Well, yes, neither am I.  I think it's

10  pretty clear.  This is being driven by the passage of time.

11         MR. DESIMONE:  I understand, Your Honor.  I

12  understand.

13         THE COURT:  And the other -- I mean, just so you

14  know and your client knows, this is governed by elements that

15  he has nothing to do with.

16         MR. DESIMONE:  Judge, we wouldn't even be here now

17  if we didn't have the situation that occurred, obviously.  We

18  weren't going to file another bail petition, but --

19         THE COURT:  You know, I have nothing more to say.

20         MR. DESIMONE:  Neither do I, Judge.  It's good to

21  see you.

22         THE COURT:  Okay, anything else from anybody?

23         MR. DESIMONE:  No, Your Honor.

24         MS. COSTELLO:  Not from the Government, Your Honor.

25  Thank you, Your Honor.

1          THE COURT:  I will be here, Mr. DeSimone or Ms.

2     Querns, so when you and the Clerk's Office get me whatever,

3     you know, this list, you'll get the inventory as soon as we're

4     able to type it up.

5          MR. DESIMONE:  We'll get it done for Your Honor.

6          THE COURT:  Whatever you give to me, send copies to

7     Government's counsel.

8          MR. DESIMONE:  Well, of course.

9          MS. COSTELLO:  Thank you, Your Honor.

10         MR. DESIMONE:  Of course, we will.  We wouldn't --

11    the last thing we would do is do an ex-parte communication

12    like that.  Oh, my gosh.

13         THE COURT:  Okay.  Next time we're together, I will

14    not resist showing you how I circled in your respective papers

15    all of the adverbs and the bric-a-brac.

16         MR. DESIMONE:  Judge, I had nothing to do with the

17    papers so you can talk to either of them.

18         MS. QUERNS:  Understood.

19         MR. DESIMONE:  I had nothing to do with the papers.

20         THE COURT:  Well, verbally.  The transcript, I can

21    circle all "ly" words as well.

22         MR. DESIMONE:  Both counsel got a B or C.  It has

23    nothing to do with me.

24         Have a nice, day.

25         MR. PARISI:  Good afternoon, Your Honor.

1          MS. COSTELLO:  Good afternoon, Your Honor.

2          THE COURT:  Take care, everybody.

3                    (Court adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                 I N D E X

2

3   DEFENDANT'S EVIDENCE        DIRECT   CROSS   REDIRECT   RECROSS

4   Niusha Houshmand             20      24

5   Mehdi Nikparvar-Fard         30      38        45

6

7

8                           C E R T I F I C A T E

9

10          I certify that the foregoing is a correct
    transcript from the record of the proceedings in the
11  above-entitled matter.

12

13

                        *Kathleen Feldman*
14                      _____
                        Kathleen Feldman, CSR, CRR, RPR, CM
                        Official Court Reporter
15

16  Date:  May 6, 2024
           _____

17

18

19

20

21

22

23

24

25

## $

**$100,000** [1] - 54:22
**$50,000** [1] - 42:4

## '

**'18** [1] - 20:24

## 1

**10** [3] - 31:14, 34:11, 48:20
**11:58** [3] - 32:22, 32:24, 33:15
**11th** [2] - 22:2, 22:4
**123** [1] - 1:16
**1250** [1] - 1:14
**130** [1] - 1:19
**15** [1] - 48:20
**16** [1] - 23:5
**18** [1] - 26:5
**18-101** [1] - 2:9
**18-101-1** [1] - 1:5
**18th** [1] - 1:19
**19103** [1] - 1:20
**19106** [2] - 1:14, 1:23
**19109** [1] - 1:17
**1986** [1] - 41:22

## 2

**20** [2] - 31:14, 63:4
**20-minute** [1] - 14:9
**2017** [13] - 20:24, 20:25, 21:1, 21:5, 23:8, 32:22, 34:2, 34:17, 35:12, 35:25, 36:13, 36:14, 36:17
**2018** [1] - 48:24
**2019** [5] - 3:15, 3:18, 4:1, 23:4, 48:24
**2022** [5] - 1:8, 34:16, 35:11, 53:7, 53:9
**215** [1] - 1:24
**24** [1] - 63:4
**2500** [1] - 1:17

## 3

**3** [1] - 55:16
**30** [3] - 14:2, 31:14, 63:5
**31st** [1] - 53:8
**38** [1] - 63:5
**3:30** [1] - 33:14

## 4

**400** [4] - 54:23, 55:21, 57:3, 58:1
**42** [1] - 10:20
**45** [1] - 63:5
**4th** [7] - 3:5, 6:15, 8:16, 11:13, 11:17, 11:18, 11:19

## 5

**5** [3] - 1:8, 33:16, 34:10
**52** [1] - 31:13

## 6

**601** [1] - 1:23
**615** [1] - 1:14
**6736** [1] - 55:15
**6744** [1] - 55:9

## 7

**7** [5] - 6:5, 32:20, 32:21, 32:22, 55:9
**70,000** [1] - 4:14
**779-5578** [1] - 1:24

## 8

**8** [1] - 6:5

## A

**able** [5] - 3:2, 44:23, 46:6, 49:7, 61:4
**above-entitled** [1] - 63:11
**abscond** [1] - 58:20
**absolutely** [10] - 23:9, 24:9, 31:13, 31:21, 37:5, 37:8, 37:10, 37:20
**accede** [1] - 40:17
**accentuate** [1] - 55:22
**accept** [1] - 36:19
**access** [3] - 6:24, 7:1, 7:8
**Accetturo** [3] - 9:23, 12:2, 50:20
**accident** [1] - 44:21
**accusations** [1] - 17:4
**Act** [1] - 7:15
**ACTION** [1] - 1:3
**Action** [1] - 2:9
**addition** [3] - 46:1, 46:9, 50:25
**additional** [2] - 4:4, 7:21
**additionally** [2] - 13:10, 13:14
**address** [3] - 3:13, 12:1, 12:6
**addressed** [1] - 51:15
**adjourned** [1] - 62:3
**admonitions** [1] - 59:9
**Advanced** [1] - 13:12
**adverb** [1] - 51:4
**adverbs** [1] - 61:15
**advisor** [2] - 23:23
**affecting** [1] - 22:1
**affects** [1] - 9:9
**afoul** [1] - 10:4
**afternoon** [9] - 24:18, 24:19, 33:11, 33:12, 33:13, 38:7, 38:8, 61:25, 62:1
**ago** [2] - 27:10, 38:20
**agree** [2] - 43:3, 58:9
**agreed** [1] - 42:6
**agreement** [2] - 55:13, 55:17
**agrees** [1] - 51:17
**ahead** [4] - 20:13, 31:4, 38:4, 38:24
**alleged** [1] - 56:18
**allow** [2] - 44:4, 54:8
**alluded** [1] - 48:1
**almost** [4] - 4:10, 21:24, 46:13, 54:10
**alone** [1] - 12:4
**ameliorated** [1] - 52:15
**AMERICA** [1] - 1:3
**America** [1] - 2:8
**amount** [4] - 45:24, 46:14, 47:11, 52:5
**analysis** [1] - 52:7
**analyze** [1] - 6:18
**anger** [1] - 57:9
**ANN** [1] - 1:19
**Ann** [2] - 2:17, 32:10, 46:7
**anorexia** [1] - 22:25
**answer** [13] - 5:14, 7:18, 8:11, 28:15, 29:13, 29:16, 44:4, 44:5, 44:7, 53:24, 54:11, 58:24, 58:25

**answered** [3] - 8:8, 11:15, 11:18
**anyway** [3] - 5:1, 6:12, 8:5
**apparent** [2] - 5:23, 11:22
**Appeals** [1] - 9:22
**appear** [2] - 16:20, 51:9
**appearance** [2] - 14:18, 58:18
**APPEARANCES** [1] - 1:11
**application** [2] - 2:7, 47:14
**apply** [2] - 56:2, 56:6
**appreciate** [4] - 17:5, 50:9, 51:10, 52:3
**area** [1] - 49:5
**areas** [1] - 49:1
**arguably** [2] - 52:22, 54:13
**argued** [2] - 10:25, 40:21
**argument** [2] - 10:6, 11:2
**arguments** [2] - 9:13, 50:13
**arm** [1] - 55:23
**Armani** [1] - 30:8
**arrested** [3] - 5:3, 14:10, 39:18
**articulated** [1] - 51:11
**aspersions** [2] - 4:12, 18:22
**asset** [1] - 43:11
**assets** [4] - 14:14, 16:13, 16:14, 37:13
**assistants** [1] - 1:13
**assumed** [1] - 8:19
**assure** [1] - 14:18
**attendance** [1] - 2:10
**attorney** [1] - 26:3
**ATTORNEY** [1] - 1:11
**Attorney** [3] - 1:13, 28:7, 28:23
**Attorney's** [1] - 19:6
**attorneys** [1] - 56:16
**Attorneys** [1] - 12:20
**attorneys'** [1] - 47:17
**AUSA** [5] - 12:12, 12:25, 17:2, 17:8, 19:4
**AUSAs** [1] - 12:13
**authorization** [2] - 55:25, 56:11
**Avenue** [1] - 55:10
**avoid** [1] - 56:13

## B

**bad** [4] - 8:5, 17:18, 21:23
**bail** [13] - 2:6, 9:9, 9:16, 14:7, 16:10, 16:15, 31:18, 37:6, 43:18, 45:18, 47:11, 58:4, 60:18
**BAIL** [1] - 1:10
**bananas** [6] - 17:16, 17:18, 17:21, 18:16, 18:17, 18:18
**bank** [2] - 46:15, 46:19
**bar** [1] - 13:14
**bars** [1] - 16:6
**based** [3] - 16:15, 43:3, 43:10
**basic** [1] - 10:6
**basis** [2] - 45:22, 56:24
**beat** [2] - 4:24, 40:15
**become** [3] - 5:23, 59:20, 59:23
**BEFORE** [1] - 1:9
**beforehand** [1] - 12:11
**beginning** [5] - 3:4, 3:10, 3:11, 5:8, 10:16
**begun** [1] - 3:16
**behalf** [1] - 2:14
**behind** [1] - 16:6
**belief** [1] - 26:10
**beneficiaries** [1] - 25:18
**best** [3] - 30:14, 39:20, 44:15
**better** [2] - 14:15, 46:12
**between** [1] - 21:8
**Biblical** [1] - 54:10
**big** [2] - 16:11, 54:1
**bills** [1] - 47:17
**bit** [3] - 47:3, 52:1, 60:6
**blame** [3] - 10:21, 11:20, 11:21
**blaming** [1] - 52:13
**Blank** [1] - 26:4
**BLANK** [1] - 1:18
**Bologna** [5] - 15:25, 17:2, 17:8, 18:21, 19:4
**Bologna's** [1] - 12:13
**bond** [3] - 42:4, 54:22, 55:19
**BOP** [2] - 6:22, 7:5
**borne** [1] - 56:12

**boss** [1] - 55:22
**bounds** [2] - 13:10, 13:18
**box** [2] - 19:20, 19:21
**brac** [1] - 61:15
**bric** [1] - 61:15
**bric-a-brac** [1] - 61:15
**brief** [1] - 18:1
**briefed** [1] - 19:4
**briefing** [4] - 41:12, 41:14, 41:15, 58:5
**bring** [3] - 18:2, 19:23, 37:23
**Broad** [1] - 1:16
**brought** [1] - 57:6
**bunch** [1] - 3:6
**burden** [1] - 46:14
**Bureau** [1] - 52:13
**business** [1] - 47:18
**BY** [14] - 1:19, 20:15, 20:19, 23:15, 24:17, 30:19, 32:7, 33:3, 33:18, 37:2, 38:6, 39:1, 42:2, 45:17

**C**

**C.A.T** [1] - 1:25
**calculus** [1] - 13:11
**calm** [1] - 22:18
**camp** [3] - 27:5, 27:6
**cannot** [6] - 22:6, 28:3, 42:17, 44:16, 46:3, 58:3
**car** [1] - 44:20
**care** [9] - 11:10, 18:20, 41:15, 44:2, 44:12, 51:3, 59:13, 62:2
**cared** [2] - 21:13, 28:22
**Cares** [1] - 13:13
**cares** [6] - 21:15, 24:9, 24:10, 35:18, 36:20, 41:14
**caring** [1] - 21:15
**Carolina** [3] - 42:10, 46:10, 54:25
**case** [43] - 2:7, 3:7, 5:4, 5:22, 9:23, 9:24, 10:8, 10:9, 10:11, 11:6, 12:23, 13:1, 13:4, 13:10, 13:12, 13:20, 14:14, 14:20, 15:8, 15:10, 15:18, 38:15, 40:5, 46:20, 47:15, 51:22, 51:24,

51:25, 52:2, 52:7, 52:16, 52:19, 52:21, 52:25, 53:4, 53:21, 56:18, 56:19, 58:3, 59:17
**cases** [5] - 12:18, 18:24, 52:1, 52:5, 52:6
**cash** [4] - 42:4, 45:18, 47:11, 54:22
**cast** [1] - 18:21
**casting** [1] - 4:12
**caused** [2] - 39:21, 45:23
**Center** [2] - 52:10, 52:13
**certain** [3] - 29:15, 52:5, 54:8
**certainly** [1] - 15:19
**certify** [1] - 63:10
**cetera** [2] - 48:13, 48:14
**challenges** [2] - 52:11, 52:15
**change** [3] - 15:14, 15:21, 52:24
**changed** [18] - 6:23, 13:2, 13:20, 15:8, 15:9, 15:18, 16:11, 16:22, 20:23, 21:17, 21:19, 21:21, 40:22, 47:12, 49:13, 49:15, 49:17, 53:4
**changer** [1] - 52:20
**changes** [4] - 6:21, 7:5, 13:10, 15:10
**charge** [1] - 55:22
**charges** [6] - 10:7, 13:21, 13:24, 13:25, 14:11
**chart** [1] - 46:3
**charts** [2] - 7:1, 46:1
**Chestnut** [1] - 1:14
**children** [13] - 20:21, 20:22, 21:16, 24:10, 25:19, 35:15, 35:18, 37:4, 37:9, 38:10, 54:9, 54:11, 54:14
**choice** [2] - 54:13, 54:14
**choose** [1] - 47:19
**cHRISTOPHER** [1] - 1:12
**Christopher** [1] - 2:13
**Churchill** [1] - 3:9
**Churchillian** [1] - 5:8
**circle** [1] - 61:21
**circled** [1] - 61:14
**Circuit** [1] - 41:21

**cited** [2] - 14:20, 52:6
**cites** [1] - 12:18
**civil** [4] - 14:11, 16:20, 39:13, 39:15
**clarification** [1] - 32:15
**clause** [1] - 12:1
**clear** [4] - 29:14, 41:19, 41:20, 60:10
**clearly** [2] - 9:21, 20:20
**CLERK** [3] - 20:1, 20:4, 30:5
**Clerk** [1] - 2:1
**Clerk's** [1] - 61:2
**client** [3] - 6:19, 13:6, 60:14
**closing** [1] - 50:13
**CM** [2] - 1:21, 63:14
**coach** [1] - 27:5
**codefendants** [1] - 56:17
**colleagues** [2] - 54:19, 59:19
**collection** [1] - 11:4
**college** [2] - 22:6, 27:22
**comments** [1] - 57:16
**commoditized** [1] - 51:24
**communication** [2] - 46:8, 61:11
**communications** [1] - 46:4
**community** [1] - 10:14
**comparison** [2] - 53:18, 54:3
**compensation** [1] - 41:8
**complaint** [1] - 17:13
**completed** [1] - 3:18
**completely** [2] - 45:6, 46:11
**complex** [3] - 10:11, 10:12, 10:13
**compliance** [3] - 55:6, 55:19, 57:11
**computer** [1] - 52:4
**concealed** [2] - 16:21, 39:24
**concern** [1] - 35:9
**concerned** [2] - 24:7, 47:9
**concerns** [1] - 51:11
**condition** [4] - 23:8, 31:2, 37:14, 43:18
**conditions** [11] -

16:16, 37:6, 40:13, 42:3, 43:4, 43:10, 54:8, 54:21, 55:7, 57:10, 57:12
**conduct** [1] - 56:19
**conduit** [1] - 59:10
**confident** [1] - 15:9
**conflict** [2] - 53:21, 53:23
**connected** [1] - 44:16
**connection** [1] - 2:6
**consider** [1] - 54:5
**consideration** [1] - 16:18
**considerations** [1] - 9:22
**Constitution** [1] - 12:1
**contact** [2] - 56:14, 56:16
**contempt** [3] - 14:11, 16:20, 39:13
**continuance** [1] - 12:23
**continue** [2] - 12:16, 50:21
**continued** [3] - 4:10, 14:16, 47:16
**continues** [2] - 4:11, 8:3
**continuing** [1] - 55:8
**contrast** [1] - 14:12
**control** [1] - 34:15
**convenient** [2] - 45:8, 45:10
**conversation** [1] - 31:6
**conversations** [1] - 21:8
**convicted** [3] - 24:25, 25:6, 39:2
**cooperating** [1] - 15:15
**copies** [1] - 61:6
**corners** [1] - 41:18
**Corona** [1] - 46:11
**correct** [7] - 4:8, 10:5, 11:8, 30:23, 37:18, 40:14, 63:10
**corresponded** [1] - 3:25
**corresponds** [1] - 33:1
**corroborate** [2] - 15:15, 15:17
**cost** [2] - 56:11, 57:9
**Costello** [10] - 2:10, 2:12, 7:20, 18:15, 18:21, 24:14, 41:5,

44:8, 54:18, 57:19
**COSTELLO** [40] - 1:12, 2:11, 8:21, 9:2, 15:4, 16:6, 17:7, 17:19, 17:24, 24:15, 24:17, 25:11, 29:24, 38:1, 38:3, 38:6, 38:16, 38:25, 39:1, 39:11, 40:6, 40:9, 40:23, 41:6, 41:12, 41:24, 42:2, 44:9, 45:12, 46:22, 50:11, 50:19, 57:20, 57:25, 58:8, 58:11, 58:22, 60:24, 61:9, 62:1
**counsel** [19] - 12:21, 29:21, 32:16, 36:20, 36:23, 38:18, 40:24, 51:6, 51:10, 52:18, 52:23, 53:2, 53:5, 53:6, 53:10, 56:14, 59:5, 61:7, 61:22
**Counsel** [2] - 1:15, 1:20
**counseling** [1] - 57:9
**counselors** [1] - 56:15
**count** [3] - 8:12, 10:20, 51:17
**couple** [1] - 32:12
**course** [6] - 24:1, 45:20, 56:25, 58:25, 61:8, 61:10
**courses** [1] - 23:24
**COURT** [168] - 1:1, 2:2, 2:5, 2:21, 3:1, 4:15, 4:18, 4:20, 4:23, 6:21, 7:4, 7:7, 7:17, 7:20, 8:1, 9:4, 9:7, 9:10, 9:18, 9:21, 9:25, 10:2, 10:6, 10:11, 10:19, 10:24, 11:6, 11:10, 14:2, 14:5, 14:23, 15:1, 16:5, 17:6, 17:18, 17:20, 17:23, 18:9, 18:12, 18:14, 19:13, 19:16, 19:18, 19:21, 19:23, 20:8, 20:11, 20:13, 20:18, 22:4, 24:14, 25:13, 25:15, 25:18, 25:20, 25:23, 26:1, 26:7, 26:10, 26:16, 26:21, 26:25, 27:4, 27:7, 27:11, 27:13, 27:16, 27:18, 27:20, 27:23, 28:1, 28:9, 28:11, 28:15, 28:17, 28:19, 28:22, 28:25, 29:7, 29:9, 29:12,

crying [1] - 26:20
CSR [2] - 1:21, 63:14
cudgels [1] - 54:2
current [1] - 12:13
custodian [1] - 53:12
custody [1] - 5:4
cut [1] - 29:5
cutting [1] - 29:10

**D**

dad [1] - 23:3
daddy's [1] - 22:12
danger [2] - 10:14, 16:13
dangerous [2] - 57:1, 57:2
Date [1] - 63:16
date [3] - 21:21, 32:16, 36:8
dates [2] - 48:22, 49:7
daughter [30] - 9:13, 9:15, 16:8, 20:24, 21:12, 21:13, 21:18, 21:20, 23:22, 25:19, 26:17, 26:24, 27:23, 28:10, 29:5, 30:23, 30:24, 31:2, 31:3, 32:8, 33:4, 33:20, 34:25, 35:2, 35:5, 35:19, 36:4, 37:14, 39:7, 39:21
days [1] - 51:5
dead [1] - 4:25
deal [3] - 5:13, 5:19, 48:10
dealing [1] - 43:14
decades [2] - 24:22, 25:7
December [8] - 4:1, 6:11, 32:10, 32:20, 32:21, 32:22, 34:2, 34:17
decided [1] - 12:24
decision [2] - 16:25, 49:8
decline [1] - 53:10
Defendant [1] - 1:20
defendant [30] - 7:3, 8:17, 10:19, 12:19, 12:21, 15:25, 18:6, 36:20, 47:6, 48:2, 50:21, 52:11, 52:21, 53:2, 54:22, 55:7, 55:20, 55:24, 56:7, 56:12, 56:13, 56:23, 56:25, 57:8, 57:11, 57:13, 57:14, 58:19,
58:23
defendant's [9] - 2:7, 12:8, 40:7, 48:9, 51:12, 54:16, 56:5, 58:18, 63:3
defendants [2] - 12:22, 15:15
defender [1] - 45:22
defense [1] - 15:5
definitely [2] - 13:20, 39:23
delay [6] - 10:22, 11:4, 12:9, 12:16, 12:22, 53:8
dentist [3] - 4:11, 4:15, 4:22
denying [1] - 51:12
deposition [1] - 53:23
depressed [3] - 21:22, 23:2, 23:21
depression [2] - 22:23, 23:25
DEPUTY [3] - 20:1, 20:4, 30:5
Deputy [1] - 2:1
designated [1] - 10:12
DeSimone [12] - 2:16, 2:22, 3:1, 7:24, 10:17, 14:8, 17:17, 17:24, 30:17, 34:20, 59:19, 61:1
DESIMONE [144] - 1:16, 2:4, 2:15, 2:23, 3:3, 4:16, 4:19, 4:21, 4:24, 6:25, 7:6, 7:18, 7:25, 8:2, 8:23, 9:5, 9:8, 9:11, 9:20, 9:24, 10:1, 10:5, 10:10, 10:18, 10:23, 11:5, 11:8, 11:12, 14:25, 17:22, 18:11, 18:13, 18:15, 19:9, 19:12, 19:14, 19:17, 19:19, 19:22, 19:25, 20:15, 20:17, 20:19, 23:14, 23:15, 24:13, 25:14, 27:10, 28:6, 28:10, 28:13, 28:16, 28:18, 28:21, 28:23, 29:2, 29:4, 29:8, 29:10, 29:14, 29:18, 29:23, 30:2, 30:19, 32:5, 32:7, 32:10, 32:12, 32:19, 32:21, 33:3, 33:17, 33:18, 34:3, 34:5, 34:10, 34:13, 34:18, 34:21, 34:23, 35:2, 35:4, 35:8,
35:13, 35:17, 35:24, 36:3, 36:7, 36:18, 36:22, 36:25, 37:2, 37:21, 38:14, 38:21, 39:8, 40:4, 40:8, 40:10, 40:14, 40:19, 41:2, 41:9, 41:14, 41:16, 44:7, 45:15, 45:17, 46:21, 46:24, 47:21, 47:23, 48:6, 48:12, 48:15, 48:18, 48:23, 49:12, 49:16, 49:21, 49:24, 50:8, 50:14, 50:18, 57:17, 58:23, 59:3, 59:7, 59:11, 59:15, 59:22, 59:25, 60:3, 60:7, 60:11, 60:16, 60:20, 60:23, 61:5, 61:8, 61:10, 61:16, 61:19, 61:22
despite [1] - 15:18
destroy [1] - 44:16
details [2] - 3:6, 23:12
detained [3] - 10:20, 12:16, 50:22
detainee [2] - 6:23, 7:8
Detention [2] - 52:10, 57:13
detention [6] - 10:3, 11:24, 14:16, 14:22, 45:23, 57:15
detriment [1] - 8:17
develop [1] - 53:21
developed [1] - 51:14
development [3] - 52:17, 53:4, 53:12
device [1] - 56:11
devices [1] - 56:9
devoted [1] - 14:9
diagnosed [3] - 22:21, 22:23, 22:24
die [1] - 44:21
different [4] - 9:25, 43:24, 45:4, 45:6
difficult [1] - 7:15
difficulty [1] - 8:3
DiGiralomo [2] - 6:4, 6:8
diligence [2] - 8:13, 8:14
direct [3] - 30:18, 43:25, 56:13
DIRECT [2] - 20:14, 63:3
directly [3] - 9:9, 13:3, 56:21
disagree [3] - 11:9, 12:5, 52:20
disclosure [1] - 47:5
discovery [10] - 3:6, 3:16, 3:17, 4:13, 4:17, 6:12, 7:11, 16:2, 17:13
discussed [1] - 31:9
discussion [1] - 7:3
disorder [1] - 22:24
disparage [1] - 19:7
disposal [1] - 47:6
dispute [1] - 14:3
distracting [1] - 51:7
distraction [2] - 16:23, 18:4
DISTRICT [2] - 1:1, 1:2
District [1] - 1:13
disturbance [1] - 39:20
disturbed [5] - 31:5, 31:6, 31:8, 31:9, 33:10
doctor [9] - 13:17, 21:3, 21:25, 22:9, 22:17, 23:1, 30:20, 32:2
Doctor [2] - 31:4, 33:5
doctors [1] - 56:15
document [2] - 46:6, 53:3
documentary [2] - 15:16, 55:6
documents [4] - 8:10, 11:19, 56:3, 56:7
done [6] - 12:21, 14:13, 16:12, 17:12, 23:5, 61:5
dose [1] - 21:25
down [3] - 29:11, 29:25, 47:1
Dr [14] - 2:16, 2:17, 5:3, 5:20, 5:21, 6:4, 6:8, 7:12, 9:12, 11:24, 13:8, 13:22, 30:2, 45:18
dr [1] - 38:7
dragged [1] - 39:19
Drive [1] - 55:15
driven [1] - 60:10
drop [4] - 23:24, 24:4, 27:7, 27:13
dropped [1] - 23:25
drugs [1] - 13:13
due [5] - 8:12, 8:14, 10:4, 11:25, 12:4
duty [1] - 18:24

# E

e-mail [1] - 4:3
E.K [1] - 1:9
earnestness [1] -
48:10
ease [1] - 53:1
easier [1] - 7:13
EASTERN [1] - 1:2
Eastern [1] - 1:13
eating [2] - 22:24
effect [1] - 23:20
either [6] - 5:19,
6:21, 7:22, 29:21,
56:20, 61:17
elements [1] - 60:14
Emlen [2] - 55:9,
55:16
emotional [2] -
39:18, 39:19
emotionally [2] -
44:16, 45:1
emphasize [1] - 51:6
employ [1] - 43:13
employee [3] - 40:2,
41:2, 41:6
empty [1] - 19:21
end [5] - 3:10, 5:8,
23:25, 36:5
End [1] - 29:19
ended [2] - 23:22,
23:25
enjoy [2] - 44:18,
44:23
entice [1] - 52:21
entire [4] - 12:20,
14:11, 19:4, 43:15
entitled [3] - 6:11,
6:12, 63:11
entity [1] - 56:4
envelope [1] - 16:2
equitable [1] - 58:17
equity [3] - 42:16,
55:1, 55:9
ERIC [1] - 1:12
especially [1] - 24:10
ESQUIRE [4] - 1:12,
1:12, 1:16, 1:19
essay [1] - 22:6
essentially [1] -
10:24
estimate [1] - 34:1
et [2] - 48:13
evaluate [1] - 48:11
EVIDENCE [1] - 63:3
evidence [20] - 5:9,
5:10, 5:18, 12:11,
12:14, 13:1, 13:2,
14:24, 15:10, 15:16,

17:25, 18:1, 19:10,
47:19, 50:10, 52:22,
52:25, 53:8, 55:6,
57:11
evidentiary [1] -
29:16
ex [1] - 61:11
ex-parte [1] - 61:11
exact [1] - 15:12
exactly [1] - 10:10
examination [1] -
43:25
EXAMINATION [5] -
20:14, 24:16, 30:18,
38:5, 45:16
example [1] - 45:24
excellent [1] - 50:5
excerpts [1] - 36:1
excessive [1] - 14:17
exculpatory [11] -
5:9, 5:10, 5:12, 5:21,
6:2, 13:2, 13:7, 17:16,
17:25, 18:1, 18:19
excuse [1] - 17:16
existed [2] - 13:13,
19:8
expect [1] - 54:17
expenses [2] -
45:24, 47:5
expensive [1] -
45:21
expert [10] - 15:16,
16:1, 56:22, 58:8,
58:25, 59:1, 59:20,
59:23, 60:1, 60:7
expert's [2] - 59:8,
59:15
explain [1] - 45:5,
45:18
explaining [1] -
34:23
express [1] - 21:12
extent [6] - 7:13,
7:14, 13:17, 36:6,
50:12, 54:11
extremely [2] - 15:8,
45:21

# F

faces [3] - 14:2,
24:22, 25:7
facilities [2] - 7:5,
52:10
fact [8] - 5:20, 31:9,
40:17, 48:1, 49:22,
52:4, 54:3, 55:22
factor [2] - 12:10,
16:11

factors [6] - 10:3,
12:2, 12:6, 41:20,
41:22, 50:20
facts [4] - 4:13,
16:22, 17:4, 59:17
failed [2] - 16:20,
39:15
fair [1] - 11:24
fairly [2] - 57:23,
58:20
Fairview [4] - 54:23,
55:21, 57:3, 58:1
fake [1] - 16:2
fall [2] - 27:16, 27:17
family [12] - 9:15,
14:9, 23:18, 24:10,
24:11, 31:25, 32:1,
43:6, 45:24, 46:9,
56:15
far [4] - 16:12, 17:15,
20:11, 38:23
FARD [2] - 1:5, 30:4
Fard [12] - 2:8, 2:16,
2:18, 5:3, 5:20, 7:12,
9:12, 13:8, 13:22,
30:2, 30:7, 63:5
Fard's [1] - 11:24
fault [4] - 9:1, 11:14,
12:18, 14:22
favor [3] - 12:8,
12:17
Fazelinia [1] - 42:18
FBI [3] - 17:7, 18:22,
19:5
FDC [4] - 6:22, 7:7,
52:14, 55:8
February [1] - 3:15
FELDMAN [1] - 1:21
Feldman [2] - 29:1,
63:14
file [3] - 32:23, 32:25,
60:18
filed [1] - 12:19
files [2] - 7:1, 7:2
final [1] - 52:7
financial [7] - 45:24,
46:14, 47:2, 47:6,
47:10, 47:16, 48:25
financially [2] - 45:1,
45:21
fine [6] - 23:13, 30:3,
30:13, 33:21, 36:25,
38:21
finish [1] - 44:8
firearm [1] - 57:1
firearms [1] - 57:2
firm [2] - 53:20, 54:1
first [5] - 12:3, 15:1,
20:6, 20:25, 33:22
flash [2] - 4:7

flattened [1] - 46:12
flee [1] - 35:21
flexibility [1] - 29:15
flight [8] - 10:14,
10:16, 14:6, 15:22,
24:7, 35:14, 40:7,
48:13
flow [1] - 3:24
focus [8] - 9:19,
11:11, 15:6, 22:8,
37:22, 38:15, 41:19,
41:22
focused [2] - 35:12,
44:6
focuses [1] - 50:20
focusing [5] - 9:18,
16:23, 18:4, 53:9,
53:11
folks [1] - 41:11
follow [1] - 3:2
followed [1] - 58:6
FOR [1] - 1:2
foregoing [1] - 63:10
forfeiture [2] - 58:2,
58:8
forget [1] - 44:14
forgive [1] - 42:17
former [3] - 12:12,
40:2, 41:6
forth [1] - 41:21
forward [3] - 4:7,
24:21, 43:15
foundation [2] - 3:4,
32:5
four [8] - 4:1, 5:5,
10:12, 32:11, 34:6,
51:13, 51:18, 51:20
fours [1] - 52:3
fourth [1] - 53:5
fragile [1] - 37:17
Frank [2] - 2:15,
41:13
FRANK [1] - 1:16
frankly [3] - 47:20,
49:18, 51:13
freshman [1] - 27:20
friends [2] - 43:12,
45:2
front [4] - 6:2, 6:14,
39:19, 41:1
fruit [1] - 17:22
full [5] - 20:5, 30:5,
54:23, 54:25, 55:9
fulsome [1] - 14:7
future [3] - 37:13,
44:13, 51:19

# G

gambits [1] - 56:20
game [4] - 10:21,
11:20, 11:21, 52:20
gaps [1] - 54:5
gather [1] - 54:18
gearing [1] - 12:24
Gedeus [1] - 2:20
GENE [1] - 1:9
generally [1] - 6:22
generation [1] -
31:15
gentleman [1] - 5:2
girl [2] - 21:1, 22:12
given [11] - 3:5, 4:13,
5:6, 6:23, 8:9, 9:17,
26:18, 32:3, 53:10,
56:6, 59:9
global [1] - 56:8
gosh [1] - 61:12
governed [1] - 60:14
government [1] - 6:5
Government [34] -
1:15, 2:14, 3:15, 3:25,
4:6, 5:9, 5:11, 5:12,
5:15, 7:12, 7:14, 8:8,
11:3, 12:5, 12:11,
12:13, 12:18, 14:20,
15:1, 15:24, 18:20,
18:22, 18:25, 20:23,
35:13, 37:24, 46:23,
49:25, 50:1, 50:10,
54:3, 56:21, 60:24
Government's [20] -
5:24, 6:6, 10:8, 11:14,
12:8, 12:25, 13:1,
13:4, 13:11, 13:12,
13:20, 15:8, 36:23,
50:21, 52:24, 53:5,
53:6, 53:14, 53:16,
61:7
governmental [1] -
56:4
GPS [1] - 56:11
grade [2] - 22:2, 22:4
grades [1] - 21:2
granted [1] - 31:18
greater [1] - 52:23
guess [2] - 7:19,
15:2
guidance [2] - 48:19,
52:1
Guideline [1] - 14:4
guilty [4] - 13:24,
14:1, 25:2, 25:3
guns [2] - 57:5, 57:6

## H

**H-O-U-S-H-M-A-N-D** [1] - 20:7
**half** [5] - 3:18, 10:12, 18:25, 19:1, 46:13
**hand** [1] - 20:2
**handle** [1] - 22:18
**handling** [2] - 53:20, 57:1
**Hanieh** [1] - 55:11
**happy** [3] - 21:1, 31:17, 44:14
**hard** [2] - 23:6, 52:2
**Harvard** [1] - 59:12
**Havertown** [1] - 55:10
**Hawthorne** [1] - 55:10
**health** [1] - 57:8
**hear** [9] - 21:7, 21:8, 29:4, 33:8, 35:5, 48:2, 48:4, 48:20, 51:1
**heard** [9] - 20:23, 22:12, 37:14, 40:20, 50:13, 50:14, 50:15, 51:2, 51:22
**hearing** [7] - 2:6, 6:2, 6:13, 18:17, 34:24, 49:14
**HEARING** [1] - 1:10
**hearings** [2] - 9:16, 16:10
**hello** [1] - 2:2
**help** [2] - 9:19, 49:8
**helpful** [4] - 13:19, 32:18, 52:7, 53:13
**helping** [1] - 23:20
**herring** [1] - 15:18
**herself** [3] - 22:7, 29:6, 29:10
**Higgins** [3] - 5:2, 5:4, 5:13
**high** [3] - 13:14, 18:7, 23:24
**higher** [1] - 47:15
**highly** [1] - 23:23
**hire** [3] - 46:2, 46:4, 46:5
**history** [1] - 40:22
**hold** [1] - 55:2
**holds** [1] - 51:19
**hologram** [1] - 19:24
**home** [6] - 26:18, 26:24, 33:23, 37:11, 37:12, 46:17
**Honor** [86] - 2:4, 2:11, 2:13, 2:15, 2:20, 2:23, 2:24, 3:4, 3:5, 3:7, 3:11, 3:19, 3:21, 4:10, 6:3, 6:14, 8:21, 9:2, 10:18, 11:8, 11:23, 12:5, 12:7, 14:25, 15:4, 15:8, 15:9, 15:19, 15:22, 16:9, 16:16, 17:5, 17:11, 17:15, 17:17, 18:7, 21:18, 24:15, 25:11, 25:14, 28:21, 28:24, 29:23, 29:24, 31:1, 31:18, 32:6, 32:13, 32:15, 33:17, 34:3, 35:18, 38:1, 38:3, 38:16, 38:25, 40:4, 40:7, 40:8, 40:9, 41:24, 45:12, 45:13, 45:15, 46:23, 47:16, 47:23, 47:25, 49:2, 49:21, 50:11, 50:19, 57:17, 57:18, 57:25, 58:22, 58:23, 60:11, 60:23, 60:24, 60:25, 61:5, 61:9, 61:25, 62:1
**honor** [2] - 31:19
**HONORABLE** [1] - 1:9
**honored** [1] - 50:5
**hope** [1] - 25:1
**hoping** [1] - 46:12
**horse** [1] - 4:25
**hospital** [3] - 21:3, 21:24, 22:22
**Hossein** [1] - 55:11
**hourly** [1] - 45:22
**house** [5] - 26:4, 26:7, 26:11, 26:24, 42:16
**houses** [1] - 45:2
**HOUSHMAND** [1] - 20:3
**Houshmand** [2] - 20:8, 63:4
**hum** [2] - 39:21, 40:6
**hurt** [10] - 9:15, 24:11, 31:12, 35:15, 37:3, 37:9, 37:10, 38:10, 39:7, 44:25
**husband** [7] - 21:8, 21:11, 23:10, 24:8, 24:22, 29:4, 54:14
**husband's** [2] - 26:12, 26:14

## I

**iceberg** [1] - 6:16
**idea** [1] - 41:10
**identify** [1] - 33:19
**ignore** [1] - 15:23
**illegal** [1] - 13:9
**illegally** [1] - 13:14
**imagine** [3] - 10:4, 40:22, 44:20
**immaterial** [1] - 5:17
**impacts** [1] - 13:3
**importance** [1] - 17:11
**important** [1] - 31:25
**improved** [1] - 52:11
**IN** [1] - 1:1
**inappropriate** [1] - 59:10
**inclination** [1] - 31:10
**include** [1] - 56:20
**included** [1] - 52:12
**including** [4] - 56:14, 56:16, 56:22, 57:9
**income** [1] - 46:13
**increasing** [1] - 21:25
**incredulous** [1] - 8:10
**incriminating** [2] - 5:18, 5:19
**indeed** [1] - 50:16
**indicated** [1] - 13:17
**indicates** [1] - 19:3
**Indicating** [1] - 41:23
**indirect** [2] - 56:13, 59:10
**individual** [2] - 46:4, 46:5
**inevitable** [2] - 51:16, 53:9
**informant** [2] - 5:13, 19:4
**informants** [3] - 3:22, 4:4
**information** [4] - 5:20, 5:21, 7:21, 17:1
**Inlet** [1] - 54:24
**instance** [1] - 12:9
**instances** [2] - 5:22, 17:25
**instead** [1] - 48:19
**instructions** [1] - 15:20
**intended** [1] - 15:21
**intensive** [1] - 53:3
**intentional** [1] - 15:14
**interaction** [1] - 52:23
**interest** [3] - 50:2, 55:1, 55:9

**interested** [1] - 29:17
**interestingly** [1] - 8:6
**interests** [1] - 55:4
**interim** [1] - 3:20
**inures** [1] - 8:16
**inventory** [1] - 61:3
**involved** [1] - 56:19
**involves** [1] - 14:20
**irrelevant** [1] - 18:3
**irrevocable** [1] - 25:21
**issuance** [1] - 52:18
**issue** [12] - 9:25, 10:2, 10:15, 49:11, 51:15, 52:17, 53:1, 54:7, 58:1, 58:7, 58:13
**issues** [4] - 9:14, 11:10, 37:22, 48:9
**itself** [1] - 45:23

## J

**jail** [5] - 14:7, 14:12, 39:5, 44:20, 46:2
**January** [7] - 3:8, 8:6, 11:15, 22:13, 22:19, 23:7, 24:24
**Jason** [2] - 15:25, 17:8
**Jencks** [2] - 7:15, 8:4
**Jimmy** [1] - 2:20
**job** [2] - 27:24, 28:2
**joyful** [1] - 31:17
**Judge** [39] - 3:13, 4:25, 5:9, 6:15, 6:18, 7:6, 7:18, 8:6, 8:10, 8:17, 8:24, 9:8, 9:17, 9:20, 11:14, 11:17, 18:20, 19:12, 19:25, 20:17, 28:6, 29:8, 31:6, 35:8, 36:18, 38:14, 40:14, 41:2, 41:9, 46:24, 48:24, 50:14, 53:22, 59:22, 59:25, 60:8, 60:16, 60:20, 61:16
**judge** [3] - 24:7, 31:10, 41:3
**July** [2] - 34:16, 35:11
**JULY** [1] - 1:8
**juries** [1] - 19:19
**jury** [3] - 15:19, 19:20, 19:24
**justified** [1] - 12:4

## K

**KATHLEEN** [1] - 1:21
**Kathleen** [1] - 63:14
**KAY** [1] - 1:12
**keep** [6] - 16:23, 18:4, 21:21, 30:16, 31:8, 38:22
**keeping** [1] - 55:23
**keeps** [1] - 21:25
**Khadijeh** [1] - 42:23
**kids** [15] - 14:9, 26:2, 27:6, 33:11, 33:12, 33:23, 36:21, 41:18, 43:6, 43:11, 44:11, 44:22, 46:18, 54:15
**kill** [2] - 16:19
**kind** [3] - 25:23, 31:5, 53:3
**knowing** [3] - 13:7, 15:13, 43:14
**knowledge** [1] - 7:11
**knows** [3] - 3:5, 17:2, 60:14

## L

**lady** [1] - 30:20
**language** [1] - 33:24
**large** [1] - 53:20
**last** [13] - 20:7, 21:17, 21:22, 21:23, 26:3, 27:11, 27:14, 30:6, 42:18, 46:11, 47:14, 51:15, 61:11
**late** [1] - 12:25
**latest** [1] - 11:3
**laundry** [1] - 58:21
**law** [4] - 11:7, 51:22, 51:23, 58:3
**lawyer** [6] - 45:22, 45:25, 46:2, 53:10, 53:19, 53:20
**lawyer's** [1] - 16:3
**lawyers** [1] - 46:1
**lay** [2] - 3:4, 32:5
**leads** [1] - 52:17
**least** [5] - 16:25, 48:9, 51:18, 51:20, 55:2
**leave** [12] - 9:15, 24:8, 26:23, 28:3, 31:20, 31:22, 37:6, 37:7, 55:24, 56:9
**leaving** [1] - 60:6
**lectern** [1] - 19:18
**legal** [6] - 10:2, 33:7,

33:8, 47:4, 58:1, 58:17
**legion** [1] - 17:24
**legions** [1] - 5:21
**Lehigh** [3] - 24:3, 24:4, 27:7
**length** [2] - 12:3, 36:9
**lengthy** [1] - 57:23
**letter** [3] - 3:14, 15:24, 16:1
**level** [1] - 14:21
**life** [13] - 31:13, 31:14, 31:16, 31:17, 31:23, 32:1, 33:9, 43:16, 43:25, 44:18, 44:21, 44:23
**light** [1] - 28:6
**likely** [1] - 14:1
**lines** [1] - 53:25
**lingo** [1] - 49:9
**list** [7] - 6:8, 9:22, 40:25, 55:8, 58:21, 59:20, 61:3
**listen** [4] - 32:3, 36:16, 44:20, 48:20
**listened** [3] - 38:18, 47:25, 49:25
**listening** [5] - 34:17, 34:18, 34:19, 34:22, 34:24
**live** [1] - 53:17
**lives** [1] - 44:17
**LLP** [1] - 1:18
**lo** [1] - 40:21
**loan** [2] - 46:18
**location** [1] - 56:8
**look** [4] - 6:17, 49:18, 52:22, 53:1
**looked** [1] - 3:14
**looks** [1] - 51:19
**lose** [16] - 16:16, 19:20, 37:11, 37:12, 43:4, 43:6, 43:21, 43:22, 43:23, 44:3, 44:25, 45:1, 45:2, 46:13, 58:19
**loud** [1] - 20:20
**love** [1] - 21:15
**loved** [2] - 16:9, 16:10
**loves** [1] - 16:8
**lower** [2] - 42:6, 45:19
**ly** [2] - 51:2, 61:21

**M**

**machine** [1] - 1:25

**mail** [1] - 4:3
**man** [4] - 14:9, 16:18, 23:18, 34:24
**management** [1] - 57:9
**March** [1] - 3:18
**Market** [1] - 1:23
**Marshal** [1] - 39:3
**marshals** [1] - 14:10
**Marshals** [1] - 16:19
**MARY** [1] - 1:12
**Mary** [1] - 2:11
**mask** [1] - 30:11
**Massachusetts** [1] - 59:11
**material** [2] - 6:18, 7:15
**matter** [5] - 3:8, 15:6, 16:24, 18:24, 63:11
**matters** [4] - 6:6, 15:7, 18:4, 51:14
**mean** [20] - 4:1, 10:11, 11:21, 16:22, 17:14, 17:15, 28:17, 31:22, 31:23, 34:15, 45:10, 46:19, 47:24, 48:19, 50:8, 53:18, 53:23, 54:11, 60:13
**meaning** [1] - 51:24
**meaningful** [1] - 52:12
**means** [3] - 52:22, 56:14, 59:16
**meantime** [1] - 8:17
**measure** [1] - 51:21
**Medical** [1] - 59:11
**medical** [1] - 56:15
**medication** [1] - 21:25
**meeting** [1] - 22:20
**MEHDI** [2] - 1:5, 30:4
**Mehdi** [5] - 2:8, 30:7, 42:24, 63:5
**mental** [1] - 57:8
**mercy** [1] - 53:22
**merely** [1] - 52:25
**merits** [1] - 10:8
**messing** [1] - 42:24
**metaphor** [4] - 4:18, 4:19, 4:21, 4:25
**might** [10] - 2:23, 7:8, 8:20, 10:3, 10:13, 32:5, 41:10, 46:12, 48:11, 59:24
**Militia** [1] - 55:15
**mind** [2] - 8:1, 49:3
**Minni** [1] - 58:10
**minute** [1] - 38:20
**minutes** [2] - 34:7, 34:11

**mistake** [1] - 16:25
**mistaken** [2] - 15:5, 22:25
**misunderstood** [1] - 59:24
**mitigate** [1] - 52:11
**mitigated** [1] - 52:15
**moment** [2] - 31:5, 38:1
**money** [1] - 46:16
**monitoring** [2] - 56:8, 56:11
**months** [3] - 4:1, 5:5, 10:21
**morning** [15] - 2:4, 2:5, 2:11, 2:13, 2:15, 2:19, 3:14, 9:12, 20:8, 26:20, 28:14, 29:5, 29:11, 33:6
**mortgage** [1] - 46:16
**most** [3] - 13:2, 30:10, 30:11
**mostly** [1] - 37:10
**motion** [1] - 51:12
**motions** [1] - 12:19
**mouth** [1] - 5:16
**move** [2] - 41:25, 44:14
**MR** [145] - 2:4, 2:13, 2:15, 2:23, 3:3, 4:16, 4:19, 4:21, 4:24, 6:25, 7:6, 7:18, 7:25, 8:2, 8:23, 9:5, 9:8, 9:11, 9:20, 9:24, 10:1, 10:5, 10:10, 10:18, 10:23, 11:5, 11:8, 11:12, 14:25, 17:22, 18:11, 18:13, 18:15, 19:9, 19:12, 19:14, 19:17, 19:19, 19:22, 19:25, 20:15, 20:19, 23:14, 23:15, 24:13, 25:14, 27:10, 28:6, 28:10, 28:13, 28:16, 28:18, 28:21, 28:23, 29:2, 29:4, 29:8, 29:10, 29:14, 29:18, 29:23, 30:2, 30:19, 32:5, 32:7, 32:10, 32:12, 32:15, 32:19, 32:21, 33:3, 33:17, 33:18, 34:3, 34:5, 34:10, 34:13, 34:18, 34:21, 34:23, 35:2, 35:4, 35:8, 35:13, 35:17, 35:24, 36:3, 36:7, 36:18, 36:22, 36:25, 37:2, 37:21, 38:14, 38:21, 39:8, 40:4, 40:8, 40:10, 40:14,

40:19, 41:2, 41:9, 41:14, 41:16, 44:7, 45:15, 45:17, 46:21, 46:24, 47:21, 47:23, 48:6, 48:12, 48:15, 48:18, 48:23, 49:12, 49:16, 49:21, 49:24, 50:8, 50:14, 50:18, 57:17, 58:23, 59:3, 59:7, 59:11, 59:15, 59:22, 59:25, 60:3, 60:7, 60:11, 60:16, 60:20, 60:23, 61:5, 61:8, 61:10, 61:16, 61:19, 61:22, 61:25
**MS** [61] - 2:11, 2:17, 7:11, 8:21, 9:2, 11:23, 14:3, 14:6, 15:4, 16:6, 17:7, 17:19, 17:24, 19:3, 19:10, 24:15, 24:17, 25:11, 29:24, 32:11, 32:20, 32:22, 32:25, 34:6, 34:12, 36:5, 36:10, 36:13, 36:15, 38:1, 38:3, 38:6, 38:16, 38:25, 39:1, 39:11, 40:6, 40:9, 40:23, 41:6, 41:12, 41:24, 42:2, 44:9, 45:12, 46:22, 47:7, 47:10, 47:13, 50:11, 50:19, 57:18, 57:20, 57:25, 58:8, 58:11, 58:22, 60:24, 61:9, 61:18, 62:1
**mud** [1] - 51:1
**Murrells** [1] - 54:24
**must** [1] - 53:12, 55:24, 56:1, 56:2, 56:5, 56:6, 56:9, 56:13, 56:23, 56:25, 57:8
**myriad** [1] - 6:19

**N**

**name** [29] - 16:3, 17:18, 20:5, 20:6, 20:7, 26:5, 26:6, 26:8, 26:11, 26:12, 26:14, 26:15, 30:5, 30:6, 32:23, 32:25, 42:14, 42:15, 42:18, 42:20, 42:21, 43:1, 43:2, 45:7, 45:9, 51:8, 51:9
**names** [3] - 42:17, 42:22, 42:24
**narrow** [1] - 38:23
**natural** [1] - 47:8
**naturally** [2] - 9:4,

9:5
**necessarily** [2] - 50:1, 52:20
**need** [17] - 6:10, 7:8, 13:12, 21:17, 28:11, 29:9, 34:12, 36:16, 37:13, 44:21, 44:22, 44:23, 48:25, 50:6, 57:23, 58:10
**needed** [1] - 17:12
**needs** [2] - 22:3, 22:5, 52:23
**negligence** [1] - 8:15
**neutral** [2] - 12:10
**never** [4] - 9:14, 13:8, 21:2
**nevertheless** [1] - 5:4
**new** [4] - 3:6, 19:3, 22:16, 40:18
**next** [3] - 31:15, 52:17, 61:13
**nice** [1] - 61:24
**Nik** [2] - 38:7, 45:18
**Nikparvar** [13] - 2:8, 2:16, 2:18, 5:3, 5:20, 7:12, 9:12, 11:24, 13:8, 13:22, 30:2, 30:7, 63:5
**NIKPARVAR** [2] - 1:5, 30:4
**Nikparvar-Fard** [12] - 2:8, 2:16, 2:18, 5:3, 5:20, 7:12, 9:12, 13:8, 13:22, 30:2, 30:7, 63:5
**NIKPARVAR-FARD** [2] - 1:5, 30:4
**Nikparvar-Fard's** [1] - 11:24
**NIUSHA** [2] - 20:3, 20:6
**Niusha** [4] - 20:16, 20:17, 20:20, 63:4
**NO** [1] - 1:5
**nobody** [2] - 10:25, 57:6
**none** [1] - 40:18
**nonetheless** [1] - 54:6
**nonpunitive** [1] - 14:17
**nonsense** [3] - 15:6, 18:3, 31:24
**nonviolent** [4] - 14:19, 14:21
**nothing** [23] - 4:12, 12:21, 15:7, 15:10, 16:11, 20:23, 25:11, 31:21, 38:9, 40:12,

43:7, 44:3, 44:11, 45:13, 46:22, 46:24, 50:22, 60:15, 60:19, 61:16, 61:19, 61:23
**November** [1] - 36:11
**number** [2] - 52:8, 52:9

## O

**oath** [2] - 55:13, 55:17
**object** [1] - 39:8
**objection** [5] - 8:21, 38:14, 38:18, 40:4, 44:7
**observation** [1] - 52:14
**obviously** [4] - 8:16, 9:3, 10:7, 60:17
**occurred** [1] - 60:17
**October** [3] - 32:4, 32:10, 36:10
**OF** [3] - 1:2, 1:3, 1:11
**offender** [2] - 14:19, 14:21
**offer** [1] - 15:1
**OFFICE** [1] - 1:11
**Office** [2] - 19:6, 61:2
**OFFICER** [2] - 2:19, 57:22
**Official** [2] - 1:22, 63:14
**often** [1] - 51:21
**old** [1] - 23:5
**Omicron** [2] - 8:7, 11:16
**once** [3] - 55:5, 57:10, 57:12
**one** [30] - 5:1, 9:13, 10:13, 11:1, 16:25, 17:9, 18:13, 25:15, 28:13, 32:20, 33:6, 34:14, 36:10, 36:11, 40:21, 43:17, 45:15, 46:13, 48:1, 48:11, 51:16, 52:3, 52:8, 52:12, 53:5, 54:9, 54:18, 57:6, 58:23, 59:19
**ones** [3] - 31:15, 36:18, 48:23
**opened** [1] - 2:1
**opening** [4] - 15:3, 18:7, 18:14, 50:15
**opinion** [1] - 52:19
**opportune** [1] - 54:19

**opportunity** [2] - 15:2, 50:17
**opposed** [1] - 47:5
**opposing** [1] - 51:10
**option** [1] - 44:15
**order** [7] - 7:8, 47:4, 54:7, 54:17, 55:14, 55:18, 57:23
**orders** [2] - 15:23, 16:20
**otherwise** [1] - 59:8
**ourselves** [3] - 9:3, 17:11, 60:1
**outline** [1] - 54:17
**outstanding** [1] - 58:1
**overall** [1] - 53:6
**overrule** [1] - 38:17
**overruled** [1] - 39:9
**owe** [1] - 43:12
**own** [8] - 13:4, 13:6, 14:22, 38:19, 44:21, 55:2, 57:9, 59:1
**owned** [2] - 42:16, 55:11
**owner** [1] - 58:17
**owner's** [1] - 58:17
**owners** [1] - 54:22
**owns** [3] - 25:16, 25:17, 55:3

## P

**p.m** [3] - 32:22, 32:24, 33:16
**PA** [4] - 1:14, 1:17, 1:20, 1:23
**package** [1] - 14:7
**pages** [1] - 4:14
**paid** [1] - 5:19
**pain** [1] - 39:21
**pale** [2] - 53:18, 54:2
**pale-in-comparison** [1] - 53:18
**pandemic** [2] - 4:1, 4:2
**panicking** [2] - 22:15, 23:6
**papers** [3] - 61:14, 61:17, 61:19
**pardon** [1] - 4:16
**parents** [2] - 54:12, 54:15
**PARISI** [4] - 1:12, 2:13, 32:15, 61:25
**Parisi** [2] - 2:14, 7:20
**parse** [1] - 53:14
**part** [1] - 26:16
**parte** [1] - 61:11

**participate** [1] - 39:15
**particular** [3] - 52:16, 53:6, 53:11
**particularly** [3] - 52:2, 53:3, 53:13
**parties** [1] - 56:17
**pass** [1] - 46:6
**passage** [6] - 10:25, 11:9, 18:5, 51:16, 52:8, 60:10
**passport** [3] - 56:2, 56:5, 56:7
**passports** [3] - 54:10, 54:15, 56:1
**past** [1] - 4:9
**pathetic** [1] - 54:2
**patient** [1] - 7:2
**patients** [1] - 39:19
**pay** [7] - 5:13, 45:22, 46:2, 46:4, 46:5, 46:19, 47:4
**payment** [1] - 55:18
**peaceful** [1] - 33:9
**pen** [1] - 51:3
**pending** [1] - 58:17
**Penn** [6] - 25:16, 54:24, 55:21, 55:24, 56:9, 57:3
**PENNSYLVANIA** [2] - 1:2, 1:7
**Pennsylvania** [1] - 1:13
**people** [4] - 6:8, 33:19, 43:21, 56:18
**perfect** [1] - 21:2
**perhaps** [1] - 17:2
**permissible** [1] - 11:25
**permitted** [1] - 57:2
**Persian** [1] - 33:24
**person** [4] - 5:17, 7:8, 14:11, 42:17
**personality** [2] - 16:12, 43:13
**perspective** [2] - 5:3, 19:20
**petition** [3] - 31:19, 31:20, 60:18
**PHILADELPHIA** [1] - 1:7
**Philadelphia** [4] - 1:14, 1:17, 1:20, 1:23
**phone** [18] - 8:18, 8:20, 8:22, 8:23, 9:13, 14:9, 21:14, 33:6, 33:11, 33:19, 34:4, 34:17, 35:12, 35:17, 44:19, 60:1
**physically** [2] - 19:6,

44:25
**physicians** [1] - 13:24
**physics** [1] - 35:7
**pick** [1] - 54:2
**picked** [1] - 16:21
**pickle** [1] - 39:12
**piece** [1] - 18:1
**plan** [1] - 19:16
**play** [7] - 9:12, 31:4, 32:2, 32:9, 32:12, 34:12, 34:13
**played** [1] - 9:16, 32:14, 33:25
**pleas** [1] - 13:15
**pledge** [1] - 43:11
**pledged** [3] - 16:15, 43:8, 58:4
**pledging** [1] - 58:14
**point** [11] - 11:25, 12:10, 12:17, 12:19, 13:19, 13:23, 14:1, 14:15, 18:16, 48:1, 52:9
**pointing** [1] - 52:25
**policies** [1] - 7:5
**political** [1] - 56:4
**portion** [1] - 35:25
**position** [7] - 5:24, 12:3, 14:13, 14:15, 22:7, 50:14, 50:21
**positioning** [1] - 56:8
**possessing** [1] - 56:25
**possession** [7] - 12:12, 12:13, 12:14, 17:1, 17:7, 17:10, 19:5
**possibility** [4] - 24:22, 24:25, 25:1, 25:7
**possibly** [1] - 49:10
**post** [6] - 42:4, 42:7, 42:9, 54:10, 54:15, 54:25
**posted** [3] - 54:22, 55:4
**posting** [5] - 42:22, 55:8, 55:13, 55:17, 58:14
**postpone** [1] - 3:8
**postponing** [1] - 21:21
**potential** [1] - 53:8
**power** [1] - 58:19
**practice** [1] - 5:5
**practicing** [1] - 53:19
**PRATTER** [1] - 1:9
**Pratter** [1] - 54:1

**premise** [1] - 38:19
**premises** [1] - 57:3
**preparation** [2] - 52:18, 54:7
**prepare** [4] - 6:24, 7:9, 52:12, 53:2
**prepared** [2] - 48:2, 54:6
**preparing** [1] - 52:16
**prescribing** [1] - 13:13
**prescriptions** [1] - 13:9
**present** [6] - 14:24, 21:7, 37:14, 50:10, 55:12, 59:6
**presented** [1] - 47:25
**presumably** [2] - 13:5, 59:5
**pretrial** [9] - 2:7, 10:3, 12:16, 49:20, 51:12, 52:4, 54:8, 57:14, 57:15
**PRETRIAL** [2] - 2:19, 57:22
**Pretrial** [8] - 2:20, 55:25, 56:2, 56:6, 56:10, 56:23, 56:24, 57:21
**pretty** [5] - 9:21, 11:6, 12:10, 19:21, 60:10
**previous** [1] - 58:4
**previously** [2] - 12:7, 57:4
**prison** [6] - 6:20, 8:19, 14:2, 24:22, 25:7, 32:8
**Prisons** [1] - 52:13
**problem** [7] - 4:2, 5:7, 17:20, 21:2, 22:21, 23:16, 23:17
**problems** [1] - 6:19
**proceed** [3] - 2:24, 11:11, 30:17
**proceeding** [2] - 40:3, 40:16
**proceedings** [2] - 39:15, 63:10
**process** [4] - 10:4, 12:1, 12:4, 47:15
**produce** [2] - 11:18, 12:15
**produced** [4] - 1:25, 12:15, 17:13, 36:13
**production** [4] - 13:1, 13:3, 19:3, 53:7
**productive** [1] - 31:14
**pronounce** [2] -

9:23, 42:17
    **properties** [6] - 55:3,
55:11, 55:14, 55:18,
58:15
    **property** [16] - 25:16,
25:17, 26:1, 42:9,
42:22, 54:24, 54:25,
55:9, 55:10, 55:15,
55:16, 55:25, 56:9,
56:10, 57:4, 58:19
    **property's** [1] -
42:10
    **proposed** [1] - 42:3
    **protection** [1] - 56:3
    **prove** [4] - 13:12,
15:12, 15:13, 15:21
    **provide** [4] - 36:6,
47:10, 47:19, 58:15
    **provided** [1] - 55:14
    **provisions** [1] -
55:19
    **psychiatrist** [2] -
22:9, 22:17
    **psychology** [1] -
22:9
    **psychology/
psychiatric** [1] - 21:3
    **public** [1] - 45:22
    **pull** [2] - 4:17, 51:25
    **punishment** [1] -
14:16
    **purpose** [2] - 13:13,
14:17
    **purposes** [1] - 58:16
    **put** [13] - 2:25, 5:16,
13:5, 18:2, 18:6, 26:4,
31:16, 31:18, 43:15,
43:17, 46:16, 48:2,
48:3
    **puzzled** [1] - 47:3

## Q

    **QUERNS** [23] - 1:19,
2:17, 7:11, 11:23,
14:3, 14:6, 19:3,
19:10, 32:11, 32:20,
32:22, 32:25, 34:6,
34:12, 36:5, 36:10,
36:13, 36:15, 47:7,
47:10, 47:13, 57:18,
61:18
    **Querns** [15] - 2:17,
2:22, 3:12, 3:14, 3:21,
3:23, 3:25, 7:10,
11:12, 11:22, 16:14,
17:1, 49:5, 50:4, 61:2
    **questions** [12] -
23:14, 28:6, 29:20,

29:21, 37:24, 38:23,
49:6, 49:8, 50:23,
52:9, 57:16, 57:22
    **quite** [3] - 28:9,
34:16, 51:23
    **quote** [1] - 52:3

## R

    **raise** [1] - 20:1
    **Ramos** [1] - 31:23
    **randomly** [1] - 32:11
    **ranges** [1] - 14:4
    **rather** [1] - 53:6
    **Razzaghi** [3] - 42:18,
42:24, 55:12
    **Razzaghis** [2] -
42:23
    **reach** [2] - 7:16,
56:20
    **reached** [2] - 49:19,
50:3
    **reaching** [1] - 16:1
    **read** [3] - 41:12,
49:2, 49:3
    **reading** [4] - 3:23,
41:14, 41:15, 51:7
    **ready** [12] - 8:8, 8:9,
8:11, 8:13, 8:14, 8:16,
11:15, 11:16, 11:18,
11:19
    **real** [1] - 55:11
    **realistic** [1] - 52:14
    **really** [29] - 5:7,
10:25, 15:7, 16:24,
21:13, 21:15, 21:23,
22:1, 22:12, 23:2,
23:4, 23:6, 23:21,
24:9, 24:10, 25:1,
26:19, 28:19, 28:22,
43:24, 44:12, 45:20,
47:19, 47:24, 50:2,
50:5, 50:19
    **reason** [6] - 5:15,
35:20, 46:15, 49:13,
49:20, 50:24
    **reasons** [1] - 51:11
    **receive** [1] - 7:13
    **received** [8] - 3:14,
3:22, 7:1, 8:18, 9:6,
9:8, 55:5, 57:11
    **recent** [1] - 13:2
    **recognize** [1] - 25:6
    **recognized** [1] -
17:11
    **recommend** [2] -
23:23, 59:18
    **record** [8] - 2:25, 7:3,
9:2, 20:5, 30:6, 32:16,

33:17, 63:10
    **recorded** [6] - 8:23,
8:25, 9:4, 9:5, 13:6,
14:10
    **recording** [2] -
32:14, 33:25
    **recordings** [5] - 4:6,
5:2, 5:5, 5:6, 32:2
    **records** [2] - 53:3,
53:11
    **RECROSS** [1] - 63:3
    **recuse** [1] - 12:20
    **red** [2] - 15:18, 51:3
    **REDIRECT** [1] - 63:3
    **redirect** [3] - 25:13,
45:14, 45:16
    **reference** [1] - 10:17
    **referenced** [1] - 14:8
    **refrain** [1] - 56:25
    **regarding** [1] - 33:7
    **regardless** [1] - 13:4
    **regular** [1] - 56:24
    **relate** [1] - 4:15
    **related** [1] - 12:23
    **relation** [1] - 14:17
    **relationship** [1] -
31:3
    **release** [8] - 2:7,
12:4, 42:3, 46:19,
51:12, 52:4, 54:8,
57:14
    **released** [4] - 55:7,
55:20, 57:11, 57:13
    **reluctant** [1] - 54:7
    **remain** [2] - 20:1,
51:13
    **remained** [1] - 47:13
    **remember** [1] - 16:3
    **remind** [2] - 15:24,
40:24
    **reminded** [1] - 3:9
    **remove** [1] - 30:11
    **rental** [2] - 46:10,
46:11
    **repeatedly** [1] - 38:9
    **report** [2] - 15:16,
56:23
    **Reporter** [1] - 1:22,
63:14
    **reporter** [1] - 30:12
    **represent** [1] - 45:25
    **representation** [1] -
36:19
    **represents** [1] -
32:23
    **request** [1] - 16:2
    **requested** [1] - 4:2
    **require** [3] - 12:16,
15:19, 54:9
    **required** [2] - 17:14,

55:12
    **requirement** [1] -
30:9
    **rescheduled** [2] -
22:13, 22:19
    **reservation** [1] - 47:4
    **reside** [1] - 55:20
    **resist** [1] - 61:14
    **resolved** [1] - 24:24
    **resources** [2] - 47:4,
47:6
    **respect** [3] - 7:7,
55:14, 58:1
    **respectfully** [1] -
49:3
    **respective** [1] -
61:14
    **respond** [1] - 40:11
    **responded** [1] - 4:6
    **responsibility** [4] -
11:1, 11:16, 23:19,
53:14
    **responsible** [2] -
10:22, 11:3
    **rest** [2] - 36:6, 46:24
    **result** [4] - 6:14,
29:20, 30:13, 57:13
    **return** [1] - 57:14
    **revenue** [1] - 46:9
    **reviewing** [1] - 17:10
    **revocable** [1] - 25:21
    **revocation** [1] -
57:14
    **rhetorical** [1] - 10:13
    **risk** [10] - 10:14,
14:6, 15:22, 18:6,
18:7, 24:7, 35:14,
40:7, 48:13, 59:21
    **river** [1] - 53:25
    **Road** [4] - 54:24,
55:21, 57:3, 58:2
    **role** [1] - 53:16
    **ROME** [1] - 1:18
    **Rome** [1] - 26:4
    **RPR** [2] - 1:21, 63:14
    **Ruan** [10] - 9:24,
10:9, 12:23, 13:10,
13:17, 15:10, 15:18,
52:19
    **rulings** [1] - 18:19
    **run** [2] - 10:3, 43:4

## S

    **sadly** [1] - 51:5
    **safe** [1] - 44:13
    **sanctuary** [1] - 56:3
    **SAT** [2] - 22:2, 22:5
    **satisfactory** [1] -

55:6
    **save** [1] - 51:5
    **savings** [1] - 43:16
    **scared** [1] - 22:14
    **scenario** [1] - 49:19
    **schedule** [1] - 56:24
    **scheduled** [1] - 8:7
    **school** [6] - 24:2,
27:1, 27:11, 27:18,
32:9, 33:10
    **search** [1] - 52:4
    **seat** [2] - 2:3, 20:4
    **second** [2] - 27:22,
43:17
    **seconds** [1] - 32:19
    **see** [13] - 4:17, 5:7,
6:11, 8:4, 18:18,
22:17, 28:7, 28:18,
28:21, 28:23, 54:20,
58:11, 60:21
    **seeing** [1] - 22:9
    **seek** [2] - 56:3, 57:8
    **seem** [2] - 3:24, 48:8
    **segmented** [1] -
53:16
    **segregation** [1] -
53:15
    **semester** [6] - 24:5,
27:8, 27:14, 27:16,
27:17
    **semesters** [1] - 27:9
    **send** [1] - 61:6
    **sending** [1] - 16:1
    **sensitive** [1] - 22:11
    **sent** [5] - 5:18, 7:12,
7:14, 15:25, 48:19
    **sentenced** [1] -
13:25
    **September** [1] -
21:23
    **serious** [3] - 10:7,
13:22
    **seriously** [1] - 53:15
    **served** [2] - 13:22,
14:1
    **SERVICES** [2] - 2:19,
57:22
    **Services** [8] - 2:20,
55:25, 56:2, 56:6,
56:10, 56:23, 56:24,
57:21
    **set** [3] - 41:21, 50:18,
56:24
    **seven** [1] - 12:21
    **severe** [1] - 13:25
    **severity** [1] - 13:21
    **shall** [2] - 55:12,
58:15
    **sharper** [1] - 52:21
    **short** [1] - 12:22

shorthand [1] - 1:25
show [5] - 4:3, 14:8, 14:11, 14:12, 52:10
showing [2] - 35:17, 61:14
shows [1] - 18:17
sick [1] - 35:19
side [2] - 11:1, 40:21
sidebar [4] - 28:7, 28:8, 28:24, 29:19
Sidebar [1] - 29:3
sign [1] - 60:5
significant [7] - 13:22, 14:14, 16:14, 45:23, 46:14, 51:13
significantly [1] - 42:6
silly [1] - 18:3
similar [2] - 13:24, 15:20
similarity [1] - 53:18
similarly [1] - 14:21
simply [1] - 52:14
single [2] - 14:20, 17:25
sister [1] - 23:19
sit [1] - 19:17
sitting [1] - 34:15
situation [5] - 5:14, 8:7, 24:20, 52:2, 60:17
six [1] - 15:15
slang [1] - 17:17
slinging [1] - 51:1
small [1] - 53:18
so-so [1] - 11:13
sometime [1] - 33:13
son [13] - 21:13, 23:16, 23:24, 25:19, 26:18, 26:22, 31:10, 33:20, 35:1, 35:2, 35:3, 35:4
son's [4] - 26:5, 26:6, 26:15, 26:25
soon [2] - 17:9, 61:3
sophomore [1] - 27:21
sorry [6] - 4:17, 7:24, 8:24, 10:1, 17:23, 42:23
sort [2] - 10:21, 53:15
sounds [1] - 47:3
South [4] - 1:16, 42:10, 46:10, 54:24
speaking [4] - 9:13, 16:4, 35:1, 51:22
speaks [1] - 11:12
specific [2] - 22:21, 54:8

specifically [3] - 4:3, 7:15
spell [2] - 20:5, 30:6
spent [1] - 51:8
spits [1] - 52:5
spots [1] - 51:13
spouse [1] - 54:13
spring [1] - 27:18
squabbling [1] - 51:8
stand [3] - 13:5, 19:14, 19:17
standards [1] - 29:16
standing [1] - 20:1
start [5] - 2:10, 6:18, 17:4, 21:22, 39:17
state [2] - 20:5, 30:5, 40:3, 40:16
statement [4] - 15:3, 18:8, 38:20, 55:16
statements [4] - 13:15, 47:2, 47:10, 47:17
STATES [3] - 1:1, 1:3, 1:11
States [5] - 1:13, 2:8, 2:12, 16:19, 39:3
stay [6] - 21:3, 26:19, 26:24, 31:19, 46:17, 46:20
stayed [1] - 21:23
staying [1] - 43:14
step [2] - 29:25, 47:1
still [11] - 4:11, 5:25, 15:12, 15:22, 15:23, 22:19, 26:7, 35:11, 54:5, 57:25
stipulate [1] - 16:8
stipulated [1] - 36:24
stopped [1] - 22:24
straight [1] - 17:4
straightforward [1] - 9:21
street [2] - 6:22, 18:6
Street [6] - 1:14, 1:16, 1:19, 1:23, 55:9, 55:16
strength [5] - 13:1, 13:3, 13:11, 13:20, 15:17
strong [3] - 10:8, 15:9, 31:10
strongly [2] - 30:11, 59:18
studies [2] - 22:1, 22:8
study [2] - 22:7, 22:8
stuff [7] - 5:25, 16:17, 17:16, 18:2, 18:17, 33:8, 46:6
subdivision [1] -

56:4
subject [4] - 56:8, 56:19, 58:2, 58:4
submissions [2] - 50:25, 51:7
submitted [1] - 51:4
suggesting [1] - 52:24
suggests [1] - 19:10
suicide [2] - 22:10, 28:4
suing [1] - 41:7
Suite [2] - 1:14, 1:17
summer [2] - 27:3, 27:6, 27:23
supply [2] - 49:3, 49:7
supposed [5] - 17:14, 17:15, 23:3, 34:16, 53:23
Supreme [1] - 52:19
surpasses [1] - 11:25
surprise [2] - 9:7, 54:4
surrender [2] - 56:1, 56:5
surreptitiously [2] - 16:2, 56:21
swimming [2] - 27:5, 27:6
switched [1] - 12:21
SWORN [2] - 20:3, 30:4
symmetrical [1] - 18:12
system [1] - 56:8

T

tailor [1] - 51:25
tailor-made [1] - 51:25
talks [1] - 23:1
tape [5] - 32:14, 33:25, 35:6, 36:5, 36:6
tapes [5] - 3:23, 31:4, 32:9, 32:11, 48:20
teaching [1] - 27:6
team [2] - 53:11, 53:14
teeth [1] - 4:17
telephone [3] - 21:9, 49:7, 59:16
ten [1] - 32:19
tendered [2] - 55:4, 57:5

term [1] - 23:25
terms [1] - 10:22
testified [4] - 30:20, 35:19, 38:9, 43:24
testify [2] - 3:21, 13:6
testifying [1] - 30:10
testimony [1] - 40:12
THE [203] - 1:1, 1:2, 1:9, 1:11, 2:2, 2:5, 2:19, 2:21, 3:1, 4:15, 4:18, 4:20, 4:23, 6:21, 7:4, 7:7, 7:17, 7:20, 8:1, 9:4, 9:7, 9:10, 9:18, 9:21, 9:25, 10:2, 10:6, 10:11, 10:19, 10:24, 11:6, 11:10, 14:2, 14:5, 14:23, 15:1, 16:5, 17:6, 17:18, 17:20, 17:23, 18:9, 18:12, 18:14, 19:13, 19:16, 19:18, 19:21, 19:23, 20:1, 20:4, 20:6, 20:8, 20:10, 20:11, 20:12, 20:13, 20:18, 22:4, 22:5, 24:14, 25:13, 25:15, 25:17, 25:18, 25:19, 25:20, 25:22, 25:23, 25:25, 26:1, 26:3, 26:7, 26:9, 26:10, 26:13, 26:16, 26:18, 26:21, 26:22, 26:25, 27:2, 27:4, 27:5, 27:7, 27:8, 27:11, 27:12, 27:13, 27:14, 27:16, 27:17, 27:18, 27:19, 27:20, 27:22, 27:23, 27:25, 28:1, 28:3, 28:9, 28:11, 28:15, 28:17, 28:19, 28:22, 28:25, 29:7, 29:9, 29:12, 29:15, 29:20, 29:25, 30:1, 30:3, 30:5, 30:7, 30:9, 30:15, 30:16, 32:18, 32:24, 33:2, 34:1, 34:4, 34:8, 34:14, 34:19, 34:22, 35:1, 35:3, 35:7, 35:10, 35:22, 35:25, 36:8, 36:12, 36:14, 36:16, 36:19, 36:23, 37:1, 37:22, 38:2, 38:4, 38:17, 38:22, 39:9, 40:12, 40:17, 40:20, 40:24, 41:4, 41:11, 41:15, 41:17, 42:1, 44:8, 44:10, 45:14, 47:1, 47:8,

47:12, 47:18, 47:22, 48:4, 48:8, 48:13, 48:16, 48:21, 49:9, 49:13, 49:18, 49:23, 50:7, 50:9, 50:12, 50:16, 50:24, 57:19, 57:21, 57:22, 57:23, 58:6, 58:10, 58:14, 59:2, 59:5, 59:8, 59:13, 59:18, 59:23, 60:2, 60:5, 60:9, 60:13, 60:19, 60:22, 61:1, 61:6, 61:13, 61:20, 62:2
themselves [1] - 12:20
theory [1] - 52:24
therefore [1] - 37:3
they've [1] - 57:5
thinking [3] - 43:17, 45:5, 45:6
thinks [1] - 13:17, 23:18, 48:25, 53:16
third [1] - 53:4
Third [1] - 41:21
thoughts [1] - 9:19
threat [2] - 15:23, 39:25
threaten [1] - 40:2
threatened [4] - 16:18, 16:19, 40:15
threatening [1] - 39:3
three [4] - 3:18, 4:9, 18:25
throw [1] - 53:21
tip [2] - 6:15, 12:8
tipped [1] - 12:7
tips [1] - 12:17
title [9] - 26:5, 54:23, 54:25, 55:2, 55:15, 55:17, 58:15, 58:17
titled [1] - 58:17
today [11] - 5:24, 11:24, 20:9, 24:21, 26:17, 26:20, 37:23, 41:19, 48:3, 49:14, 58:12
together [5] - 49:11, 49:20, 51:18, 54:18, 61:13
took [1] - 18:25
top [1] - 45:23
toward [1] - 12:8
towards [1] - 12:7
track [2] - 38:22, 55:23
transcribe [3] - 8:22, 8:24, 8:25
transcribed [2] -

8:18, 8:20

**Transcript** [1] - 1:25

**transcript** [2] - 61:20, 63:10

**transfer** [1] - 26:5

**translation** [1] - 33:23

**transmissions** [1] - 3:22

**transparent** [1] - 49:10

**travel** [2] - 56:3, 56:7

**treatment** [1] - 57:8

**trees** [1] - 51:5

**trial** [18] - 3:8, 4:10, 6:24, 8:7, 8:9, 12:24, 14:18, 25:4, 45:20, 51:18, 51:20, 52:12, 52:16, 53:9, 53:11, 53:14, 58:18

**trouble** [2] - 51:13, 59:25

**troublesome** [1] - 53:7

**true** [6] - 38:12, 38:13, 39:2, 39:4, 39:14, 54:13

**trust** [11] - 25:17, 25:18, 25:21, 25:24, 26:2, 26:8, 42:10, 42:12, 42:13, 55:1

**try** [4] - 31:20, 46:15, 52:21, 53:13

**trying** [8] - 19:7, 22:16, 23:12, 23:20, 27:25, 40:24, 51:8, 56:20

**turn** [2] - 5:25, 7:23

**turned** [1] - 17:10

**turning** [1] - 15:2

**turns** [2] - 6:5, 58:18

**tweak** [1] - 15:19

**two** [10] - 19:1, 20:22, 21:18, 21:24, 22:1, 27:8, 33:6, 46:1, 52:9

**type** [3] - 46:5, 46:7, 61:4

**typed** [1] - 57:24

**typically** [1] - 58:2

# U

**U.S** [5] - 1:22, 12:20, 19:6, 28:7, 28:23

**um-hum** [2] - 39:21, 40:6

**unattractive** [1] - 53:7

**unavoidable** [1] - 53:9

**under** [8] - 11:25, 12:1, 12:4, 21:24, 22:10, 28:4, 55:13, 55:17

**underscores** [1] - 52:17

**understood** [2] - 57:4, 61:18

**unemployment** [1] - 41:7

**unfortunately** [2] - 21:21, 22:10

**unimaginable** [1] - 45:3

**unique** [3] - 51:6, 51:25, 52:7

**Unit** [2] - 55:9, 55:16

**UNITED** [3] - 1:1, 1:3, 1:11

**United** [5] - 1:13, 2:8, 2:12, 16:18, 39:3

**University** [2] - 24:3, 24:4

**unless** [3] - 19:23, 30:10, 50:22

**unpersuaded** [1] - 51:23

**up** [20] - 3:21, 10:24, 12:24, 14:2, 14:14, 16:22, 19:15, 19:17, 20:20, 23:22, 23:25, 30:16, 42:24, 47:20, 51:3, 54:2, 57:24, 58:16, 59:11, 61:4

**updated** [1] - 31:8

**upset** [2] - 44:19, 44:24

**upstairs** [1] - 41:21

**urge** [1] - 53:10

**Urgent** [1] - 13:13

# V

**vacation** [3] - 46:10, 46:11, 53:24

**vagaries** [1] - 54:12

**Valley** [6] - 25:16, 54:24, 55:21, 55:24, 56:9, 57:3

**various** [1] - 48:9

**vehicle** [1] - 59:23

**verbally** [1] - 61:20

**versus** [1] - 2:8

**via** [1] - 1:25

**victims** [1] - 56:18

**violate** [2] - 37:6, 40:13

**violation** [2] - 57:10, 57:12

**visas** [1] - 56:1

**voice** [1] - 30:16

**voluntary** [1] - 54:13

**vs** [1] - 1:4

**vulnerable** [1] - 30:13

# W

**wait** [1] - 6:10

**wants** [1] - 14:8

**watch** [2] - 22:10, 28:4

**watching** [1] - 26:21

**Wayne** [1] - 55:15

**weapon** [2] - 16:21, 39:24

**weapons** [2] - 57:1, 57:2

**weeks** [3] - 4:9, 21:24

**well-being** [1] - 44:13

**whatnot** [1] - 47:11

**whole** [1] - 43:16

**wife** [13] - 30:20, 31:8, 31:11, 33:7, 33:22, 35:19, 40:15, 44:11, 44:18, 46:15, 54:16, 55:20, 56:5

**willing** [1] - 18:5

**WITNESS** [29] - 20:6, 20:10, 20:12, 22:5, 25:17, 25:19, 25:22, 25:25, 26:3, 26:9, 26:13, 26:18, 26:22, 27:2, 27:5, 27:8, 27:12, 27:14, 27:17, 27:19, 27:22, 27:25, 28:3, 30:1, 30:7, 30:15, 35:3, 39:10, 44:10

**witness** [12] - 6:4, 6:5, 16:1, 16:20, 19:16, 19:17, 24:13, 29:21, 37:25, 40:3, 40:15, 56:21

**witness'** [1] - 38:19

**witnesses** [13] - 2:24, 6:1, 13:5, 13:6, 13:15, 13:19, 15:24, 19:12, 30:10, 30:11, 36:20, 56:17, 56:22

**word** [1] - 8:24

**words** [3] - 5:16, 51:2, 61:21

**works** [1] - 3:1

**world** [2] - 45:4, 45:5

**worried** [1] - 60:7

**wrestling** [1] - 51:14

**write** [2] - 46:5, 46:7

**written** [2] - 50:25, 55:13

# Y

**year** [10] - 21:18, 21:22, 22:3, 26:3, 27:11, 27:20, 27:22, 36:12, 46:11, 46:12

**years** [13] - 3:19, 10:12, 12:14, 14:2, 19:1, 23:5, 31:15, 40:21, 43:15, 46:13, 51:18, 51:20

**yourself** [2] - 39:2, 39:12